1 | Brian L. Davidoff (State Bar No. 102654)
C. John M. Melissinos (State Bar No. 149224)
2 | David Y. Joe (State Bar No. 206507)
Claire E. Shin (State Bar No. 249492)
3 | RUTTER HOBBS & DAVIDOFF
   INCORPORATED
4 | 1901 Avenue of the Stars, Suite 1700
Los Angeles, California 90067
5 | Telephone:  (310) 286-1700
Facsimile:  (310) 286-1728
6 | Email:   bdavidoff@rutterhobbs.com
         jmelissinos@rutterhobbs.com
7 |        djoe@rutterhobbs.com
         cshin@rutterhobbs.com
8 |
[Proposed] General Reorganization Attorneys for
9 | Debtors and Debtors-In-Possession

10 |                    UNITED STATES BANKRUPTCY COURT

11 |                    CENTRAL DISTRICT OF CALIFORNIA

12 |                         LOS ANGELES DIVISION

13 | In re:                              )   Case No.:  2:10-bk-46350-PC
                                        )
14 | P&C POULTRY DISTRIBUTORS, INC.,     )   Chapter 11
                                        )
15 |      Debtor and Debtor-in-Possession. )   **NOTICE OF MOTION AND EMERGENCY
                                        )   MOTION FOR ORDER AUTHORIZING
16 |                                     )   DEBTORS IN POSSESSION TO USE CASH
                                        )   COLLATERAL; MEMORANDUM OF POINTS
17 |                                     )   AND AUTHORITIES IN SUPPORT
                                        )   THEREOF**
18 |                                     )
                                        )   [Declarations of Michael Bennish and Bruce
19 |                                     )   Weinstein in Support of First Day Motions
                                        )   Filed Concurrently Herewith]
20 |                                     )
                                        )   <u>Emergency Hearing</u>
21 |                                     )
                                        )   Date:    TBD
22 |                                     )   Time:    TBD
                                        )   Ctrm:
23 |                                     )            255 E. Temple Street
                                        )            Los Angeles, CA 90012
24 |                                     )
                                        )   [Joint Administration Requested]
25 |                                     )
                                        )
26 | _____ )

27 |

28 |

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

{8313.001-683935.DOC-(7)}     MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL

1  **TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE, THE UNITED**

2  **STATES TRUSTEE, ALL PARTIES-IN-INTEREST HEREIN, AND THEIR RESPECTIVE**

3  **COUNSEL:**

4        **PLEASE TAKE NOTICE** that the Debtors and Debtors-in-Possession P&C Poultry

5  Distributors, Inc. and Custom Processors have filed their Emergency Motion for Order

6  Authorizing Debtors-in-Possession to Use Cash Collateral (the "Motion").  This Motion is

7  based upon these moving papers, the accompanying Memorandum of Points and Authorities,

8  the Declarations of Michael Bennish and Bruce Weinstein in Support of First Day Motions,

9  the records and pleadings in this case, the arguments and representations of counsel, and any

10  oral or documentary evidence presented at or prior to the time of the hearing.

11        **PLEASE TAKE FURTHER NOTICE** that pursuant to Local Bankruptcy Rule 9075-1 any

12  response, written or oral, to the moving papers may be presented before or at the time of the

13  hearing on the Motion.

14        P&C Poultry Distributors, Inc. (the "Company")[1] hereby moves this Court, on an

15  emergency basis, for entry of interim and final orders:  (1) authorizing the Company to use

16  cash collateral of its secured lender, East West Bank (the "Bank") pursuant to section 363(c)

17  of the Bankruptcy Code on an interim  (the "Interim Order") basis, pending a final hearing on

18  the Debtor's permanent use of cash collateral (the "Final Hearing"), in such amounts as are

19  necessary to enable the Company to operate its business in such a way as to avoid immediate

20  and irreparable harm; (2) granting replacement liens and other adequate protections to the

21  Bank as described in this Motion; (3) scheduling and establishing deadlines regarding a Final

22  Hearing; and (4) following the Final Hearing, authorizing the Debtor to use cash collateral in

23  the ordinary course of its business and granting adequate protection to the Bank.

24  ///

25  ///

26  ///

27  ───────────────────
[1] P&C Poultry Distributors, Inc. ("P&C")'s debtor affiliate is Custom Processors, Inc ("Custom").  Custom
28  filed a joinder to this Motion. (P&C and Custom are collectively referred to as the "Company").

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL
{8313.001-683935.DOC-(7)}

1   The Company requires immediate authority to use cash collateral to satisfy its daily

2   obligations and carry on its business operations.  If the Company is not immediately granted

3   authority to use cash collateral on an interim basis pending the Final Hearing, it will be

4   unable to operate its business and its ability to reorganize will be virtually eliminated.

5   Without question, the Company would suffer irreparable harm absent the interim relief

6   requested in this Motion.  Therefore, the Company seeks an order on an emergency basis:

7   (A)   Authorizing the Company to use any and all "cash collateral," as that term is

8   defined in 11 U.S.C. § 363(a), now on hand or hereafter collected (the "Cash Collateral"), in

9   accordance with the 13-Week Budget (the "Budget") attached as Exhibit "C" to the

10   accompanying Declaration of Bruce Weinstein in Support of First Day Motions (the

11   "Weinstein Decl.");

12   (B)   Authorizing a variance of any line item in the Budget by as much as twenty

13   percent (20%);

14   (C)   Finding that the interest of the Bank in the Cash Collateral is adequately

15   protected by (i) that the value of the Company's assets will not decline, if not increase; (ii)

16   the equity in the Company's Business, which exists in excess of the amount owing to the

17   Bank; (iii) the provision of the replacement lien to the Bank; and (iv) the provision of regular

18   cash usage reports and monthly income statements and operating reports to the Bank; and

19   (D)   Scheduling a Final Hearing on the Company's permanent use of cash collateral,

20   and establishing any deadlines in connection therewith.

