Brian L. Davidoff (State Bar No. 102654)
C. John M. Melissinos (State Bar No. 149224)
David Y. Joe (State Bar No. 206507)
Claire E. Shin (State Bar No. 249492)
RUTTER HOBBS & DAVIDOFF
  INCORPORATED
1901 Avenue of the Stars, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 286-1700
Facsimile:  (310) 286-1728
Email:  bdavidoff@rutterhobbs.com
        jmelissinos@rutterhobbs.com
        djoe@rutterhobbs.com
        cshin@rutterhobbs.com

[Proposed] General Reorganization Attorneys for
Debtors and Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re: | Case No.:  2:10-BK-46350-PC |
| | |
| P&C POULTRY DISTRIBUTORS, INC., | Chapter 11 |
| | |
| Debtor and Debtor-in-Possession. | **DECLARATION OF MICHAEL BENNISH IN SUPPORT OF FIRST DAY MOTIONS** |
| | |
| | Emergency Hearing |
| | |
| | Date:     TBD |
| | Time:     TBD |
| | Place: |
| | 255 E. Temple Street |
| | Los Angeles, CA 90012 |
| | |
| | [Joint Administration Requested] |

## DECLARATION OF MICHAEL BENNISH

I, Michael Bennish, being fully sworn, hereby declare that the following is true to the best of my knowledge, information and belief:

1.    I am  Chief Executive Officer ("CEO") and Chairman of the Board of Directors of both P&C Poultry Distributors, Inc. ("P&C"), a California corporation, and Custom Processors, Inc. ("Custom"), a California corporation, debtors and debtors-in-possession

-1-

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

DECLARATION OF MICHAEL BENNISH IN SUPPORT OF FIRST DAY MOTIONS____
{8313.001-689305.DOC-(1)}

1  (collectively, the "Company") in the above referenced chapter 11 cases.  I have been

2  responsible for and have overseen the general operations of the Company since the mid

3  1990s and, in my current capacity, I am familiar with the day-to-day operations, business,

4  and financial affairs of the Company.

5          2.    I submit this declaration (the "Declaration") to assist the Court and other

6  parties in interest in understanding the circumstances that compelled the commencement of

7  these chapter 11 cases (the "Chapter 11 Cases") and in support of (i) the Company's

8  voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the

9  "Bankruptcy Code") filed on the date hereof (the "Commencement Date") and (ii) the relief,

10  in the form of motions and applications, that the Company has requested of the Court (the

11  "First Day Motions").

12          3.    Except as otherwise indicated, all facts set forth in this Declaration are based

13  upon my personal knowledge, my discussion with other employees and representatives of the

14  Company, my review of relevant documents, or my opinion based upon my experience and

15  knowledge of the Company's operations and financial condition.  If I were called to testify, I

16  would testify competently to the facts set forth in this Declaration.  I am authorized to submit

17  this declaration on behalf of the Company.

18          4.    This Declaration is intended to provide a summary overview of the Company's

19  business and the Chapter 11 Cases.  Section A provides a description of the Company's

20  business, history, organizational structure, and prepetition indebtedness; Section B explains

21  the circumstances giving rise to the commencement of the Chapter 11 Cases and the Chapter

22  11 Cases; and Section C, under various sub-headings, summarizes the First Day Motions and

23  the relief they seek, which the Company believes is crucial to its successful reorganization.

24  **A.    <u>Company Overview</u>**

25          5.    P&C Poultry Distributors, Inc ("P&C") and its affiliate Custom Processors, Inc.

26  ("Custom"[1]) are a "further processor"[2] and distributor of processed poultry products

27

---

[1] The Debtors' motions authorizing joint administration of the cases under P&C's case number are
pending.

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

DECLARATION OF MICHAEL BENNISH IN SUPPORT OF FIRST DAY MOTIONS____
{8313.001-689305.DOC-(1)}

1  operating out of a U.S.D.A.-certified facility located in City of Industry, California. The

2  Company produces value-added frozen and fresh poultry products for re-sale to major fast

3  food restaurant chains and casual dining services, including CKE Restaurants, Inc. (Carl's Jr.,

4  Hardee's), Yum! Brands, Inc. (KFC, Taco Bell), the Carlson Companies (Pickup Stix, T.G.I.

5  Friday's) and Daphne's Greek Cafe. The Company is a well-regarded, top-tier food supplier

6  with annual sales topping $50 million.

7       6.   Currently, P&C and Custom each handle different functions relating to the

8  Company's operations. P&C handles the purchasing of raw materials, warehousing and

9  distribution of finished goods, while Custom performs the processing and manufacturing

10  work for P&C.

11  History of the Company.

12       7.   In 1992, my father Howard Bennish and my uncle Stafford Bennish formed

13  P&C as a poultry brokerage company. My cousin Daniel Bennish (uncle Stafford's son) and I

14  entered the business in the mid-1990s.

15       8.   Daniel Bennish and I saw opportunities for P&C to buy, process, and sell

16  chicken products directly to customers in the fast food restaurant and casual dining service

17  industries, and began to transition P&C's business accordingly. In order to serve the

18  specialized needs of our customers for high-quality, processed product, we formed Custom

19  which, in 1999, opened its first processing plant, in Long Beach, California. In 1998, Custom

20  started building a second processing plant, in Los Angeles, California, and relocated its

21  operations to that facility in 2000. In 2005, P&C and Custom opened a new 55,000 square-

22  foot facility in City of Industry, California, which includes a state-of-the-art, USDA-certified

23  processing plant. This City of Industry plant is leased by P&C from Chi-Ming Fan, Trustee of

24  the Fan Family Trust Dated 1988, at a rental of approximately $41,800 per month.