21                                          Respectfully submitted,

22   DATED:  August 27, 2010              RUTTER HOBBS & DAVIDOFF
                                          INCORPORATED
23

24                                        By    /s/  Brian Davidoff
                                              _____
25                                            BRIAN L. DAVIDOFF
                                              C. JOHN M. MELISSINOS
26                                            DAVID Y. JOE
                                              CLAIRE E. SHIN
27                                            [Proposed] General Reorganization
                                              Attorneys for Debtors and Debtors-In-
28                                            Possession

**RUTTER
HOBBS &
DAVIDOFF**
INCORPORATED
LAWYERS

-3-

# TABLE OF CONTENTS

Page

I.    JURISDICTION AND VENUE .................................................................... 1

II.   BACKGROUND FACTS ............................................................................. 1

A.    Company Overview ........................................................................ 1

    1.    History of the Company ....................................................... 2

    2.    Operations and Competitive Edge ....................................... 2

    3.    Sales History and Growth of the Company .......................... 4

    4.    Current Ownership Structure and Management .................... 5

    5.    The Company's Outstanding Obligations to East West Bank. ................ 6

    6.    The P&C Balance Sheet ....................................................... 7

    7.    The Custom Balance Sheet .................................................. 7

    8.    Adjustments to be Made on the Company Balance Sheet in August 2010 ........................................................................... 8

B.    Events Leading to Chapter 11 Filing .............................................. 9

    1.    Temporary Cash Flow Shortfall in July 2010, Caused in Part by Unexpected Rise in Chicken Price and Dip in Sales. ............... 9

    2.    History and Settlement with Lawrence Wholesale. ............... 9

    3.    Negotiations with East West Bank regarding Financing and Cash Collateral. ..................................................................... 10

C.    The Company's Petitions ............................................................... 11

III.  RELIEF REQUESTED ................................................................................ 11

IV.   ARGUMENT ............................................................................................... 12

A.    Legal Standard Authorizing Use of Cash Collateral ...................... 12

B.    The Bank is Adequately Protected ................................................. 13

    1.    The Assets Securing the Loans Will Not Decrease in Value During the Pendency of the Chapter 11 Cases .................................. 14

    2.    The Bank is Adequately Protected by Other Assets ............. 15

    3.    The Company Also Agrees to Provide a Replacement Lien to the Bank ................................................................................... 16

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL

{8313.001-683935.DOC-(7)}

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

4.    The Company Agrees to Provide Periodic Reports on Use of Cash
Collateral .................................................................................... 17

C.    Emergency/Interim Use of Cash Collateral is Necessary and Appropriate ....... 17

D.    The Budget Is Reasonable and Feasible ........................................................... 18

E.    Information Required by Local Bankruptcy Rule 4001-2 ................................. 19

V.    CONCLUSION ............................................................................................................... 19

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL
{8313.001-683935.DOC-(7)}

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Gen. Elec. Mortgage Corp. v. S. Vill. Inc. (In re S. Vill., Inc.),*
  25 B.R. 987, n.4 (Bankr. D. Utah 1982) ...................................................... 13

*In re Center Wholesale, Inc.,*
  759 F.2d 1440 (9th Cir. 1985) ..................................................................... 17

*In re First S. Sav. Ass'n,*
  820 F.2d 700 (5th Cir. 1987) ....................................................................... 14

*In re Markos Gurnee Partnership,*
  252 B.R. 712 (Bankr. N.D. Ill. 1997) ........................................................... 14

*In re McCombs Properties VI, Ltd.,*
  88 B.R. 261 (Bankr. C.D. Cal. 1988) ............................................................ 14

*In re Mellor,*
  734 F.2d 1396 (9th Cir. 1984) ............................................................... 14, 16

*In re Sullivan Ford Sales,*
  2 B.R. 350, 255 (Bank. D. Me. 1980) ........................................................... 17

*O'Toole, Adequate Protection and Post-Petition Interest in Chapter 11 Proceedings,*
  56 Am. Bankr. L.J. 251 (1982) ..................................................................... 13

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assoc. Ltd.,*
  484 U.S. 365, 108 S.Ct. 626 (1988) ............................................................. 14

## Statutes and Rules

11 U.S.C. § 361 ................................................................................................ 13

11 U.S.C. § 363(c)(3) ...................................................................................... 17

11 U.S.C. § 552(b) ........................................................................................... 19

11 U.S.C. §§ 544 ............................................................................................. 19

11 U.S.C. §§ 545 ............................................................................................. 19

11 U.S.C. §§ 547 ............................................................................................. 19

11 U.S.C. §§ 548 ............................................................................................. 19

11 U.S.C. §§ 549 ............................................................................................. 19

28 U.S.C. §§ 1334 ............................................................................................. 1

28 U.S.C. §§ 1408 ............................................................................................. 1

-iii-

RUTTER
HOBBS ⊠
DAVIDOFF
INCORPORATED
L A W Y E R S

1   28 U.S.C. §§ 1409 .................................................................................... 1

2   28 U.S.C. §§ 157 ...................................................................................... 1

3   Fed. R. Bankr. P. 4001(b)(2) ................................................................ 17

4   Local Bankruptcy Rule 2081-1(a)(9) .................................................... 17

5   Rule 4001 of the Federal Rules of Bankruptcy Procedure ..................... 17

6   Title 11 of the United States Code, Section 105(a) ................................ 1

7   Title 11 of the United States Code, Section 363(b) ................................ 1

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**RUTTER**
**HOBBS ⊠**
**DAVIDOFF**
INCORPORATED
L A W Y E R S

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL

{8313.001-683935.DOC-(7)}

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### JURISDICTION AND VENUE

The Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The venue of the Cases are proper pursuant to 28 U.S.C. §§ 1408 and 1409.

The statutory predicates for the relief requested herein are sections 105(a) and 363(b) of Title 11 of the United States Code (the "Bankruptcy Code").

### II.

### BACKGROUND FACTS

The Background Facts are based on the Declarations of Michael Bennish and Bruce Weinstein in Support of First Day Motions filed concurrently herewith.

**A.      Company Overview**

P&C Poultry Distributors, Inc ("P&C") and its affiliate Custom Processors, Inc. ("Custom"[2] and, collectively, the "Company") are a "further processor"[3] and distributor of processed poultry products operating out of a U.S.D.A.-certified facility located in City of Industry, California.  The Company produces value-added frozen and fresh poultry products for re-sale to major fast food restaurant chains and casual dining services, including CKE Restaurants, Inc. (Carl's Jr., Hardee's), Yum! Brands, Inc. (KFC, Taco Bell), the Carlson Companies (Pickup Stix, T.G.I. Friday's) and Daphne's Greek Cafe.  The Company is a well-regarded, top-tier food supplier with annual sales topping $50 million.