25

26

27

28

[2] The Company produces and sells "further-processed" chicken meat, *i.e.*, meats that have been cut, de-boned, marinated, battered, breaded, partially fried or "par-fried," frozen, or otherwise prepared for cooking by restaurants and other food service establishments.

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

DECLARATION OF MICHAEL BENNISH IN SUPPORT OF FIRST DAY MOTIONS____
{8313.001-689305.DOC-(1)}

9.    In 2008, Custom moved its Los Angeles processing operations to the City of Industry plant and has, since that time, done all of its production there. P&C now uses the Los Angeles location as a warehouse/cold storage facility (the "Los Angeles Facility"). The Los Angeles Facility is owned by an affiliate entity, Sotello Properties, LLC, which is owned by P&C, Howard Bennish, Stafford Bennish, Daniel Bennish and me. P&C rents the Los Angeles Facility from Sotello Properties, LLC at a rental of approximately $30,000 per month.

10.    Sotello Properties, LLC has an outstanding loan from East West Bank, and this loan is secured by a deed of trust against the Los Angeles Facility.

Operations and Competitive Edge.

11.    The Company contracts with suppliers on yearly commitments to purchase part of the raw poultry meat it needs, based on its contracted customer accounts. It also purchases poultry meat on the weekly spot market, depending on the amount of inventory it needs to meet demand.

12.    All raw materials, including boneless/skinless chicken breast meat, boneless/skinless chicken leg and thigh meat, and chicken tenders are brought into the Company's processing facility fresh. The chicken meat is then cut, sized and/or filleted, and processed to order in compliance with strict sanitation and manufacturing guidelines imposed by U.S.D.A. with the highest level of food safety in mind. The Company also customizes and formulates marinades proprietary to a specific customer's needs. The finished products include breaded products and raw marinated products. Once the Company finishes processing, the finished products are blast frozen, palletized, and then stored in freezers on site or sent to outside cold storage to await shipment to customers. The City of Industry plant has been approved to process, and does process, chicken 24 hours a day, 7 days a week. The plant processes up to one million pounds of raw meat on a weekly basis.

13.    The Company occupies a unique, unrivaled niche in the marketplace based on a combination of factors. It is currently the only poultry "further processor" specializing in fast food and casual dining with the credentials and production capabilities it has in the Western half of the United States. Thus, the Company's nearest competitor is located in Alabama,

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

-4-

DECLARATION OF MICHAEL BENNISH IN SUPPORT OF FIRST DAY MOTIONS_____
{8313.001-689305.DOC-(1)}

three (3) days away by truck.  The Company not only provides benefits to customers through its high quality products and food safety accomplishments, but its location allows its customers to save by having to carry less inventory and spend less on freight charges.

14.     The Company consistently achieves top food-safety ratings, and its products are approved and certified by the nation's top food distributors, including Yum! Brands, Inc. (KFC, Taco Bell, Pizza Hut, Wingstreet, Long John Silver, and A&W Restaurants), Sysco Corporation, Brinker International, Inc. (Chili's Grill & Bar, Maggiano's Little Italy), CKE Restaurants, Inc. (Carl's Jr., Hardee's, Green Burrito, and Red Burrito) and AFC Enterprises (Popeye's Chicken & Biscuits).  The combination of the high quality products and high food safety ratings from some of the most reputable companies in the industry, together with the Company's first-rate production capabilities and its advantageous geographical location, allows the Company to stay highly competitive in the marketplace.

Sales History and Growth of the Company.

15.     Since 1999, the Company has grown significantly in size and annual revenue. The Company experienced a 50% growth in sales in 2000 and 2001.  In 2002, the Company's products were first approved and certified by major fast food and casual dining service establishments (Sysco Corporation and Tricon Global Restaurants, Inc., now known as Yum! Brands, Inc.); in that same year, the Company landed on its first major fast food restaurant chain customer, Tricon.  After that, in 2003, the Company began selling its products to KFC (Popcorn Chicken and Crispy Chicken Strips) and to Rubio's Baja Grill (now known as Rubio's Fresh Mexican Grill).  In 2004, the Company entered into an expanded supply contract with KFC to cover the entire Western region.

16.     By September 2008, the new City of Industry production facility was operating at its top efficiency level.  In the same year, the Company procured new customer accounts with Chili's Grill & Bar, Popeye's Chicken & Biscuits and Long John Silver's, in addition to KFC and Rubio's Baja Grill.  In 2009, the Company's sales were over $47 million.

17.     In January 2010, P&C's sales dipped to $2.9 million per month ($34.8 million per year), primarily due to a change in sales strategies of its largest customer, KFC.  KFC

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

{8313.001-689305.DOC-(1)}    DECLARATION OF MICHAEL BENNISH IN SUPPORT OF FIRST DAY MOTIONS

1  started selling "grilled menu" items which P&C did not and does not supply to it.  Profitability

2  also suffered because the price of raw poultry meat unexpectedly rose to all time high in 7

3  years in the first half of 2010 (about 34% increase from the average price during the last 5-6

4  years) partly due to the heat wave that swept the Southern states.