Currently, P&C and Custom each handle different functions relating to the Company's operations.  P&C handles the purchasing of raw materials, warehousing and distribution of finished goods, while Custom performs the processing and manufacturing work for P&C.

---

[2]  Custom has also filed a Voluntary Chapter 11 Petition in the United States Bankruptcy Court for the Central District of California, Bankruptcy Case No. 2:10-bk-46362-BB.  The Debtors' motions authorizing joint administration of the cases under P&C's case number are pending.

[3] The Company produces and sells "further-processed" chicken meat, *i.e.*, meats that have been cut, de-boned, marinated, battered, breaded, partially fried or "par-fried," frozen, or otherwise prepared for cooking by restaurants and other food service establishments.

RUTTER
HOBBS ▣
DAVIDOFF
INCORPORATED
L A W Y E R S

-1-

1.   <u>History of the Company</u>

In 1992, two brothers, Howard Bennish and Stafford Bennish, formed P&C as a poultry brokerage company. Howard's son, Michael Bennish, and Stafford's son, Daniel Bennish, entered the business in the mid-1990s.

Michael Bennish and Daniel Bennish saw opportunities for P&C to buy, process, and sell chicken products directly to customers in the fast food restaurant and casual dining service industries, and began to transition P&C's business accordingly. In order to serve the specialized needs of their customers for high-quality, processed product, they formed Custom which, in 1999, opened its first processing plant, in Long Beach, California. In 1998, Custom started building a second processing plant, in Los Angeles, California, and relocated its operations to that facility in 2000. In 2005, P&C and Custom opened a new 55,000 square-foot facility in City of Industry, California, which includes a state-of-the-art, USDA-certified processing plant. This City of Industry plant is leased by P&C from Chi-Ming Fan, Trustee of the Fan Family Trust Dated 1988, at a rental of approximately $41,800 per month.

In 2008, Custom moved its Los Angeles processing operations to the City of Industry plant and has, since that time, done all of its production there. P&C now uses the Los Angeles location as a warehouse/cold storage facility (the "Los Angeles Facility"). The Los Angeles Facility is owned by an affiliate entity, Sotello Properties, LLC, which is owned by P&C, Michael Bennish, Howard Bennish, Stafford Bennish and Daniel Bennish. P&C rents the Los Angeles Facility from Sotello Properties, LLC at a rental of approximately $30,000 per month. Sotello Properties, LLC has an outstanding loan from East West Bank, and this loan is collateralized by a deed of trust against the Los Angeles Facility.

2.   <u>Operations and Competitive Edge</u>

The Company contracts with suppliers on yearly commitments to purchase part of the raw poultry meat it needs, based on its contracted customer accounts. It also purchases poultry meat on the weekly spot market, depending on the amount of inventory it needs to meet demand.

///

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL
{8313.001-683935.DOC-(7)}

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

1      All raw materials, including boneless/skinless chicken breast meat, boneless/skinless

2  chicken leg and thigh meat, and chicken tenders are brought into the Company's processing

3  facility fresh.  The chicken meat is then cut, sized and/or filleted, and processed to order in

4  compliance with strict sanitation and manufacturing guidelines imposed by U.S.D.A. with the

5  highest level of food safety in mind.  The Company also customizes and formulates

6  marinades proprietary to a specific customer's needs.  The finished products include breaded

7  products and raw marinated products.  Once the Company finishes processing, the finished

8  products are blast frozen, palletized, and then stored in freezers on site or sent to outside

9  cold storage to await shipment to customers.  The City of Industry plant has been approved

10  to process, and does process, chicken 24 hours a day, 7 days a week.  The plant processes up

11  to one million pounds of raw meat on a weekly basis.

12      The Company occupies a unique, unrivaled niche in the marketplace based on a

13  combination of factors.  It is currently the only poultry "further processor" specializing in fast

14  food and casual dining with the credentials and production capabilities it has in the Western

15  half of the United States.  Thus, the Company's nearest competitor is located in Alabama,

16  three (3) days away by truck.  The Company not only provides benefits to customers through

17  its high quality products and food safety accomplishments, but its location allows its

18  customers to save by having to carry less inventory and spend less on freight charges.

19      The Company consistently achieves top food-safety ratings, and its products are

20  approved and certified by the nation's top food distributors, including Yum! Brands, Inc.

21  (KFC, Taco Bell, Pizza Hut, Wingstreet, Long John Silver, and A&W Restaurants), Sysco

22  Corporation, Brinker International, Inc. (Chili's Grill & Bar, Maggiano's Little Italy), CKE

23  Restaurants, Inc. (Carl's Jr., Hardee's, Green Burrito, and Red Burrito) and AFC Enterprises

24  (Popeye's Chicken & Biscuits).  The combination of the high quality products and high food

25  safety ratings from some of the most reputable companies in the industry, together with the

26  Company's first-rate production capabilities and its advantageous geographical location,

27  allows the Company to stay highly competitive in the marketplace.

28  ///

RUTTER
HOBBS
DAVIDOFF
INCORPORATED
LAWYERS

-3-

3.    <u>Sales History and Growth of the Company</u>

Since 1999, the Company has grown significantly in size and annual revenue. The Company experienced a 50% growth in sales in 2000 and 2001. In 2002, the Company's products were first approved and certified by major fast food and casual dining service establishments (Sysco Corporation and Tricon Global Restaurants, Inc., now known as Yum! Brands, Inc.); in that same year, the Company landed on its first major fast food restaurant chain customer, Tricon. After that, in 2003, the Company began selling its products to KFC (popcorn chicken and chicken strips) and to Rubio's Baja Grill (now known as Rubio's Fresh Mexican Grill). In 2004, the Company entered into an expanded supply contract with KFC to cover the entire Western region.

By September 2008, the new City of Industry production facility was operating at its top efficiency level. In the same year, the Company procured new customer accounts with Chili's Grill & Bar, Popeye's Chicken & Biscuits and Long John Silver's, in addition to KFC and Rubio's Baja Grill. In 2009, the Company's sales were over $47 million.

In January 2010, P&C's sales dipped to $2.9 million per month ($34.8 million per year), primarily due to a change in sales strategies of its largest customer, KFC. KFC started selling "grilled menu" items which P&C did not and does not supply to it. Profitability also suffered because the price of raw poultry meat unexpectedly rose to all time high in 7 years in the first half of 2010 (about 30% increase from the average price during the last 5 years) partly due to the heat wave that swept the Southern states.