5       18.    Nevertheless, by June 2010, the Company's sales had risen by over 250% to

6  $7.7 million for the month, in part due to new customer contracts with Carlson Companies,

7  which operates the T.G.I. Friday's and Pickup Stix chains, and CKE Restaurants, Inc., which

8  operates the Hardee's chain, and an updated contract with Yum! Brands, Inc.  Also, starting

9  in May 2010, despite the introduction of its "grilled menu," KFC re-shifted its marketing

10  efforts on selling fried items such as Extra Crispy Chicken Strips and Popcorn Chicken, a large

11  part of which was and is supplied by the Company.  The Company expects further strong

12  sales growth with additional business from CKE Restaurants, Inc. and Yum! Brands, Inc.

13  coming in the third and fourth quarters of 2010.  Profitability will also return as the price of

14  the raw materials is expected to retreat dramatically within the next 4 weeks.

15       Current Ownership Structure and Management.

16       19.    P&C and Custom are managed and directed by:

17            A.    Michael Bennish, Chief Executive Officer and Chairman of the Board of

18  Directors of both companies, who handles all purchasing and sales, and oversees the

19  general operations and financial affairs;

20            B.    Daniel Bennish, Vice President and Board member of both companies,

21  who oversees production schedules and shipping operations;

22            C.    Howard Bennish, Secretary and Board member;

23            D.    Stafford Bennish, Vice President and Board member; and

24            E.    Bruce Weinstein of BDW and Company, Inc. who is the Chief

25  Restructuring Officer, since the Company's bankruptcy filing.  In the second quarter of 2010,

26  P&C engaged Bruce Weinstein of BDW and Company, Inc., a corporate turnaround

27  consultant, to assist me with management of the Company's financial affairs so that I could

28  allocate more of my time and skill to rebuilding the Company's sales.  As of the Petition Date

-6-
DECLARATION OF MICHAEL BENNISH IN SUPPORT OF FIRST DAY MOTIONS____
{8313.001-689305.DOC-(1)}

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

1  (defined below), Bruce Weinstein is employed by the Company as Chief Restructuring Officer

2  and will be overseeing the financial affairs and management of the Company.

3       20.     Since 2000, Daniel Bennish, Howard Bennish, Stafford Bennish and I

4  (collectively, the "Bennishes") have each owned 25% of P&C's corporate shares, and 25% of

5  Custom's corporate shares, and thus P&C and Custom are each owned by the same four

6  individuals.

7       <u>The Company's Outstanding Obligations to East West Bank.</u>

8       21.     East West Bank (the "Bank") extended a commercial term loan (the "Term

9  Loan" (Loan No. 2003087)) and revolving line of credit (the "Line of Credit Loan" (Loan No.

10  2003082)) in or about July 2006 (collectively, the "Loans") to P&C, originally in the principal

11  amount of $5 million for each Loan.  The principal amount of the Line of Credit Loan was

12  later increased to $5.7 million and then reduced to $5.5 million.  The Loans were and are

13  secured by what the Company understands to be duly-perfected first priority security

14  interests in substantially all of the assets of P&C and are guaranteed by each and all of the

15  Bennishes, the Bennish Family Trust dated July 3, 1997, Stafford B. Bennish and Pamela R.

16  Bennish Living Trust dated February 12, 1987 as Amended and Restated, Custom, Falkirk

17  Sales Corporation, and Sotello Properties, LLC.  The Loans are further secured by a deed of

18  trust on the residences of Howard Bennish and Stafford Bennish.  The Term Loan is also

19  collateralized by a deed of trust against the Los Angeles Facility owned by Sotello Properties,

20  LLC.  The Term Loan is scheduled to mature on August 1, 2011.  The Loans require daily,

21  weekly and monthly financial reporting as well as compliance with financial, affirmative, and

22  negative covenants.  As such, the cash held by the Company is arguably the collateral of the

23  Bank (collectively the "Cash Collateral").

24       22.     Historically, and as required by the Line of Credit Loan, the Bank made

25  advances to the Company based on the Company's existing borrowing base at the time, for

26  the Company to cover its operating expenses and purchase raw materials.  The Company's

27  ability to receive advances under this arrangement is determined using a formula based on

RUTTER 28
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

-7-

DECLARATION OF MICHAEL BENNISH IN SUPPORT OF FIRST DAY MOTIONS_____
{8313.001-689305.DOC-(1)}

1   eligible assets (borrowing base).  Upon request of the Company for loan advances, pursuant

2   to this formula, the Bank wired corresponding amounts to the Company.

3       23.    The Line of Credit Loan matured in July 2010.  Although for a certain time the

4   Bank was willing to continue to make advances on account of the Loans, the Bank has

5   indicated that it will no longer do so.

6       24.    Currently, there is approximately $5,513,371 owed on account of the Line of

7   Credit Loan and approximately $3,310,846 owed on account of the Term Loan.

8   **B.    <u>Events Leading to Chapter 11 Filing</u>**

9   <u>Temporary Cash Flow Shortfall in July 2010, Caused in Part by Unexpected

10  Rise in Chicken Price and Dip in Sales.</u>

11      25.    As discussed above, sales dipped in early 2010, but they have increased

12  strongly in May and June.  To accommodate the increased sales, the Company

13  correspondingly increased its purchases of poultry meat.  However, an unanticipated

14  reduction in sales in July led to what the Company believes is a short-term cash shortfall

15  staring in July 2010.  Furthermore, a sudden, unexpected increase in the price of raw poultry

16  meat to a record high (in 7 years) during the first half of 2010 contributed significantly to

17  this shortfall, as well.

18  <u>History and Settlement with Lawrence Wholesale.</u>

19      26.    During approximately the last ten (10) months, the Company purchased most

20  of its raw chicken meat from a single supplier, Lawrence Wholesale, LLC ("Lawrence

21  Wholesale").  However, in July 2010, the Company was unable to make timely payments to

22  Lawrence Wholesale.  As of July 20, 2010, the Company owed Lawrence Wholesale about

23  $12 million for meat delivered by Lawrence Wholesale from October 2009 to July 20, 2010.