Nevertheless, by June 2010, the Company's sales had risen by over 250% to $7.7 million for the month, in part due to new customer contracts with Carlson Companies, which operates the T.G.I. Friday's and Pickup Stix chains, and CKE Restaurants, Inc., which operates the Hardee's chain, and an updated contract with Yum! Brands, Inc. Also, starting in May 2010, despite the introduction of its "grilled menu," KFC re-shifted its marketing efforts on selling fried items such as Extra Crispy Chicken Strips and Popcorn Chicken, a large part of which was and is supplied by the Company. Sales for January through July 2010 were $27 million. Attached as Exhibit "A" to the Weinstein Decl. is a draft copy of the Company's

RUTTER
HOBBS ▨
DAVIDOFF
INCORPORATED
LAWYERS

-4-

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL
{8313.001-683935.DOC-(7)}

1  combined statement of operations for the period January 1, 2010 to July 31, 2010.  The

2  Company expects further strong sales growth with additional business from CKE Restaurants,

3  Inc. and Yum! Brands, Inc. coming in the third and fourth quarters of 2010.  Profitability will

4  also return as the price of the raw materials is expected to retreat dramatically within the

5  next 4 weeks.

6        4.   <u>Current Ownership Structure and Management</u>

7        P&C and Custom are managed and directed by:

8        A.   Michael Bennish, Chief Executive Officer and Chairman of the Board of

9  Directors of both companies, who handles all purchasing and sales, and oversees the general

10  operations and financial affairs;

11        B.   Daniel Bennish, Vice President and Board member of both companies,

12  who oversees production schedules and shipping operations;

13        C.   Howard Bennish, Secretary and Board member;

14        D.   Stafford Bennish, Vice President and Board member; and

15        E.   Bruce Weinstein of BDW and Company, Inc. who is the Chief

16  Restructuring Officer, since the Company's bankruptcy filing.  In the second quarter of 2010,

17  P&C engaged Bruce Weinstein of BDW and Company, Inc., a corporate turnaround

18  consultant, to assist Michael Bennish with management of the Company's financial affairs so

19  that Michael Bennish could allocate more of his time and skill to rebuilding the Company's

20  sales. As of the Petition Date (defined below), Bruce Weinstein is employed by the Company

21  as Chief Restructuring Officer and will be overseeing the financial affairs and management of

22  the Company.

23       Since 2000, Michael Bennish, Daniel Bennish, Howard Bennish and Stafford Bennish

24  (collectively, the "Bennishes") have each owned 25% of P&C's corporate shares, and 25% of

25  Custom's corporate shares, and thus P&C and Custom are each owned by the same four

26  individuals.

27  ///

28  ///

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

{8313.001-683935.DOC-(7)}

-5-

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL

5.    <u>The Company's Outstanding Obligations to East West Bank</u>

East West Bank (the "Bank") extended a commercial term loan (the "Term Loan" (Loan No. 2003087)) and revolving line of credit (the "Line of Credit Loan" (Loan No. 2003082)) in or about July 2006 (collectively, the "Loans") to P&C, originally in the principal amount of $5 million for each Loan. The principal amount of the Line of Credit Loan was later increased to $5.5 million. The Line of Credit Loan is guaranteed by each and all of the Bennishes, the Bennish Family Trust dated July 3, 1997, Stafford B. Bennish and Pamela R. Bennish Living Trust dated February 12, 1987 as Amended and Restated, Custom, Falkirk Sales Corporation, and Sotello Properties, LLC. The Term Loan is scheduled to mature on August 1, 2011. The Term Loan is also guaranteed by the same individual and entity guarantors guaranteeing the Line of Credit Loan. The term Loan is also collateralized by a deed of trust against the Los Angeles Facility owned by Sotello Properties and the Loans (including the Term Loan) were and are secured by what the Company understands to be duly-perfected first priority security interests in substantially all of the assets of P&C. The Loans require daily, weekly and monthly financial reporting as well as compliance with financial, affirmative, and negative covenants. As such, the cash held by the Company is arguably the collateral of the Bank (collectively the "Cash Collateral").

Historically, and as required by the Line of Credit Loan, the Bank made advances to the Company based on the Company's existing borrowing base at the time, for the Company to cover its operating expenses and purchase raw materials. The Company's ability to receive advances under this arrangement is determined using a formula based on eligible assets (borrowing base). Upon request of the Company for loan advances, pursuant to this formula, the Bank wired corresponding amounts to the Company.

The interest rate under the Loans are subject to change from time to time based on changes in an independent index (Wall Street Journal Prime Rate), but was about 8.75% per annum at the time the Loans were made.

///

///

RUTTER
HOBBS
DAVIDOFF
INCORPORATED
LAWYERS

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL
{8313.001-683935.DOC-(7)}

1        The Line of Credit Loan matured in July 2010.  Although for a certain time the Bank

2  was willing to continue to make advances on account of the Loans, the Bank has indicated

3  that it will no longer do so.

4        Currently, there is approximately $5,513,371 owed on account of the Line of Credit

5  Loan and approximately $3,310,846 owed on account of the Term Loan.

6      6.   The P&C Balance Sheet

7        As of July 31, 2010, the Company's assets based on it unaudited balance-sheet,

8  totaled approximately $16.5 million.  Of this amount, P&C held, on a book value basis,

9  approximately $6.1 million inventories; $3.0 million in accounts receivable; $5.6 million

10  fixed assets (including machinery and equipment), net of depreciation; and $1.9 million

11  loans receivable.[4]

12        As of July 31, 2010, P&C's unaudited balance-sheet liabilities totaled approximately

13  $27.7 million, about $19.5 million of which was current liabilities.  The current liabilities

14  included about $5.8 million outstanding under the Line of Credit Loan owing to the Bank;

15  approximately $1.1 million current portion of the repayment owing under the Term Loan;

16  and $12.4 million accounts payable and accrued expenses.

17      7.   The Custom Balance Sheet

18        Custom does not have any significant assets and liabilities.  The Company has

19  always maintained a consolidated balance sheet for both P&C and Custom combined.