24      27.    In late July 2010, Lawrence Wholesale demanded that P&C fully pay all of its

25  outstanding obligations to it, or it would initiate a lawsuit against P&C and its guarantors and

26  possibly seek a writ of attachment to attach the assets of the Company. The Company entered

27  into negotiations with Lawrence to establish a payment program.  However, on August 6,

28  2010, Lawrence Wholesale commenced an action in the Los Angeles Superior Court styled,

**RUTTER
HOBBS &
DAVIDOFF**
INCORPORATED
L A W Y E R S

-8-

DECLARATION OF MICHAEL BENNISH IN SUPPORT OF FIRST DAY MOTIONS_____
{8313.001-689305.DOC-(1)}

1  *Lawrence Wholesale, LLC v. P&C Poultry Distributors, Inc., et al.*, Case No. BC 443239 (the

2  "Superior Court Action"), against P&C and the Bennishes.  Lawrence Wholesale alleges that

3  P&C breached contracts for the purchase of chicken, and seeks damages in the amount of

4  $12,010,740.  The parties engaged in further negotiations to settle the matter.  On or about

5  August 16, 2010, Lawrence Wholesale and the Company reached a mutual agreement on

6  most of the essential terms of a settlement agreement.  However, the settlement was

7  contingent on the approval of the Bank, whose approval was not received.

8  <u>Negotiations with East West Bank regarding Financing and Cash Collateral.</u>

9      28.    In addition to its discussions with Lawrence Wholesale, the Company engaged

10  in negotiations with the Bank for a new infusion of capital necessary for the Company to

11  overcome its short-term cash-flow difficulties and return to profitability.  However, the

12  Company and the Bank were unable to agree on a plan for additional advances by the Bank.

13      29.    Furthermore, beginning in the week of August 16, 2010, the Bank stopped

14  wiring advances, required for the Company to purchase raw materials to fulfill customers'

15  orders, while continuing to receive the daily deposits of cash receipts from the Company's

16  lockbox in satisfaction of the Loan.  Consequently, it became extremely difficult for the

17  Company to continue to operate.  In order to survive, the Company has since August 19,

18  2010 collected and retained payments from customers.  As of August 25, 2010 the Company

19  holds $817,920.30 in checks received from customers which have not been deposited into the

20  lockbox, although the Bank has received $62,362.20 through the lockbox collections since

21  August 22, 2010.

22      30.    The Company needs immediate access to cash, including the checks from

23  customers it is now holding.  Currently, due to the Bank's cessation of advancing funds, bills

24  are going unpaid and vendors are not shipping.  The most crucial need is in paying the

25  payroll.  Employee payroll for Custom due on August 20, 2010 for the stub period from

26  August 1 through 7, 2010 in the approximate amount of $117,000 was advanced by ADP, but

27  the payment to ADP by the Company was not cleared by the Bank.  Since August 16, 2010,

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

28

-9-

approximately $766,000 of checks were rejected by the Bank in addition to the payroll of $117,000.

31.    For about two and a half weeks preceding the Petition Date, the Company engaged in negotiations with the Bank to reach an agreement regarding the use of the Cash Collateral.  However, as of the Petition Date, no such agreement has been reached.

32.    Thus, to forestall a potentially devastating interruption in the Company's cash flow and resulting damage to its operations, and to preserve the jobs of over 600 workers and the value of the Company for all its stakeholders, P&C and Custom, through their officers and directors, determined to file voluntary Chapter 11 Petitions.

33.    P&C and Custom commenced their chapter 11 cases on August 27, 2010 (the "Petition Date") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in order to protect the value of their assets and pursue a strategy that will permit them to reorganize for the benefit of all stakeholders.  The Company has requested joint administration of the P&C's and Custom's chapter 11 cases under P&C's bankruptcy case number.

## C.    **First Day Motions**

(1)    *Emergency Motion for Order Authorizing to Honor Certain Prepetition Wages and Benefits in the Ordinary Course of Business  (the "Employee Wages Motion")*

### Employee Wages and Payroll.

34.    The Company employs a total of approximately 620 people at its management offices and processing plant in City of Industry, California and its cold storage facility in Los Angeles, California.  P&C employs approximately 52 people (13 salaried and 39 hourly), and Custom employs approximately 567 (14 salaried and 553 hourly).  All of the employees are regular full-time employees and none are seasonal or temporary.

35.    These employees, the vast bulk of whom handle production and manufacturing, are critical to the Company's successful operations and its reorganization efforts.  In addition to conducting the Company's production and distribution operations, some perform crucial administrative, financial management, human-resource services, marketing, merchandising,

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

-10-

1  and distribution services needed to operate the Company's business.  Since the Company

2  commenced its bankruptcy cases, in addition to handling their current responsibilities and

3  dealing with the effects of the Company's current financial difficulties, many of its accounting

4  and managerial employees will also be heavily involved in reviewing and assisting the

5  preparation of Bankruptcy Court documents and the financial reports required by the Office

6  of the United States Trustee, preparing the vital financial projections and budgets that are

7  required by Court and the Bank and are a crucial part of the anticipated a plan of

8  reorganization for the Company.

9       36.    To prevent defections and bolster employee morale, it is essential for the

10  Company seek authority to honor its pre-petition employee obligations.  Failing to honor

11  payroll commitments and discontinuing employee-benefit programs would at any time be

12  devastating to employees, but this is especially the case at the time of filing a Chapter 11 case.