20  Custom's liabilities include contingent accounts payable to Lawrence Wholesale in the

21  approximate amount of $2,335,966.30.  A true and correct copy of the Consolidated Balance

22  Sheet as of July 31, 2010 is attached is Exhibit "B" to the Weinstein Decl.

23  ///

24  ///

25  ///

26

27

28

[4] The loans receivables include loans made to the Bennishes but these are more than offset by loans payable to the Bennishes, outstanding amount of which is approximately $4.5 million.  Those loans payable represent money loaned by the Bennishes to the Company for its operations.

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL
{8313.001-683935.DOC-(7)}

8.     <u>Adjustments to be Made on the Company Balance Sheet in August 2010</u>

         The Company has not closed its books for August 2010, but the Company estimates that by the end of the month, there will be a large reduction in its inventory from approximately $6 million to approximately $1 million, as a result of shipping out finished products to customers but not being able to purchase additional raw materials (for the reasons explained below).  Additionally, the Company anticipates that there will be a considerable discrepancy between the reduction in inventory and the amount reflected in accounts receivable, as a result of selling significant portions of its products to KFC, one of its largest customers, at a significantly reduced price.  During August 2010 the Company entered into a one-time deal with KFC to sell a large portion of its finished products at a significantly reduced price (as much as by 40% from the previous, normal price).  The Company needed to do this in order to accommodate the customer's demand level in the high commodity price market.  The prices at which these finished products are sold are as much as 65% below the Company's production cost.

        The value of inventory recorded on the Company's books represents the production cost (*i.e.*, cost of raw meat plus costs associated with further-processing).  Due to the record high price of raw poultry meat during the first half of 2010, the Company's inventories were booked at the high cost of purchase to the Company (plus processing).  However, as a result of the one-time KFC transaction, along with the highest commodity prices in 7 years, the accounts receivable will not reflect much of the reduction in the inventory.

         After these adjustments, at the end of August 2010, the Company's current assets will be approximately $3.3 million, including about $1million inventories and $2.3 million accounts receivable, plus  $5.6 million fixed assets (including machinery and equipment), net of depreciation, making the total assets of the Company securing the Loans of about $8.9 million.

/// 

///

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

-8-

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL
{8313.001-683935.DOC-(7)}

**B.      Events Leading to Chapter 11 Filing**

       1.      Temporary Cash Flow Shortfall in July 2010, Caused in Part by
Unexpected Rise in Chicken Price and Dip in Sales

             As discussed above, sales dipped in early 2010, but they have increased strongly in May and June.  To accommodate the increased sales, the Company correspondingly increased its purchases of poultry meat.  However, an unanticipated reduction in sales in July led to what the Company believes is a short-term cash shortfall staring in July 2010.  Furthermore, a sudden, unexpected increase in the price of raw poultry meat to a record high (in 7 years) during the first half of 2010 contributed significantly to this shortfall, as well.

       2.      History and Settlement with Lawrence Wholesale

             During approximately the last ten (10) months, the Company purchased most of its raw chicken meat from a single supplier, Lawrence Wholesale, LLC ("Lawrence Wholesale").  However, in July 2010, the Company was unable to make timely payments to Lawrence Wholesale.  As of July 20, 2010, the Company owed Lawrence Wholesale about $12 million for meat delivered by Lawrence Wholesale from October 2009 to July 20, 2010.

         In late July 2010, Lawrence Wholesale demanded that P&C fully pay all of its outstanding obligations to it, or it would initiate a lawsuit against P&C and its guarantors and possibly seek a writ of attachment to attach the assets of the Company. The Company entered into negotiations with Lawrence to establish a payment program.  However on August 6, 2010, Lawrence Wholesale commenced an action in the Los Angeles Superior Court styled, *Lawrence Wholesale, LLC v. P&C Poultry Distributors, Inc., et al.*, Case No. BC 443239 (the "Superior Court Action"), against P&C and the Bennishes.  Lawrence Wholesale alleges that P&C breached contracts for the purchase of chicken, and seeks damages in the amount of $12,010,740.  The parties engaged in further negotiations to settle the matter.  On or about August 16, 2010, Lawrence Wholesale and the Company reached a mutual agreement on most of the essential terms of a settlement agreement.  However, the settlement was contingent on the approval of the Bank, whose approval was not received.

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

{8313.001-683935.DOC-(7)}

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL

3.  **Negotiations with East West Bank regarding Financing and Cash
Collateral**

In addition to its discussions with Lawrence Wholesale, the Company engaged in negotiations with the Bank for a new infusion of working capital necessary for the Company to overcome its short-term cash-flow difficulties and return to profitability. However, the Company and the Bank were unable to agree on a plan for additional advances by the Bank.

Furthermore, beginning in the week of August 16, 2010, the Bank stopped wiring advances, required for the Company to purchase raw materials to fulfill customers' orders, while continuing to receive the daily deposits of cash receipts from the Company's lockbox in satisfaction of the Loan. Consequently, it became extremely difficult for the Company to continue to operate. In order to survive, the Company has since August 19, 2010 collected and retained payments from customers. As of August 25, 2010 the Company holds $817,920.30 in checks received from customers which have not been deposited into the lockbox, although the Bank has received $62,362.20 through the lockbox collections since August 22, 2010.

The Company needs immediate access to cash, including the checks from customers it is now holding. Currently, due to the Bank's cease of advancing funds, bills are going unpaid and vendors are not shipping. The most crucial need is in paying the payroll. Employee payroll for Custom due on August 20, 2010 for the stub period from August 1 through 7, 2010 in the approximate amount of $117,000 was advanced by ADP, but the payment to ADP by the Company was not cleared by the Bank. Since August 16, 2010, approximately $766,000 of checks were rejected by the Bank in addition to the payroll of $117,000.

For about two and a half weeks preceding the Petition Date, the Company engaged in negotiations with the Bank to reach an agreement regarding the use of the Cash Collateral. However, as of the Petition Date, no such agreement has been reached.

Thus, to forestall a potentially devastating interruption in the Company's cash flow and resulting damage to its operations, and to preserve the jobs of over 600 workers and the

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL
{8313.001-683935.DOC-(7)}

1    value of the Company for all its stakeholders, P&C and Custom, through their officers and

2    directors, determined to file voluntary Chapter 11 Petitions.