13       37.    P&C's employees are paid their wages and salaries bi-weekly on Fridays, one-

14  week in arrears, *i.e.*, for the two-week period ending the previous Friday.  Custom's

15  employees are paid their wages and salaries weekly on Fridays, two-weeks in arrears, i.e., for

16  the one-week period ending the Friday two weeks before.  Accordingly, at any given time the

17  Company has outstanding payroll obligations to its employees.  P&C's most recent regular

18  payroll occurred on August 13, 2010 and covered all amounts due to employees through a

19  cut-off date of August 6, 2010.  Custom's most recent regular payroll occurred on August 20,

20  2010 and covered all amounts due to employees through a cut-off date of August 6, 2010.

21  Employees have earned additional prepetition wages from these cut-off dates through the

22  Petition Date.

23       Employee Benefits.

24       38.    The Company's business practice has been to provide its employees with a

25  limited number of benefit plans and programs designed to assist them in meeting certain

26  financial burdens and to keep employee morale positive for the benefit of the Company's

27  business. These programs include such standard benefits as paid vacation and sick time; legal

28  holidays; bereavement leave and time off for jury duty; reimbursements for medical care;

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

-11-

DECLARATION OF MICHAEL BENNISH IN SUPPORT OF FIRST DAY MOTIONS____

{8313.001-689305.DOC-(1)}

1    reimbursements of business-related expenses including automobile expenses for certain of its

2    employees; and workers' compensation insurance.

3        39.    The Employee Wages Motion further requests that the Court enter an order

4    authorizing the Company to honor and continue its employee benefit programs in the

5    ordinary course of business.  This applies solely to persons employed by the Company as of

6    and after the Petition Date.

7        40.    Except for those limited exceptions indicated below, the Company is current on

8    the prepetition obligations under its benefit programs.  Therefore, in most instances, the

9    Motion is not seeking authority to honor benefits accrued prepetition.  To the extent that

10    certain benefits earned or accrued may constitute prepetition claims, many of these claims

11    have not yet been reported to or calculated by the Company.  It would therefore be difficult

12    for the Company to calculate the exact benefits accrued by each of the employees during the

13    prepetition period and to identify and separately treat them as prepetition and postpetition

14    claims arising under the employee-benefit programs or to identify any benefits that might

15    exceed $10,950.  Moreover, any such effort would require the Company to divert valuable

16    resources away from pressing operational matters and would thus be contrary to the interests

17    of all creditors and the estates.  Therefore, the figures included in the following discussion

18    are only estimates of the amounts currently outstanding under the employee-benefit

19    programs.

20        (a)    *Vacation and Sick Leave*

21        41.    Vacation and sick leave for all regular full-time employees begins accruing from

22    their first month of service with the Company, however, most hourly employees do not

23    accrue vacation pay.  Employees earn sick leave regardless of their years of employment with

24    the Company.  Pursuant to the Company's polices and procedures, the Company requests

25    authority to continue to honor such time in the ordinary course of its business even though

26    certain amounts of it may have accrued pre-petition.

27

28

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

-12-

DECLARATION OF MICHAEL BENNISH IN SUPPORT OF FIRST DAY MOTIONS

{8313.001-689305.DOC-(1)}

*(b)    Medical Expense and Business Expense Reimbursements*

42.    The Company offers eligible employees certain general health benefits, including, but not limited to, health expense reimbursements, but these employees are only a relatively small percentage of the Company's total workforce.  For certain employees, the Company pays the entire amount of medical insurance and/or medical expenses.

43.    The Company also reimburses eligible employees for reasonable business-related expenses incurred through business-related activities.  The following business expenses are typically reimbursed:  travel expenses; automobile expenses; lodging; tips; and business meals.  Employees must submit expense reports before they may receive reimbursement for their business expenses.  All cash advances must be accounted for, and expense receipts are required.  Employees then forward the expense reports to the accounts-payable department, and expenses are reimbursed with a check within approximately a week of receipt.

44.    Before the Company commenced these cases, employees incurred various business expenses that, consistent with ordinary practice, are reimbursable by the Company.  Because the Company cannot know the exact amount of requested business reimbursements until the accounts payable department receives expense reports from all eligible employees, it is difficult to determine the total outstanding reimbursement obligations at any given time.

45.    Based on historical amounts of such reimbursements paid to its employees, on average, the Company pays approximately $25,000 per month on account of the employee benefits, which consists exclusively of its reimbursements of medical insurance and/or medical expenses and business expenses including automobile expenses for one or two senior, non-insider managers.  As of the Petition Date, the Company believes that it is current on payment of its employee benefits, but requests authority to continue making these payments in the ordinary course of its business.

46.    With the exception of those noted above, the Company does not provide its employees with any other benefits such as a 401k or other pension plan.



**RUTTER
HOBBS** ◼
**DAVIDOFF**
I N C O R P O R A T E D
L A W Y E R S

-13-

DECLARATION OF MICHAEL BENNISH IN SUPPORT OF FIRST DAY MOTIONS_____
{8313.001-689305.DOC-(1)}

### (c)    Workers' Compensation and Insurance Policies

47.    The Company maintains a workers' compensation liability insurance policy ("Workers' Compensation") in connection with the daily operation of its business to provide its employees with workers' compensation insurance benefits.  The Company maintains its workers' compensation liability insurance policy with Farmers Insurance and the annual premium is $890,703.00.  This premium was paid with an initial deposit of $89,070.00 on June 29, 2010, with an additional payment of $64,200.00 due on August 15, 2010, which payment has not yet been made.