3    **C.    The Company's Petitions**

4        P&C and Custom commenced their chapter 11 cases on August 27, 2010 (the "Petition

5    Date") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in

6    order to protect the value of their assets and pursue a strategy that will permit them to

7    reorganize for the benefit of all stakeholders.  As noted in footnote 2, the Company has

8    requested joint administration of the P&C's and Custom's chapter 11 cases under P&C's

9    bankruptcy case number.

10                                    **III.**

11                            **RELIEF REQUESTED**

12        The Company seeks an order authorizing it to use the Cash Collateral of the Bank in

13    the ordinary course of its operations, subject to a twenty percent (20%) individual variance

14    in any line item, in accordance with the Budget attached to Weinstein Decl. as Exhibit "C".

15    The Budget sets forth the Company's estimated cash receipts and operating expenses for the

16    period of time from the week of August 27, 2010 through November 19, 2010 (the "Budget

17    Period").  As set forth on the Budget, the Company will generate sufficient receipts to cover

18    its operating expenses during the Budget Period.

19        In order to preserve the value of the Company's business (the "Business"), the

20    Company seeks an order, on an emergency basis, authorizing the use of the Cash Collateral

21    on an interim basis until such time as the Court approves the use of the Cash Collateral on a

22    permanent basis.  As set forth below, because the value of the Business exceeds the amount

23    owing on the Loans, and because the assets securing the Loans as of the commencement of

24    the cases will not later decrease in value, the Bank will at all times remain adequately

25    protected.

26    ///

27    ///

28    ///

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

{8313.001-683935.DOC-(7)}

-11-

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL

## IV.

## ARGUMENT

## THE USE OF CASH COLLATERAL, IF ANY, FOR OPERATIONS SHOULD BE AUTHORIZED IN ACCORDANCE WITH THE BUDGET

### A.    Legal Standard Authorizing Use of Cash Collateral

A debtor-in-possession's use of property of the estate is governed by Section 363 of the Bankruptcy Code.  Section 363(c)(1) provides, in pertinent part, that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the trustee [or debtor-in-possession] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or hearing, and may use property of the estate in the ordinary course of business without notice or hearing.

The Bankruptcy Code establishes a special requirement, however, regarding a debtor-in-possession's use of "cash collateral," defined as:

> . . . cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest  and includes the proceeds, products, offspring, rents, or profits of property. . .

11 U.S.C § 363(a).

In this case, at least some of the proceeds of the Company's operations constitute "cash collateral," as that term is defined in the Bankruptcy Code because the Bank holds security interests in all of the Company's assets, including cash receipts generated by selling its products.

Section 363(c)(2) permits a debtor-in-possession to use, sell or lease "cash collateral" under subsection (c)(1) only if either of two alternative circumstances exists:

> (A)    each entity that has an interest in such cash collateral consents; or

///

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL

{8313.001-683935.DOC-(7)}

RUTTER
HOBBS ☒
DAVIDOFF
INCORPORATED
L A W Y E R S

1                       (B)     the court, after notice and a hearing, authorizes
such use, sale, or lease in accordance with the provisions of this
2    section.

3

4    11 U.S.C. § 363(c)(2).

5        If the secured creditor does not consent to the use of its cash collateral, the court may

6    authorize a debtor-in-possession to use the cash collateral even over the creditor's objection

7    under section 363(c)(2)(B) if the court determines that the creditor is "adequately

8    protected." 11 U.S.C. §§ 361, 363(c), (e).

9    **B.**    **The Bank is Adequately Protected**

10        Section 361 of the Bankruptcy Code provides that:

11            [W]hen adequate protection is required ... of an interest of
an entity in property, such adequate protection may be provided
12    by —
             (1) requiring the trustee to make a cash payment or
13    periodic cash payments to such entity, to the extent that the . . .
use . . . under section 363 of this title . . . results in a decrease in
14    the value of such entity's interest in such properly;
             (2) providing to such entity an additional or
15    replacement lien to the extent that such . . . use . . . results in a
decrease in the value of such entity's interest in such property; or
16             (3)   granting such other relief . . . as will result in the
17    realization by such entity of the indubitable equivalent in such
entity's interest in such property.
18

19

20    11 U.S.C. § 361.

21        Neither Section 361 nor any other provision of the Bankruptcy Code defines the

22    nature and extent of the "interest in property" of which a secured creditor is entitled to

23    adequate protection under section 361. However, the statute plainly provides that a

24    qualifying interest demands protection only to the extent that the use of the creditor's

25    collateral will result in a decrease in "the value of such entity's interest in such property." 11

26    U.S.C. § 361. *See also Gen. Elec. Mortgage Corp. v. S. Vill. Inc. (In re S. Vill., Inc.)*, 25 B.R. 987,

27    989-90 & n.4 (Bankr. D. Utah 1982); *O'Toole, Adequate Protection and Post-Petition Interest in

28    Chapter 11 Proceedings*, 56 Am. Bankr. L.J. 251, 263 (1982).

RUTTER
HOBBS ☒
DAVIDOFF
INCORPORATED
L A W Y E R S

-13-

1      The phrase "value of such entity's interest," although not defined in the Bankruptcy

2  Code, was addressed by the Supreme Court in the landmark decision, *United Sav. Ass'n of*

3  *Tex. v. Timbers of Inwood Forest Assoc. Ltd.,* 484 U.S. 365, 108 S.Ct. 626 (1988). For the

4  meaning of "value of such entity's interest," the Supreme Court was guided by section

5  506(a), which defines a creditor's allowed secured claim:

6          The phrase "value of such creditor's interest" in §506(a)
means "the value of the collateral." H.R. Rep. No. 950-595, pp.

7          181, 356 (1977); *see also* S. Rep. No. 95-989, p. 68 (1978), U.S.
Code Cong. & Admin. News, 1978 pp. 5787, 5854, 6141, 6312.

8          We think the phrase "value of such entity's interest" in §361(1)

9          and (2), when applied to secured creditors, means the same.

10  *Id.* at 630.

11    *Timbers* teaches that a secured creditor is entitled to "adequate protection" only

12  against diminution in the value of the collateral securing the creditor's allowed secured claim.

13  Under *Timbers,* therefore, where the "value of the collateral" is not diminishing by its use,

14  sale, or lease, the creditor's interest is adequately protected. This conclusion flows directly

15  from the equivalency of "value of such entity's interests" with "value of the collateral."