48.    The Company proposes to pay and/or honor the claims of only those employees who are currently employed by the Company.  The Company does not propose to pay pre-petition wages or claims or honor pre-petition benefits for any employees who are no longer employed by the Company or who have provided notice that they will be leaving the Company's employ.

49.    The Company's prepetition employee-related obligations include amounts owed to or on account of the Company's employees for wages, salaries, commissions, benefits, reimbursements, withholding obligations and payroll taxes, accrued vacation and related claims.  Failure to pay these pre-petition employee-related obligations would place the Company's operations and its reorganization at a substantial risk.  The Company's employees expect payment of their wages on certain pre-determined payroll dates and the Company cannot afford to miss one of these pay periods without the risk of losing its employees.

50.    Through the Employee Wages Motion, the Company seeks authority to pay pre-petition wages on an emergency basis so that employees will be paid on, or near to, the expected payroll dates.  This is beneficial to prevent attrition in the Company's workforce, which would lead to severe disruption, if not cessation, of the Company's operations.  Such disruption or cessation would result in immediate and irreparable harm and loss to the estate.

51.    Given its history of steady growth and profitable operations over the last ten years, the Company believes its prospects for reorganization are strong.  The Company requests authority to pay and/or honor its employee-related obligations because such relief

-14-

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

DECLARATION OF MICHAEL BENNISH IN SUPPORT OF FIRST DAY MOTIONS_____
{8313.001-689305.DOC-(1)}

1  will allow it to retain its employees who are vital to its ability to operate the business as

2  debtors-in-possession and to pursue an appropriate reorganization strategy.

3      52.    The Company does contemplate that to the extent pre-petition benefits have

4  been paid to Daniel Bennish, Howard Bennish, Stafford Bennish, and me, each of whom is an

5  insider of the Company, such benefits will continue and as were paid prior to the Petition

6  Date.  The Company has or will file requests for the setting of insider compensation with

7  respect to each of these individuals, including myself.  The Company will not make any

8  payments to them or me until such time as the insider compensation has been approved.  In

9  addition, Bruce Weinstein of BDW and Company, Inc., has been employed as the Company's

10  "Chief Restructuring Officer" since August 13, 2010, and he is paid through the payroll

11  process for P&C. (Prior to such date his firm was a consultant to the Company).  The

12  Company does not believe he is actual "officer" of the Company or truly an "insider" because

13  he has not been elected to such position.

14      53.    Unlike an ordinary trade creditor, the typical employee does not have other

15  sources of income and thus cannot diversify the risk of the employer's default.  Many

16  employees of the Company live from paycheck to paycheck and rely exclusively on receiving

17  their full compensation or reimbursement of their expenses in order to continue to pay their

18  daily living expenses.  The employees of the Company and their families will suffer undue

19  hardship if the Company is not permitted to pay and/or honor the wages and benefits owed

20  to its employees in the ordinary course of the Company's business.  The relief sought in the

21  Employee Wages Motion is needed to enable them to meet their financial obligations and

22  maintain their personal health and well-being.

23      54.    Furthermore, any interruption in the workers' compensation program or any

24  payments due thereunder could severely impair the Company's ability to continue to do

25  business in California.  Also, any risk that an eligible claimant will not receive payments with

26  respect to employment-related injuries may have a detrimental effect on the financial well-

27  being and morale of the Company's employees and their willingness to remain in the

28

**RUTTER**
**HOBBS** &
**DAVIDOFF**
INCORPORATED
L A W Y E R S

DECLARATION OF MICHAEL BENNISH IN SUPPORT OF FIRST DAY MOTIONS_____
{8313.001-689305.DOC-(1)}

1  Company's employ. Departures by employees at this critical time may result in a severe

2  disruption of the Company's business to the detriment of all parties in interest.

3      55.    Based on my review of the payroll records, I believe that none of the Company's

4  former or current employees are owed in excess of $10,950 as of the Petition Date.

5      *(2)    Emergency Motion for Order Authorizing Use of Cash Collateral*

6      56.    The Company estimates that by the end of the month, there will be a large

7  reduction in its inventory from approximately $6 million to approximately $1 million, as a

8  result of shipping out finished products to customers but not being able to purchase

9  additional raw materials (for the reasons explained above in Paragraphs 29-30).

10     57.    Additionally, the Company anticipates that there will be a considerable

11 discrepancy between the reduction in inventory and the amount reflected in accounts

12 receivable, as a result of selling significant portions of its products to KFC, one of its largest

13 customers, at a significantly reduced price. During August 2010 the Company entered into a

14 one-time deal with KFC to sell a large portion of its finished products at a significantly

15 reduced price (as much as by 40% from the previous, normal price). The Company needed

16 to do this in order to accommodate the customer's demand level in the high commodity price

17 market. The prices at which these finished products are sold are as much as 65% below the

18 Company's production cost.

19     58.    The value of inventory recorded on the Company's books represents the

20 production cost (*i.e.*, cost of raw meat plus costs associated with further-processing). Due to

21 the record high price of raw poultry meat during the first half of 2010, the Company's

22 inventories were booked at the high cost of purchase to the Company (plus processing).

23 However, as a result of these one-time transactions, along with the highest commodity prices

24 in 7 years, the accounts receivable will not reflect much of the reduction in the inventory.