16      The entitlement to and measure of the protection required is therefore determined by

17  the extent of the anticipated or actual decrease, if any, in the value of the secured creditor's

18  collateral during the course of the bankruptcy case. *See In re First S. Sav. Ass'n, 820 F.2d 700,*

19  *710 (5th Cir. 1987); In re Mellor,* 734 F.2d 1396, 1400 (9th Cir. 1984). Said another way, it

20  is "intended by the Bankruptcy Code only to assure that a secured creditor, during the

21  pendency of a bankruptcy case, does not suffer a loss in the value of its interest in property of

22  the bankruptcy estate." *In re Markos Gurnee Partnership,* 252 B.R. 712, 716 (Bankr. N.D. Ill.

23  1997); *In re McCombs Properties VI, Ltd.,* 88 B.R. 261 (Bankr. C.D. Cal. 1988).

24      1.    <u>The Assets Securing the Loans Will Not Decrease in Value During the</u>

25               <u>Pendency of the Chapter 11 Cases</u>

26      As stated above, the Company will have about $8.9 million in assets as of the

27  Petition Date. Based on the projections made by the Company, the value of the Company's

28  assets will increase through the Budget Period. The inventory will stay more or less

-14-

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

{8313.001-683935.DOC-(7)}

1  consistently at just below the $1 million level, while the accounts receivable will increase

2  from $2.3 million to about $5 million by November 19, 2010.  This will be made possible by

3  the upcoming drop in the price of raw materials and long-term additional contracts which

4  would increase the total volume of the Company's revenues by up to 100%.  The Company

5  has recently secured new agreements for orders for additional products worth $600,000 per

6  week from CKE Restaurants, Inc. to supply Carl's Jr.'s new line of menu items being launched

7  in September, 2010.  The enterprise value of the Company will accordingly increase,

8  although it is not part of the formula used by the Bank to calculate the borrowing base.  In

9  any case, the assets securing the Bank's Loans will not decrease, if not increase.  Because

10  there will not be any diminution in the value of the Bank's collateral during the Budget

11  Period, the Bank is adequately protected under the meaning of section 361 of the Bankruptcy

12  Code.

13      If the Company is unable to use the Cash Collateral, it will not be able to continue its

14  operations, and its going concern value will be lost or substantially devalued.  The increase or

15  preservation of the value of the assets necessitates the Company's use of the Cash Collateral

16  to operate.  Put in another word, the Bank's interests can only be adequately provided by the

17  Company's use of the Cash Collateral.

18      2.    The Bank is Adequately Protected by Other Assets

19      Even assuming, *arguendo*, that the value of the Business might decline during

20  the Budget Period, the Bank is still adequately protected by a substantial "equity cushion."

21  As described in the Weinstein Decl., ¶ 29, the going concern value of the Business, which is in

22  the range of $28 million to $30 million, less trade debt and Bank debt, far exceeds the

23  amount owing under the Loans.

24      Furthermore, the Term Loan is also secured by the real property owned by an affiliate

25  of the Company, Sotello Properties, LLC. at which the Los Angeles Facility of the Company is

26  located.  The Bank recently appraised that property at about $4.9 million.  As noted above,

27  Sotello owes to the Bank as separate secured loan with a balance owing of $3,759,610.03,

28  leaving in excess of $1.1 million equity in this property to further secure the Term Loan.  In

RUTTER
HOBBS
DAVIDOFF
INCORPORATED
LAWYERS

-15-

{8313.001-683935.DOC-(7)}

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL

1   addition, as noted above the Loans are guaranteed by each and all of the Bennishes, the

2   Bennish Family Trust dated July 3, 1997, Stafford B. Bennish and Pamela R. Bennish Living

3   Trust dated February 12, 1987 as Amended and Restated, Custom, Falkirk Sales Corporation

4   and Sotello Properties, LLC, and further secured by a deed of trust on the residences of

5   Howard Bennish and Stafford Bennish. Therefore, there is a substantial "equity cushion" in

6   the Bank's collateral which also provides adequate protection to the Bank in the event of any

7   reduction in the value of the collateral during the pendency of the cases. *See In re Mellor*,

8   734 F.2d 1396 (9th Cir. 1984) (reasonable equity cushion can protect secured creditor even

9   where value of collateral might be declining).

10        3.    <u>The Company Also Agrees to Provide a Replacement Lien to the Bank</u>

11        While the Company contends that the Bank is adequately protected, as further

12   adequate protection for post-petition decrease in the value of the Bank's pre-petition

13   collateral, if any, the Company agrees to grant the Bank a lien and security interest (the

14   "Replacement Lien") against the Company's post-petition assets as well as the proceeds and

15   products thereof; provided, however, that the Replacement Lien shall only be valid and

16   enforceable to the same extent, against the same type of property and in the same priority as

17   the security interests and liens that the Bank enjoyed immediately prior to the Petition Date.

18   The Replacement Lien shall be recognized only to the extent of the post-petition diminution

19   in value of the Bank's pre-petition collateral resulting from the Company's use of the Cash

20   Collateral during these Chapter 11 cases. The foregoing notwithstanding, the Replacement

21   Lien shall not attach to claims, rights and causes of action arising under Title 5 of the

22   Bankruptcy Code.

23        The Company is in the process of negotiating further use of the Cash Collateral with

24   the Bank, but the granting of the Replacement Liens more than adequately protects the

25   Bank's interests in the Cash Collateral during the Budget Period.

26   ///

27   ///

28   ///

RUTTER
HOBBS ▣
DAVIDOFF
INCORPORATED
LAWYERS

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL
{8313.001-683935.DOC-(7)}

4. <u>The Company Agrees to Provide Periodic Reports on Use of Cash</u>
<u>Collateral</u>

In addition to the above, the Company proposes to provide periodic cash collateral usage reports and monthly income statements and operating reports to the Bank, under such terms as mutually agreed upon by the Company and the Bank.

**C. <u>Emergency/Interim Use of Cash Collateral is Necessary and Appropriate</u>**

In enacting section 363(c)(3), Congress recognized that preliminary hearings on cash collateral would frequently be held on an emergency basis by stating therein that such hearing ". . . shall be scheduled in accordance with the needs of the debtor." 11 U.S.C. § 363(c)(3). The courts have also recognized that emergency relief on the use of cash collateral is necessary after a case is filed.