25     59.    As discussed above, the price of raw poultry meat unexpectedly rose to a record

26 high in 7 years in the first half of 2010. The highest price was about $2.05 per lb. Compared

27 against the average price of $1.35 per lb. during the last 5-6 years, this represents about a

28 34% increase. This upsurge in price was partly due to the heat wave that swept the Southern

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

-16-

DECLARATION OF MICHAEL BENNISH IN SUPPORT OF FIRST DAY MOTIONS_____
{8313.001-689305.DOC-(1)}

states.  However, according to various industry reports and outlook newsletters analyzing

conditions and events relating to domestic and global poultry markets that influence supply,

demand, trade, and prices, the price of raw poultry meat is expected to fall in the next couple

months to the pre-2010 level.  The Company typically contracts on yearly commitments to

purchase raw poultry meat, thereby locking the price, in October.  I plan to cause the

Company to lock the purchase price in October this year.  This will significantly reduce the

production cost.

60.    The Company has recently secured new agreements for orders for additional

products worth up to $600,000 per week from CKE Restaurants, Inc. to supply Carl's Jr.'s

new line of menu items being launched in September, 2010.  These agreements represent

long-term purchase commitments on the part of CKE.  Further, additional customers have

indicated that they would make commitments for sizeable (additional) orders.  But currently,

the Company cannot meet their demands due to the unavailability of cash to purchase raw

materials.  Inevitably, the Company is routing these orders to other manufacturers and losing

business.  Once the short-term cash flow difficulties are overcome, the Company will

definitely generate positive cash flow.

> *(3)    Emergency Motion for Order (1) Prohibiting Utilities from Altering, Refusing or Discontinuing Service, (2) Deeming Utilities Adequately Assured of Future Performance, and (3) Establishing Procedures for Determining Adequate Assurance of Payment Under Section 366 of the Bankruptcy Code (the "Utilities Motion")*

61.    In connection with the operation of the Company's business, P&C obtains

electricity, natural gas, water, sewer, telephone, disposal, waste, internet services and/or

other services from the utility companies (the "Utility Companies").  Uninterrupted utility

services to the Company's processing plant and its warehouse/cold storage facility are

essential to its ongoing operations and the success of its reorganization.  Moreover, in light of

the nature of the services provided, the Company cannot easily find replacement services.

Should any of the Utility Companies refuse or discontinue services, even for a brief period,

the Company's business operations would be severely disrupted.  The impact of this

disruption on the Company's business and revenue would be extremely harmful and would

RUTTER ☒
HOBBS ☒
DAVIDOFF
INCORPORATED
LAWYERS

DECLARATION OF MICHAEL BENNISH IN SUPPORT OF FIRST DAY MOTIONS____
{8313.001-689305.DOC-(1)}

1  jeopardize the Company's reorganization efforts.  It is therefore critical that utility services

2  from the Utility Companies continue uninterrupted.  The Company expects that its

3  postpetition cash will be more than sufficient to pay all postpetition obligations to the utility

4  companies, and the Company has specifically included such payments (and the deposits

5  proposed in the Utilities Motion) in its proposed cash collateral budget.  The relief requested

6  in the Utilities Motion will ensure that the Company's operations will not endure such

7  disruption.  Attached hereto as <u>Exhibit "1"</u> is a true and correct copy of the spreadsheet that

8  (i) lists each Utility Company providing utility services to the Company, its address and P&C's

9  account number(s) with such Utility Company; and (ii) specifies the type of utility service

10  provided by each Utility Company and the average monthly payment made to each Utility

11  Company by P&C, calculated as a

12     62.    P&C proposes to give each of the Utility Companies a cash deposit (each, a

13  "Utility Deposit," and collectively, the "Utility Deposits") equal to the average monthly

14  payment made by P&C to each respective Utility Company, calculated as a historical average

15  during the three (3) months prior to the Petition Date (where applicable).  The amount of

16  the average monthly payments made to each Utility Company is specified on <u>Exhibit "1"</u>

17  attached hereto and to the Utilities Motion.  P&C proposes to pay the Utility Deposits within

18  30 days after the Court's entry of an order granting this Motion.  P&C submits that the Utility

19  Deposits and the adequate assurance procedures set forth in the Utilities Motion, together

20  with the Company's ability to pay for future utility services in the ordinary course of business,

21  constitute sufficient adequate assurance to the Utility Companies.  If any of the Utility

22  Companies believe additional adequate assurance is required, they may request such

23  assurance pursuant to the procedures set forth in the Utilities Motion, of which P&C requests

24  Court approval.

25

26

27

28

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

DECLARATION OF MICHAEL BENNISH IN SUPPORT OF FIRST DAY MOTIONS____
{8313.001-689305.DOC-(1)}

*(4) Emergency Motion for Order Authorizing Joint Administration of Related Cases (the "Joint Administration Motion")*

63.    As discussed in Section A. Company Overview, there is substantial overlap with respect to P&C and Custom.  Substantive matters affecting one estate typically will affect the other estate.  Therefore, I believe that it is in the best interest of the Company's estates to jointly administer their chapter 11 cases, as joint administration will substantially reduce the costs of administering the chapter 11 cases.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 27th day of August, 2010, at City of Industry, California.

By   signature page attached
Michael Bennish, Declarant.

DECLARATION OF MICHAEL BENNISH IN SUPPORT OF FIRST DAY MOTIONS_____

{8313.001-689305.DOC-(1)}

RUTTER
HOBBS ▣
DAVIDOFF
INCORPORATED
LAWYERS

1  historical average during the three (3) months prior to the Petition Date (where applicable).