> We realize that "in certain circumstances the entire reorganization effort may be thwarted if emergency relief is withheld" and that reorganization under the Bankruptcy Code "is a perilous process, seldom more so than at the outset of the proceedings when the debtor is often without sufficient cash flow to fund essential business operations. . . ." It is for this very reason that Congress specified that hearings concerning the use of cash collateral "shall be schedule in accordance with the needs of the debtor."

*In re Center Wholesale, Inc.*, 759 F.2d 1440, 1444 (9th Cir. 1985); *see also In re Sullivan Ford Sales*, 2 B.R. 350, 255 (Bank. D. Me. 1980).

Rule 4001 of the Federal Rules of Bankruptcy Procedure provides:

> The court may commence a final hearing on a motion for authorization to use cash collateral no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a preliminary hearing before such 14 day period expires, but the court may authorize use of only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(b)(2). Local Bankruptcy Rule 2081-1(a)(9) also provides for an expedited consideration of the Motion.

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL
{8313.001-683935.DOC-(7)}

1    The interim relief requested in this Motion is not only appropriate and fully

2  warranted, but it is necessary and essential to avoid immediate and irreparable harm to the

3  Company, its estate and creditors.  The Company needs cash immediately to operate, and in

4  particular, it has a critical need for cash to meet the payroll that is due for over 600 regular,

5  full-time employees on Friday, August 27, 2010.  The authorization to use Cash Collateral

6  pending a Final Hearing will preserve the value of the Business only if authorization is

7  granted immediately and on short notice.  Uninterrupted operations are critical to a

8  successful reorganization.  If there is any interruption in the operations of the Company, the

9  value of the Business will be significantly impaired, to the serious harm and detriment of the

10  Company and its creditors, employees and customers.  Weinstein Decl., ¶¶ 19, 28.

11  **D.    The Budget Is Reasonable and Feasible**

12    The Budget attached as Exhibit "C" to the Weinstein Decl. projects the Company's cash

13  needs over the next thirteen (13) weeks.  This projection was developed by the Company's

14  management based upon current operating data and management's best estimate of future

15  cash needs.  The historical operating results of the Company and the projected industry-wide

16  retreat in raw material prices coupled with a significant amount of additional purchase

17  commitments made by existing customers for the third and fourth quarters of 2010

18  (discussed in the Declaration of Michael Bennish ("Bennish Decl."), ¶¶ 59-60) establish that

19  the Company will generate positive cash flow.  Also, a customer of the Company has

20  indicated that, with Court approval, it would provide an unsecured loan in the amount of $1

21  million to the Company to help it overcome the short term cash flow crunch.  Weinstein

22  Decl., ¶ 24.  Accordingly, the Bank's collateral pool will not be depleted through the Budget

23  Period and continued operations.  To the contrary, the cash assets of the Company will most

24  likely increase through post-petition operations.  Weinstein Decl., ¶¶ 25, 27.

25    All of the expense items in the Budget are the actual and necessary costs of operating

26  the Business that will enable it to continue to manufacture and sell the sufficient amount of

27  high-quality products its customers expect and demand.  Moreover, based on the widely

28  anticipated fall of raw poultry meat prices by approximately 25-30% in the next couple

RUTTER
HOBBS ☒
DAVIDOFF
INCORPORATED
LAWYERS

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL
{8313.001-683935.DOC-(7)}

1    months and additional purchase commitments made by the Company's existing customers,

2    the Company's management is very confident that it will both generate the projected revenue

3    and keep expenses within the parameters set forth in the Budget.  Bennish Decl., ¶¶ 59-60;

4    Weinstein Decl., ¶ 26.

5    **E.    Information Required by Local Bankruptcy Rule 4001-2**

6         The proposed form of order or relief sought in this Motion does not contain any

7    provision that:

8         (1)    Grants cross-collateralization protection, other than a replacement lien or other

9    adequate protection, to the prepetition secured creditors;

10        (2)    Binds the estate or all parties in interest with respect to the validity, perfection,

11   or amount of the secured creditor's prepetition lien or debt or the waiver of claims against

12   the secured creditor;

13        (3)    Waives or limits the estate's rights under 11 U.S.C. § 506(c);

14        (4)    Grants to the prepetition secured creditor liens on the debtor's claims and

15   causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548, or 549;

16        (5)    Deems prepetition secured debt to be postpetition debt or that use postpetition

17   loans from a prepetition secured creditor to pay part or all of that secured creditor's

18   prepetition debt, other than as provided in 11 U.S.C. § 552(b);

19        (6)    Provides disparate treatment for the professionals retained by a creditors'

20   committee from that provided for the professionals retained by the debtor with respect to a

21   professional fee carve out; or

22        (7)    Primes any secured lien.

23                                   **V.**

24                          **CONCLUSION**

25        Based on the foregoing, the Company respectfully requests an order of the Court:

26        (A)    Authorizing the Company to use Cash Collateral in accordance with the Budget

27   attached as Exhibit "C" to the Weinstein Decl.;

28

RUTTER
HOBBS ☒
DAVIDOFF
INCORPORATED
L A W Y E R S

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL

{8313.001-683935.DOC-(7)}

1    (B)    Authorizing the Company to exceed any line item in the Budget by as much as

2    twenty percent (20%);

3    (C)    Finding that the interest of the Bank in the Cash Collateral is adequately

4    protected by (i) that the value of the Company's assets will not decline, if not increase; (ii)

5    the equity in the Company's Business, which exists in excess of the amount owing to the

6    Bank; (iii) the provision of the replacement lien to the Bank; and (iv) the provision of regular

7    cash usage reports and monthly income statements and operating reports to the Bank;

8    (D)    Scheduling a Final Hearing on the Company's permanent use of cash collateral,

9    and establishing any deadlines in connection therewith; and

10    (E)    Such other and further relief as the Court deems just and proper.

11                                              Respectfully submitted,

12    DATED:  August 27, 2010                 RUTTER HOBBS & DAVIDOFF
                                                 INCORPORATED

13

14
                                              By ___/s/ Brian Davidoff___
15                                               BRIAN L. DAVIDOFF
                                                 C. JOHN M. MELISSINOS
16                                               DAVID Y. JOE
                                                 CLAIRE E. SHIN
17                                               [Proposed] General Reorganization
                                                 Attorneys for Debtors and Debtors-In-
18                                               Possession

19

20

21

22

23

24

25

26

27

28

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

-20-

MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL
{8313.001-683935.DOC-(7)}