2  The same document has also been annexed to the Utilities Motion as Exhibit "1".

3      62.    P&C proposes to give each of the Utility Companies a cash deposit (each, a "Utility

4  Deposit," and collectively, the "Utility Deposits") equal to the average monthly payment made

5  by P&C to each respective Utility Company, calculated as a historical average during the three

6  (3) months prior to the Petition Date (where applicable). The amount of the average monthly

7  payments made to each Utility Company is specified on Exhibit "1" attached hereto and to the

8  Utilities Motion. P&C proposes to pay the Utility Deposits within 30 days after the Court's entry

9  of an order granting this Motion. P&C submits that the Utility Deposits and the adequate

10  assurance procedures set forth in the Utilities Motion, together with the Company's ability to

11  pay for future utility services in the ordinary course of business, constitute sufficient adequate

12  assurance to the Utility Companies. If any of the Utility Companies believe additional adequate

13  assurance is required, they may request such assurance pursuant to the procedures set forth in

14  the Utilities Motion, on which P&C requests Court approval.

15      *(4) Emergency Motion for Order Authorizing Joint Administration of Related Cases (the*

16  *"Joint Administration Motion")*

17      63.    As discussed in Section A. Company Overview, there is substantial overlap with

18  respect to P&C and Custom. Substantive matters affecting one estate typically will affect the

19  other estate. Therefore, I believe that it is in the best interest of the Company's estates to jointly

20  administer their chapter 11 cases, as joint administration will substantially reduce the costs of

21  administering the chapter 11 cases.

22      I declare under penalty of perjury under the laws of the United States of America that the

23  foregoing is true and correct.

24      Executed this 27th day of August, 2010, at _C.ty of Industry_ California.

25

26                      By _____

27                          Michael Bennish, Declarant.

28

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

{8313.001-683938.DOC-(2)}

DECLARATION OF MICHAEL BENNISH IN SUPPORT OF FIRST DAY MOTIONS____

# EXHIBIT "1"

Exhibit "1"

Utility Companies
P&C Poultry Distributors, Inc.

| Utility Company Name / Contact Information | Account No. | Type | Average Monthly Payments (for all Accounts) |
|---|---|---|---|
| AT&T<br>Payment Center<br>Sacramento, CA  95881-001<br>(800) 404-4474 - Phone<br>(817) 339-4247 - Fax | 323 224-1200 014 3 | Telephone | $          66.11 |
| CBEYOND<br>320 Interstate North Parkway, SE<br>Atlanta, GA  30339<br>(678) 424-2400 - Phone<br>info@cbeyond.net - E-mail | 115836 | Internet | $          793.43 |
| City of Industry Disposal<br>PO Box 3366<br>City of Industry, CA  91744<br>Attn: Mary Hull<br>(626) 333-2211 x104 - Phone<br>(626) 236-4052 - Fax | 12031 | Disposal | $          20,741.24 |
| City of Los Angeles Municipal DWP<br>PO Box 10324<br>Van Nuys, CA  91410<br>Attn: Bankruptcy Department<br>(213) 367-9793 - Phone<br>(213) 367-9783 - Fax | 1-61-55545-01457-00-0000-3-01 | Electricity / Water | $          23,478.65 |
| Co-West Commodities<br>1389 W. Mill Street<br>San Bernardino, CA  92410<br>Attn: Freddy Peterson<br>(909) 383-8341 - Phone<br>(909) 885-2013 - Fax | P&CP (Customer ID) | Waste | $          11,891.08 |

Exhibit "1"

| | | | |
|---|---|---|---|
| The Gas Company<br>PO Box C<br>Monterey Park, CA  91756<br>Attn: Hector Ortiz<br>(213) 244-8322 - Phone<br>(213) 244-8309 - Fax | 092 717 7243 7<br>123 733 3784 4 | Gas | $        3,330.97 |
| Los Angeles Sanitation<br>PO Box 4998<br>Whittier, CA  90607-4998<br>Attn: Deah Thalenberg<br>(562) 699-7411 x2608 - Phone<br>(562) 908-4864 - Fax | 2099311 | Sewer | $      30,645.00 |
| Primus<br>PO Box 3018<br>Milwaukee, WI  53201<br>(703) 902-2800 - Phone | 81973500 | Telephone | $           111.05 |
| Rowland Water District<br>3021 S. Fullerton Road<br>Rowland Heights, CA  91748-4799<br>Attn: Customer Service<br>(562) 697-1726 - Phone<br>(562) 697-6149 - Fax | 159611-54-015<br>317402-15-015 | Water | $        4,612.13 |
| Southern Calif. Edison<br>PO Box 600<br>Rosemead, CA  91771-0001<br>(800) 655-4555 - Phone<br>(909) 394-8896 - Fax | 2-27-767-4362 | Electricity | $      30,748.87 |
| Sprint<br>PO Box 4181<br>Carol Stream, IL  60197-4181<br>Attn: Customer Service<br>(877) 639-8351 - Phone<br>(404) 948-9989 - Fax | 987165315 | Telephone | $        5,222.62 |

2

Exhibit "1"

| | | | | |
|---|---|---|---|---|
| T-Mobile<br>c/o T-Mobile USA Inc.<br>Bankruptcy Department<br>PO Box 53410<br>Bellevue, WA  98015-53410<br>(800) 937-8997 - Phone | 302553246 | Telephone | $ | 821.60 |
| | | | | |
| Verizon<br>PO Box 9622<br>Mission Hills, CA  91346<br>(800) 555-8879 - Phone<br>(309) 820-7044 - Fax | 269952349-00001 | Telephone | $ | 550.41 |

Total:    $    133,013.16