1  Brian L. Davidoff (State Bar No. 102654)
   Email: bdavidoff@rutterhobbs.com
2  C. John M. Melissinos (State Bar No. 149224)
   Email: jmelissinos@rutterhobbs.com
3  Claire E. Shin (State Bar No. 249492)
   Email: cshin@rutterhobbs.com
4  RUTTER HOBBS & DAVIDOFF
     INCORPORATED
5  1901 Avenue of the Stars, Suite 1700
   Los Angeles, California 90067
6  Telephone:  (310) 286-1700
   Facsimile:  (310) 286-1728
7
   General Reorganization Attorneys for
8  Debtors and Debtors-in-Possession

9              UNITED STATES BANKRUPTCY COURT
10
              CENTRAL DISTRICT OF CALIFORNIA
11
                  LOS ANGELES DIVISION
12

13 | In re: | ) Case No. 2:10-bk-46350-PC |
   | | ) |
   | P&C POULTRY DISTRIBUTORS, INC., | ) Joint Administered with |
14 | | ) Case No. 2:10-bk-45362-PC |
   |        Debtor and Debtor-in-Possession. | ) |
15 | | ) Chapter 11 |
   | | ) |
16 | | ) **DEBTORS' MOTION FOR ORDER** |
   | | ) **APPROVING THE STALKING HORSE** |
17 | | ) **BIDDER PROTECTIONS SET FORTH IN THE** |
   | | ) **LETTER OF INTENT WITH BALMORAL** |
18 | In re: | ) **ADVISORS, LLC; DECLARATIONS OF** |
   | | ) **MICHAEL BENNISH  AND GORDON** |
19 | CUSTOM PROCESSORS, INC., | ) **GREGORY IN SUPPORT THEREOF** |
   | | ) |
20 |        Debtor and Debtor-in-Possession. | ) *[Application for Order Setting Hearing on* |
   | | ) *Shortened Notice Concurrently Filed Herewith]* |
21 | | ) |
22 | | ) Hearing: |
   | | ) |
23 | | ) Date:    April 6, 2011 |
   | | ) Time:    9:30 a.m. |
24 | | ) Ctrm:    Courtroom 1539 |
   | | )          Edward R. Roybal Fed. Bldg. |
25 | | )          255 East Temple Street |
   | | )          Los Angeles, CA 90012 |

26 //

27 //

28

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

1    TO THE HONORABLE PETER CARROLL, UNITED STATES BANKRUPTCY JUDGE,

2    THE UNITED STATES TRUSTEE, THE OFFICIAL COMMITTEE OF UNSECURED

3    CREDITORS, ALL PARTIES-IN-INTEREST HEREIN, AND THEIR RESPECTIVE COUNSEL:

4    Debtors and Debtors-in-Possession P&C Poultry Distributors, Inc. ("P&C") and Custom

5    Processors, Inc. ("Custom" and, collectively with P&C, the "Company" or the "Debtors"),

6    hereby move (the "Motion") for entry of an order approving certain procedures set forth in a

7    letter of intent agreement ("LOI") entered into by and between the Company and Balmoral

8    Advisors, LLC (along with its designee, "Balmoral") in connection with a potential sale of the

9    Debtors' assets.  In support of their Motion, the Debtors respectfully represent as follows.

10                                          I.

11                                   **INTRODUCTION**

12    By this Motion, and in furtherance of an exit transaction and the Debtors' ultimate

13    restructuring under Bankruptcy Court protection, the Debtors seek an order approving

14    certain procedures set forth in the LOI, pursuant to which the Debtors may enter into an asset

15    purchase agreement with Balmoral.  The specific provisions of the LOI for which the Debtors

16    seek court approval include the requirements to pay a break-up fee to Balmoral, to reimburse

17    its reasonable out-of-pocket expenses, and to provide other initial bidder or "stalking horse"

18    protections, including a limited exclusive due diligence period (collectively, the "Stalking

19    Horse Bidder Protections").  The Stalking Horse Bidder Protections are designed to induce

20    Balmoral to dedicate the significant time and resources necessary to perform diligence on the

21    Company and potentially enter into definitive documents to acquire the assets and specified

22    liabilities of the Company ("Sale") for the benefit of the Debtors' estates and to potentially

23    induce competitive bidding for any Sale.

24    As further discussed below, as a result of the work over the last few months, the

25    Debtors have identified a stalking horse bidder/potential buyer for the Debtors' business and

26    they expect to be able to propose an exit transaction by late April, 2011.  Now that the

27    Debtors have identified a stalking horse bidder/potential transaction for the Debtors' business,

28    they will proceed with all due speed to provide diligence information to Balmoral and work

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

-2-

8313.001 873260.2

## TABLE OF CONTENTS

Page

I.  INTRODUCTION ......................................................................... 2

II.  BACKGROUND FACTS ................................................................ 3

    A.    Company Overview ............................................................ 3

    B.    Status of the Bankruptcy Cases ...................................... 4

    C.    Mosaic's Efforts to Date .................................................. 6

    D.    Baloral LOIs ...................................................................... 7

        1.    Redacted Portions of the LOI and the Management LOI ............... 8

        2.    Conditional "No-Shop" Exclusivity Provision
            (LOI, p.3, ¶8A). .......................................................... 9

        3.    The Break-Up Fee and Expense Reimbursement
            (LOOI, p.4, ¶8B .......................................................... 10

        4.    Quallifying Bid and Overbid (LOI, p.4, ¶8C) ......................... 10

        5,    Due Diligence Period (LOI, p.4. ¶8D) ................................. 11

        6.    Auction/Sale Timeline (LOI, p.5. ¶8E) ................................ 11

III.  THE STALKING HORSE BIDDER PROECTIONS SHOULD BE APPROVED
    TO FACILITATE THE DEBTORS' EXIT TRANSACTION ............................... 12

    A.    The Legal Standard .......................................................... 12

    B.    The Stalking Horse Bidder Protections Are Fair, Reasonable,
        And in the Best Interest of the Debtors' Estates ..................... 13

        1.    The LOI is a Production of the Debtors' Sound Business
            Judgment .................................................................. 14

        2.    The Proposed Procedures Enhance Competitive Bidding ............ 15

        3.    The Proposed Protections Are Fair and Reasonable.................. 16

        4.    The Proposed Transaction is in the Best Interests of the
            Estates and Other Interested Parties.................................. 17

        5.    The Primary Objectives: Closing the Sale Prior
            To May 27, 2011 .......................................................... 18

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S     8313.001  873260.2

MOTION FOR ORDER APPROVING LETTER OF INTENT

1

## TABLE OF CONTENTS

2                                                                    Page

3   IV.    CONCLUSION ................................................................    19

4   DECLARATION OF MICHAEL BENNISH ..........................................    20

5   DECLARATION OF GORDON GREGORY ...........................................    24

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**RUTTER**
**HOBBS &**
**DAVIDOFF**
INCORPORATED
L A W Y E R S

1

## TABLE OF AUTHORITIES

2

Page

3  Cases

4  *In re 995 Fifth Ave. Associates, L.P.,*
    96 B.R. 24 (Bankr. S.D.N.Y. 1989) ................................................................. 14

5

6  *In re Am. W. Airlines, Inc.,*
    166 B.R. 908 (Bankr. D. Ariz. 1994) ......................................................... 16, 17

7  *In re APP Plus, Inc.,*
    223 B.R. 870 (Bankr. E.D.N.Y. 1998) ............................................................. 12

8

9  *In re Holley Garden Apartments, Ltd.,*
    223 B.R. 822 (Bankr. M.D. Fla. 1998) ................................................. 13, 14, 15

10  *In re Hupp Indus., Inc.,*
     140 B.R. 191 (Bankr. N.D. Ohio 1992) ........................................................... 13

11

12  *In re Integrated Res., Inc.,*
     135 B.R. 746 (Bankr. S.D.N.Y. 1992) ....................................................... 12, 13

13  *In re Integrated Res., Inc.,*
     147 B.R. 650 (S.D.N.Y. 1992) ............................................................. 12, 14, 15

14

15  *In re Johns-Manville Corp.,*
     60 B.R. 612 (Bankr. S.D.N.Y. 1986) ............................................................... 15

16  *In re O'Brien Envtl. Energy, Inc.,*
     181 F.3d 527 (3d Cir. 1999) ........................................................................... 16

17

18  *In re S.N.A. Nut Co.,*
     186 B.R. 98 (Bankr. N.D. Ill. 1995) ................................................................ 15

19  *In re Summit Land Co.,*
     13 B.R. 310 (Bankr. D. Utah 1981) ................................................................ 15

20

21  *In re Wintz Companies,*
     230 B.R. 840 (B.A.P. 8th Cir. 1999) ............................................................... 13

22

23  Statutes
    11 U.S.C.A. § 363 (West) .......................................................................... 25, 26

24

25  Other Authorities
    *The Legal Considerations of Acquiring Distressed Business: A Primer,*
    11 J. Bankr. L. & Prac. 3 (2001) .................................................................... 17

26

27

RUTTER []  28
HOBBS []
DAVIDOFF
INCORPORATED
L A W Y E R S

1  toward definitive documents and ultimately the Sale.  If the definitive documents

2  contemplate a section 363 sale, the Debtors contemplate seeking approval of detailed bid

3  procedures to encourage robust bidding for the Company.  It is the Debtors' belief that a Sale

4  currently provides the best opportunity for the Debtors' creditors in these cases.

5      Although the LOI is not intended to be an asset purchase agreement, and it does not

6  contain all matters upon which agreement must be reached by the Company and Balmoral

7  (collectively, the "Parties") in order for a transaction to be consummated, the Parties require

8  approval of certain critical terms and conditions to provide negotiated protections to

9  Balmoral as it conducts its diligence of the Company and potentially prepares definitive

10  documents in pursuit of the Sale.

11      This Motion is not a motion for approval of either the Sale or the detailed bid

12  procedures required for an auction.  Separate bid procedures and/or sale motions will follow

13  as appropriate at a later date.

14  **II.**

15  **BACKGROUND FACTS**

16  A.    **Company Overview.**

17      The Debtors are a "further processor" of chicken meats (*i.e.*, chicken meats that have

18  been cut, de-boned, marinated, battered, breaded, partially fried or "par-fried," frozen, or

19  otherwise prepared for cooking by restaurants and other food service establishments), and

20  distributor of processed poultry products operating out of a U.S.D.A.-certified facility located

21  in City of Industry, California.  The Company produces value-added frozen and fresh poultry

22  products for re-sale to major fast food restaurant chains and casual dining services, including

23  CKE Restaurants, Inc. (Carl's Jr., Hardee's), Yum! Brands, Inc. (KFC, Taco Bell), the Carlson

24  Companies (Pickup Stix, T.G.I. Friday's) and Daphne's Greek Cafe.  The Company is a well-

25  regarded, top-tier food supplier with annual sales topping $48 million in 2010.  Please see the

26  accompanying Declaration of Michael Bennish ("Bennish Decl."),¶ 4.

27  //

28  //

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

-3-

8313.001  873260.2

### B.    Status of the Bankruptcy Cases.

P&C and Custom commenced their chapter 11 cases on August 27, 2010 (the "Petition Date") by filing voluntary petitions (the "Petitions")[1] under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Bennish Decl., ¶ 5. Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors continue to operate their business and manage their properties as debtors-in-possession. The first meeting of creditors pursuant to section 341(a) of the Bankruptcy Code was held on October 18, 2010, and has been completed. On November 24, 2010 the United States Trustee ("UST") appointed a Committee of Creditors Holding Unsecured Claims (the "Committee"). Bennish Decl., ¶ 6.

On September 3, 2010, the Debtors submitted substantially all the items they were required to submit to the Office of the United States Trustee with the "7-Day Package." On October 1, 2010, each of P&C and Custom filed their Schedules of Assets and Liabilities and Statements of Financial Affairs. The Debtors have timely filed all their Monthly Operating Reports, and thus the Debtors are current on their administrative duties as debtors and debtors-in-possession herein. Bennish Decl., ¶ 7.

On December 21, 2010, the Court entered its order extending the Debtors' exclusive periods such that the period during which only the Debtors may file a plan of reorganization will run through and including April 25, 2011, and the period during which only the Debtors may solicit acceptances of a plan will run through and including June 24, 2011. On December 28, 2010, the Court entered an order setting February 28, 2011 as the deadline for filing pre-petition claims. The Debtors served and filed notice of the deadline on or about December 30, 2010. Bennish Decl., ¶ 8.

On December 21, 2010, the Court entered an order authorizing the employment of Mosaic Capital LLC ("Mosaic") as investment bankers for the Debtors. As further described below, Mosaic has done a significant amount of work in attempting to locate new financing sources for the Debtors, and eventually identifying Balmoral as a stalking horse

---

[1] An order granting joint administration of the P&C and Custom bankruptcy cases, under P&C's bankruptcy case number, was entered on September 1, 2010 [Docket No. 16 in the P&C case].

MOTION FOR ORDER APPROVING LETTER OF INTENT

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

8313.001    873260.2

1  bidder/potential buyer for the Debtors' assets.  Bennish Decl., ¶ 9; please see the

2  accompanying Declaration of Gordon Gregory (the "Gregory Decl.").

3        By orders entered on October 4, 2010, November 29, 2010, January 28, 2011 and

4  February 11, 2011, the Court authorized the Debtors' use of cash collateral.  After a hearing

5  on the Debtors' Further Motion for Order Authorizing Continued Use of Cash Collateral on

6  February 9, 2011, the Court entered its order (the "February Order") extending the Debtors'

7  authority to use cash collateral through May 13, 2011.  Bennish Decl., ¶ 10.  The February

8  Order contains a timeline in accordance of which certain events in connection with a Sale

9  and/or confirmation of a chapter 11 plan (the "Plan") must take place, as follows:

10        (i)    If **Sale**:

11              (a)    **March 4, 2011** – The Debtors shall have identified a transaction

12        by this date and a buyer/partner with respect to such transaction.

13              (a)    **April 1, 2011** – The Debtors shall have negotiated and executed a

14        definitive asset purchase agreement.

15              (b)    **April 20, 2011** – The Debtors shall file a motion seeking approval

16        of a Sale.

17              (c)    **May 31, 2011** – The Sale shall close by this date after entry of an

18        order approving a Sale.

19        (ii)   If **Plan**:

20              (a)    **March 4, 2011** – The Debtors shall have identified a transaction

21        by this date and a buyer/partner to form the basis of the Plan.

22              (b)    **April 29, 2011** – A hearing on the approval of a disclosure

23        statement describing the Plan must occur by this date.

24              (c)    **June 30, 2011** – A confirmation hearing on the Plan must occur

25        by this date.

26  Bennish Decl., Exh. "1". (As discussed under Section III. B. 5. below, the LOI proposes a

27  slightly different schedule from the timeline stated in the February Order.)

28

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

C.     **Mosaic's Efforts to Date.**

Since its retention by the Debtors, Mosaic has been actively engaged in identifying and contacting potential purchasers (or equity sources) for the Debtors' business, organizing the process, assisting potential bidders/investors in the conduct of due diligence, and conducting other activities designed to maximize the value of the estates. As part of this process, Mosaic identified and contacted at least 40 parties which have indicated an interest in purchasing the Debtors' assets, and of these, at least, 25 serious interested potential buyers signed and returned non-disclosure agreements. Gregory Decl., ¶ 3.

Mosaic completed a "pitch book" to be used in the formal effort to solicit interest in the Debtors. Although seemingly a simple task, the "pitch book" reflects the sum total of Mosaic's understanding of the Debtors' business, including customers, industrial processes, profit and margin drivers, actual and pro forma financials, and competitive position in the marketplace. Gregory Decl., ¶ 4.

At the same time as formal, broad marketing efforts were underway, Mosaic worked through the end of the year holidays to generate interest from firms Mosaic knew might have a special interest in the Debtors' business. Given the specialized nature of the Debtors' business and operating environment, Mosaic targeted parties generally falling into the following categories: (a) food companies with either a focus in poultry or other types of meat processing or private label manufacturing; and (b) private equity firms with a focus on distressed transactions and a history of working with food and/or agriculture related companies, including parties having prior experience with asset sales under section 363 of the Bankruptcy Code. Of these parties, three met with the Debtors at the Debtors' offices. Gregory Decl., ¶ 5.

In or around late February, Mosaic completed its marketing process and commenced negotiations with one or more lead bidders. Shortly afterward, Mosaic identified Balmoral as a stalking horse bidder/potential buyer for the Debtors' operations. On or about March 10, 2011, after extensive negotiations with Balmoral and considerable internal deliberation among the Debtors and their professionals, the Parties executed and entered into the LOI,

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

MOTION FOR ORDER APPROVING LETTER OF INTENT

8313.001  873260.2

1 which contains their preliminary agreement relating to a potential Sale, as more fully set

2 forth below.  Gregory Decl., ¶ 6.  Also, on or about the same date, Balmoral and the

3 Company's senior management entered into a letter agreement regarding their future

4 management of the new entity that would be established after a Sale to Balmoral (the

5 "Management LOI").  Bennish Decl., ¶ 11.

6      The Debtors currently anticipate structuring the Sale as either a public auction sale

7 under section 363 of the Bankruptcy Code or as a plan of reorganization.  If the Debtors

8 pursue a sale through a plan, they expect that distributions to unsecured creditors will be

9 made through a "pot" plan.

10      **D.**    <u>**Balmoral LOIs.**</u>

11      The LOI contemplates that a new entity controlled by Balmoral ("Newco") acquire the

12 Company in an efficient and rapid manner.  The LOI, among other things, lays out some

13 essential terms of the Parties' preliminary agreement with respect to a Sale, including some

14 bidding procedures, the consideration (LOI, p. 2. ¶ 3) and bidder protections.  A true and

15 correct copy of the LOI (partly redacted) is attached to the Declaration of Michael Bennish as

16 Exhibit "<u>2</u>".

17      The Management LOI contemplates that Newco will employ Michael Bennish and

18 Daniel Bennish ("Future Senior Management") in positions similar to those currently

19 occupied by them within the Company.  Subject to certain terms and conditions set forth in

20 the Management LOI, the Future Senior Management may be offered the opportunity to

21 acquire interests in Newco in exchange for new cash investments, up to a certain percentage

22 of additional common equity participation in Newco through their employment, and some

23 representation on the board of directors.  The Management LOI also contains an exclusivity

24 provision under which the Future Senior Management agreed not to, directly or indirectly, (i)

25 provide due diligence material or information related to, (ii) solicit, (iii) favorably respond to

26 any communication related to, or (iv) negotiate or enter into any employment agreement or

27 understanding (written or oral), definitive asset purchase or sale agreement with respect to,

28 any sale, merger, restructuring, reorganization or capital infusion into the Company or any

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

MOTION FOR ORDER APPROVING LETTER OF INTENT

8313.001  873260.2

1    similar transaction with respect to any of the capital stock, debt or assets of the Company

2    with any parties other than Balmoral that require the participation of the Future Senior

3    Management in such transaction after the closing of the contemplated transaction.

4    (Management LOI, pp. 1-2, ¶ 1-2.)  A true and correct copy of the Management LOI (partly

5    redacted) is attached to the Declaration of Michael Bennish as Exhibit "<u>3</u>".

6    　　　　Balmoral has begun its due diligence on the assets and liabilities of the Company

7    following the execution of the LOI.  If Balmoral determines that the results of its preliminary

8    diligence support further expenditures of time and money, it will begin to negotiate formal

9    agreements ("Definitive Document(s)") for a transaction ("Transaction") with the Debtors.

10    The Parties anticipate that they will be in a position to execute the Definitive Documents by

11    April 29, 2011 and close the Transaction if it is through a section 363 sale by May 27, 2011.

12    Gregory Decl., ¶ 7.

13    　　　　As stated above, the LOI is not intended to be an asset purchase agreement, which

14    would contain all matters upon which the Parties need to agree for a Sale.  Neither is it

15    intended to be an exhaustive list of the bidding procedures.  *Id.* at ¶ 6.  However, in order to

16    have the flexibility to induce Balmoral to expend time and resources, and to procure the

17    benefits of securing a stalking horse bid, the Debtors submit that it is necessary for them to

18    provide the Stalking Horse Bidder Protections to Balmoral as set forth below.

19    　　　　　　　1.　　　<u>Redacted Portions of the LOI and the Management LOI.</u>

20    　　　　The filing of an application requesting approval of bidding procedures in connection

21    with a non-definitive agreement raises issues of confidentiality for the Parties.  Balmoral has

22    required that for it to incur the time and expense related to diligence and potentially

23    negotiating Definitive Documents, it requires court approval of the Stalking Horse Bidder

24    Protections at the earliest possible time.  At the same time, the Company as well as its

25    primary secured creditor, East West Bank (the "Bank") believe that it would be premature to

26    reveal certain financial aspects of the LOI, in that it is not yet a Definitive Document.

27    Bennish Decl., ¶ 12.  Accordingly, certain portions of the LOI and the Management LOI,

28    attached to the accompanying Declaration of Michael Bennish, have been redacted.

RUTTER
HOBBS ☒
DAVIDOFF
INCORPORATED
L A W Y E R S

-8-

1  Unredacted, complete versions of the LOI and Management LOI shall be filed concurrently

2  with the Court under seal.[2]

3      **2.**    **Conditional "No-Shop" Exclusivity Provision (LOI, p.3, ¶ 8A).**

4         In consideration of Balmoral's commitment of costs, time and effort to conduct due

5  diligence and potentially prepare the Definitive Documents, during the period from March

6  10, 2011 (the date of the execution of the LOI) until and through April 29, 2011 (or earlier

7  upon receipt of a termination notice from Balmoral)("No-Shop Period"), the Company

8  agreed, among other things, not to (i) solicit, (ii) favorably respond to any communication

9  related to, or (iii) negotiate or enter into any definitive asset purchase or sale agreement with

10  respect to, any sale, merger, restructuring, reorganization or capital infusion into the

11  Company or any similar transaction with respect to any of the capital stock, debt or assets of

12  the Company with any parties (other than the respective officers, directors, advisors and

13  representatives of Balmoral) (collectively a "Third Party Transaction") which would render

14  completion of the proposed Transaction infeasible.

15         However, during the No-Shop Period, the Company may still passively continue to

16  receive submissions, letters of intent or offers relating to Third Party Transactions, and

17  existing interested parties may continue to have access to data maintained by Mosaic and the

18  Company's senior management.  The Company agreed, during the No-Shop Period, to have

19  Mosaic (i) provide Balmoral with contemporaneous email notice of each document requested

20  by and/or delivered to any parties related to a potential Third Party Transaction and (ii)

21  provide a written summary of any and all communications between such parties and Mosaic

22  or the Company's senior management by the second business day after such communication

23  (collectively, "Mosaic Disclosures").  The Company also agreed to have Mosaic inform any

24

25

26

27

---

[2] This Court's Order Authorizing Debtors to File Deposition Transcript of Michael Bennish Under Seal and to Require Pleadings Containing Confidential Information to be Filed Under Seal [Docket No. 63] entered on September 17, 2010 (the "Sealing Order") allows pleadings containing the Debtors' confidential, sensitive information to be filed under seal.  While the Debtors recognize that the LOI and Management LOI might not precisely fall within the scope of the Sealing Order as originally contemplated, the Debtors respectfully request that Court apply the Sealing Order broadly and allow the non-redacted versions of the LOIs to be filed under seal as they contain confidential, sensitive information.

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

28

-9-

8313.001  873260.2

1  parties pursuing a potential Third Party Transaction of Mosaic's obligations to make the

2  Mosaic Disclosures.

3       Following expiration of the No-Shop Period, if Balmoral elects to pursue the

4  Transaction as a 363 Sale, then the Company agreed that it would market and auction the

5  assets of the Company in accordance with procedures approved by the Court as part of this

6  Motion and subsequently approved by the Court, including providing due diligence

7  information to entities contemplating a Third Party Transaction and soliciting entities to

8  make a qualified bid in accordance with the approved procedures.  The Parties agreed that

9  the No-Shop Period would be extended by the number of business days, if any, between April

10  8, 2011 and the date the Court enters an order approving the Stalking Horse Bidder

11  Protections and related bidding procedures.

12       **3.**    **The Break-Up Fee and Expense Reimbursement (LOI, p.4, ¶ 8B).**

13       The Parties agreed, that in the event that the Parties enter into Definitive Documents,

14  and Balmoral is not the successful bidder with respect to the Debtors' assets at either a 363 or

15  plan sale, then Balmoral would be entitled to receive, upon the consummation of a Third

16  Party Transaction, an immediate break-up fee payment in the amount of $350,000 (the

17  "Break-Up Fee"), and reimbursement of its actual and reasonable documented due diligence

18  expenses up to a maximum amount of $250,000 ("Expense Reimbursement") from funds

19  available in the Debtors' bankruptcy estates, including the overbid deposits described below.

20       To further assure Balmoral of payment, the Debtors agreed that the Break-Up Fee and

21  Expense Reimbursement shall be entitled to the status of a superpriority claim pursuant to

22  section 503(b)(1) and 507(b) of the Bankruptcy Code.

23       **4.**    **Qualifying Bid and Overbid (LOI, p.4, ¶ 8C).**

24       The Parties agreed that for any proposed Third Party Transaction to be a "Qualifying

25  Bid", it must be in an initial amount not less than $600,000 above the consideration amount

26  set forth in paragraph 3 of the LOI in cash, and be accompanied by a cash deposit of

27  $600,000.  The Qualifying Bid shall provide no less than the net Closing Cash (as the term is

28  defined in the LOI) plus the required $600,000 overbid, and no more than the net Working

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

-10-

Capital Commitment (as the term is defined in the LOI).  The Parties also agreed that all
subsequent bids from "Qualifying Bidders" must be in increments of not less than $50,000,
and such additional amounts shall be allocated to the Closing Cash portion of their bid and
not the Working Capital Commitment.  In addition, the Parties agreed that Balmoral would
have the right to match the economic terms of any competing bid submitted for a Third Party
Transaction and have its bid be considered the highest and best bid.[3]

**5.    Due Diligence Period (LOI, p.4, ¶ 8D).**

The Parties agreed that a due diligence period would be provided for all interested
parties once the No-Shop Period expires if the Definitive Documents provide for a 363 Sale or
the Company receives a termination notice from Balmoral.

**6.    Auction/Sale Timeline (LOI, p.5, ¶ 8E).**

The Parties agreed that if the Definitive Documents provide for a 363 Sale then (i) the
auction should occur no later than May 20, 2011, and the Parties should request (ii) the
Bankruptcy Court to enter an order approving and authorizing the Sale no later than May 27,
2011, subject to reasonable adjustments for the Court's schedule.  Neither such deadline may
be extended (other than for reasonable accommodations of the Court's schedule) without
Balmoral's written consent.

These terms and conditions were entered into with Balmoral consistent with the
Debtors' exercise of their business judgment and fiduciary duties to the estates and in
recognition of the need to expedite the Sale process while promoting active bidding at the
appropriate time in an effort to secure the highest and best offer the marketplace can sustain
for the Debtors' business.

---

[3] Again, the overbid procedures set forth in the LOI are not intended to be final or exhaustive.  The Parties
anticipate negotiating further bidding procedures, which would then be incorporated into the sale motion
and/or a bid procedures motion that would be filed with the Court at a later date.

MOTION FOR ORDER APPROVING LETTER OF INTENT

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

8313.001  873260.2

### III.

### THE STALKING HORSE BIDDER PROTECTIONS

### SHOULD BE APPROVED TO FACILITATE THE DEBTORS' EXIT TRANSACTION

As stated above, the Stalking Horse Bidder Protections contemplated by the LOI include the provisions of the No-Shop Period, Break-Up Fee, Expense Reimbursement, and other overbid protections and agreed-upon timeline. The Stalking Horse Bidder Protections should be approved because they (i) are the product of the Debtors' sound business judgment; (ii) are in the best interest of the Debtors' estates and all other interested parties; (iii) will foster the maximization of the value of the assets to be sold/purchased; (iv) are the result of arms-length negotiations between the Debtors and Balmoral; and (v) will enhance the bidding process. The Debtors believe that the Stalking Horse Bidder Protections are (a) fair and reasonable given the benefits to the estates of having a definitive agreement on essential terms and the risk to Balmoral that a third-party offer ultimately may be accepted and (b) necessary to preserve and enhance the value of the Debtors' estates.

### A.    The Legal Standard.

Break-up fees and other arrangements, such as those proposed here, are "important tools to encourage bidding and to maximize the value of the debtor's assets." *In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992). Bid protections encourage potential buyers such as Balmoral to make bids to purchase a company's assets, and typically offer a combination of various incentives such as break-up fees and expense reimbursement agreements. *See In re Integrated Res., Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992) *aff'd*, 147 B.R. 650 (S.D.N.Y. 1992). A "break-up" or "stalking horse" fee is a "fee paid to a potential acquirer of a business, or certain assets, by the seller, in the event that the transaction contemplated fails to be consummated and certain criteria in the purchase agreement are met." *Id.* Expense reimbursement provisions grant a potential acquirer the right to payment for its efforts, resources, lost opportunity costs and risks associated with investigating and negotiating a sale of a company. *See In re APP Plus, Inc.*, 223 B.R. 870, 874 (Bankr. E.D.N.Y. 1998).

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

1    Outside of the bankruptcy context, sellers often use bid protections and break-up fees

2    to attract bidders. *See In re Integrated Res., Inc.*, 135 B.R. at 750; *In re Hupp Indus., Inc.*, 140

3    B.R. 191, 195 (Bankr. N.D. Ohio 1992). Similarly, numerous bankruptcy courts have

4    approved motions by debtors requesting bid protections and break-up fees. *See In re*

5    *Integrated Res., Inc.*, 135 B.R. at 751(citing several instances of bankruptcy court approval of

6    bid protections). Indeed, the Debtors submit that such protections are routinely granted in

7    chapter 11 bankruptcy cases. The rationale for granting bid protections is to encourage an

8    initial bid. *APP Plus, In re Holley Garden Apartments, Ltd.*, 223 B.R. 822, 824 (Bankr. M.D.

9    Fla. 1998). A debtor can use the initial offer to demonstrate the attractiveness of the assets

10    and induce higher offers. *See In re Integrated Res., Inc.*, 135 B.R. at 750. At the same time,

11    the initial offeror desires protection that another entity will not rely on the offeror's efforts,

12    including costly due diligence, to submit a higher bid. *See id.* As such, bankruptcy courts

13    routinely permit bid protections if they create an incentive for increased bidding on the

14    estate's assets. *In re Wintz Companies*, 230 B.R. 840, 846 (B.A.P. 8th Cir. 1999) *aff'd*, 219

15    F.3d 807 (8th Cir. 2000).

16    Courts have applied various tests to determine whether the bid protections offered by

17    a debtor should be granted. The primary concern of these courts is "whether the offer made

18    by the party seeking the break-up fee will enhance or hinder the bidding process. If the

19    break-up fee encourages bidding, it will be approved, if it stifles bidding, it will not be

20    approved." *In re Integrated Res., Inc.*, 135 B.R. at 750.

21    **B.**    **The Stalking Horse Bidder Protections Are Fair, Reasonable, and in the**

22    **Best Interest of the Debtors' Estates.**

23    As further set forth below, the anticipated Break-up Fee is reasonable in light of

24    Balmoral's projected efforts and is necessary to encourage the submission of qualified bids to

25    initiate the auction/sale process. The Expense Reimbursement is intended to cover

26    Balmoral's costs in conducting due diligence of the Debtors' operations and the costs of

27    negotiating and documenting the Definitive Documents. Balmoral's initial offer will serve as

28    a floor for other bids and will attract other bids that otherwise would not have been made or

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

-13-

8313.001  873260.2

MOTION FOR ORDER APPROVING LETTER OF INTENT

1  would have otherwise been limited.  Thus, if Balmoral is not the successful buyer, the

2  Expense Reimbursement will be covered by the proceeds that will be realized from the Third

3  Party Transaction with the higher and better bid.  This provides an obvious benefit to the

4  Debtors' estates.

5       The other Stalking Horse Bidder Protections set forth in the LOI are also appropriate

6  under the circumstances and likewise in the best interests of the Debtors' estates.  The

7  Debtors agreed to a modest minimum overbid requirement that reflects the level of effort and

8  expense required of Balmoral as well as the magnitude of the Debtors' assets and the scope of

9  their business operations.  The Debtors do not believe that the protections afforded to

10 Balmoral in the LOI will deter serious competing bidders.  The proposed timeline is intended

11 to promote an efficient and effective bidding/sale process while complying with the

12 requirements of the Bank.

13       **1.    The LOI is a Product of the Debtors' Sound Business Judgment.**

14       Historically, bankruptcy courts have approved bidding incentives similar to the

15 Stalking Horse Bidder Protections under the "business judgment rule."  *See, e.g., In re 995*

16 *Fifth Ave. Associates, L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be

17 legitimately necessary to convince a 'white knight' to enter the bidding by providing some

18 form of compensation for the risks it is undertaking").  Because the agreed upon terms of the

19 LOI are the product of a sound business decision, made in good faith and with full

20 information, the Court should approve the Stalking Horse Bidder Protections pursuant to the

21 business judgment rule.

22       One court has explained that, in applying the business judgment rule in the break-up

23 fee and sales procedures context, a court must ask: "(1) is the relationship of the parties who

24 negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper,

25 rather than encourage, bidding; (3) is the amount of the fee unreasonable relative to the

26 proposed purchase price?"  *In re Integrated Res., Inc.*, 147 B.R. at 657.  The *Integrated*

27 *Resources* court determined that if the answer to each of these questions is negative, then the

28 proposed break-up should be approved.  *Id.; also see In re Hupp Indus., Inc.*, 140 B.R.,

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

-14-

1   194(identifying certain factors to be considered in determining the propriety of bid

2   protections).

3        Applying this test to the Stalking Horse Bidder Protections supports approval of this

4   Motion.  Throughout the negotiation process, the proposed terms were extensively

5   negotiated and were the subject of considerable internal deliberation among the Debtors and

6   their professionals.  Accordingly, the Stalking Horse Bidder Protections are the result of a

7   sound business judgment, made in good faith and with full information.  Furthermore, the

8   Break-up Fee, Expense Reimbursement and conditional "No-Shop" provisions are not tainted

9   by self-dealing or manipulation because they were extensively negotiated at arm's-length

10  between the Parties.  The Parties are unrelated and have had virtually no prior ordinary

11  course business dealings.

12       Once a debtor articulates a valid business justification, "[t]he business judgment rule

13  is a presumption that in making a business decision the directors of a corporation acted on an

14  informed basis, in good faith and in the honest belief that the action was in the best interests

15  of the company." *In re S.N.A. Nut Co.*, 186 B.R. 98 (Bankr. N.D. Ill. 1995)(internal quotation,

16  citation omitted); *In re Integrated Res., Inc.*, 147 B.R., 656; *In re Johns-Manville Corp.*, 60 B.R.

17  612, 615-16 (Bankr. S.D.N.Y. 1986)("a presumption of reasonableness attached to a debtor's

18  management decisions").  Indeed, when applying the "business judgment" rule, courts show

19  great deference to the debtor's decision making.  *See In re Summit Land Co.*, 13 B.R. 310, 315

20  (Bankr. D. Utah 1981).

21       Given all of the above, and the degree of connection between the LOI, final bidding

22  procedures to be further negotiated and proposed, and the ultimate Sale, it is clear that the

23  Stalking Horse Bidder Protections are in the best interests of the Debtors and their

24  bankruptcy estates.

25               2.     **The Proposed Procedures Enhance Competitive Bidding.**

26       In determining whether to approve bidding incentives similar to the Stalking Horse

27  Bidder Protections, other courts, instead of applying the business judgment rule, have

28  evaluated whether (a) such incentives including a break-up fee would chill the bidding; and

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

8313.001  873260.2

1  (b) the transaction as a whole would further the diverse interests of the debtor, creditors and

2  equity security holders alike. *See, e.g., In re Am. W. Airlines, Inc.*, 166 B.R. 908, 912 (Bankr.

3  D. Ariz. 1994).

4        The Debtors believe that the Stalking Horse Bidder Protections will foster, rather than

5  hinder, competitive bidding. First of all, the Stalking Horse Bidder Protections will provide

6  protection and increased certainty to Balmoral, inducing it to submit its highest and best bid,

7  which, in turn, will trigger competitive bidding by attracting other qualified bidders to make

8  their bids. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999)(explaining

9  that a break-up fee could be found to be a benefit to the estate where "assurance of a break-

10  up fee promoted more competitive bidding"). Although under the conditional exclusivity

11  provision, the Debtors may not actively solicit and engage in negotiations regarding potential

12  competing bids during the initial No-Shop Period, they still may continue to receive, and also

13  transmit, information in connection with a Sale provided that same is also provided to

14  Balmoral. Also, when the No-Shop Period expires, the Debtors will be free to solicit and

15  engage in negotiations regarding potential competing bids without restrictions. Second, the

16  Staking Horse Bidder Protections provide clear guidance to the Parties regarding requisites of

17  competitive bids and a solid basis upon which to further negotiate and finalize relevant

18  bidding procedures.

19              3.    **The Proposed Protections are Fair and Reasonable.**

20        The Stalking Horse Bidder Protections, including the Break-Up Fee and Expense

21  Reimbursement, are fair and customary under the circumstances, and Balmoral, who has

22  presented the most attractive preliminary offers to the Debtors thus far, would not be

23  interested in acting as the "stalking horse" without these negotiated protections, and some

24  level of assurance that these protections would still be available should it further proceed

25  with its efforts and expenditure of resources in connection with the Transaction.

26        The amount of the proposed Break-Up Fee is not unreasonable relative to the

27  proposed purchase price. The combined amount of the proposed Break-Up Fee and Expense

28  Reimbursement, at a maximum, is $600,000, which is in the range of 1% to 5% of the

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

8313.001  873260.2

MOTION FOR ORDER APPROVING LETTER OF INTENT

1    aggregate value to be realized by Balmoral by the potential Sale. This percentage is within

2    the range of fees generally approved by bankruptcy courts. In light of the complexity and

3    size of the proposed transaction, a break-up fee of $325,000.00 (which is in the range of 1%

4    to 3% of the aggregate value to be realized) is reasonable. "A general rule of thumb is that

5    breakup fees which equate to about 3% or less of the proposed purchase price are approved,

6    while breakup fees of greater amounts are more suspect." *See* THE THE *LEGAL CONSIDERATIONS*

7    *OF ACQUIRING DISTRESSED BUSINESS: A PRIMER*, 11 J. BANKR. L. & PRAC. 3 (2001), FN 12. In any

8    event, in light of the efforts made and will be made by Balmoral, the size of the proposed

9    transaction, the circumstances of the Debtors, and customary protections provided to the

10    stalking horse bidder under similar circumstances, the Debtors submit that the proposed

11    Break-Up Fee is reasonable. In addition, given this relatively insubstantial percentage of the

12    purchase price, the Debtors do not believe that the aggregate amount will have a chilling

13    effect on future bids.

14        Furthermore, the Bank has reviewed the LOI prior to the filing of this Motion and the

15    Debtors understand that it does not oppose the terms and conditions contained therein,

16    including the provisions for the Stalking Horse Bidder Protections. Bennish Decl., ¶ 12.

17        4.    **The Proposed Transaction is in the Best Interests of the Estates and**

18            **Other Interested Parties.**

19        In determining whether to approve terms and conditions related to a proposed

20    transaction, many courts consider whether the transaction is (i) in the best interest of the

21    estates, creditors, equity holders, and other parties involved and (ii) maximizes revenues for

22    the estates. *In re S.N.A. Nut Co.*, 186 B.R., 104; *In re Am. W. Airlines, Inc.*, 166 B.R., 912.

23        The Stalking Horse Bidder Protections should be approved also because they induce a

24    transaction that is in the best interests of the Debtors' estates and other creditor

25    constituencies involved in these cases and maximizes revenues for the estates. As discussed

26    above, the Stalking Horse Bidder Protections will encourage bidding by inducing Balmoral to

27    pursue the Transaction, thereby demonstrating the attractiveness of the Transaction to other

28    potential purchasers. It is axiomatic that the receipt of higher bids will benefit the

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

8313.001  873260.2

-17-

MOTION FOR ORDER APPROVING LETTER OF INTENT

1  bankruptcy estates and parties-in-interest.  Even if no further bids are obtained, all parties

2  involved will retain the benefit inherent in Balmoral's offer and the reassurance of a market

3  tested price.  Obviously, the Transaction will result in a greater return for the creditors and

4  parties-in-interest than a liquidation.  Further, if Balmoral's offer is accepted, the Debtors will

5  not be required to pay the Break-up Fee or the Expense Reimbursement.  Finally, absent

6  authorization of the Stalking Horse Bidder Protections, the Debtors may lose the opportunity

7  to obtain the highest and best offer for the sale of the Debtors' assets.  Balmoral may not

8  commit to going forward with the Sale if the protections are not assured.  In fact, not only

9  Balmoral, but any serious bidder will likely require similar bid protections before pursuing

10 diligence and making a binding offer.  For these reasons, the Stalking Horse Bidder

11 Protections will serve the interest of all parties and maximize revenues for the estates.

12        5.    **The Primary Objectives:  Closing the Sale Prior to May 27, 2011.**

13        The Debtors' primary objective in seeking approval of this Motion is to facilitate and

14 close the sale of the Debtors' operations as a going concern prior to the end of May, 2011.

15 Although the LOI proposes a slightly different schedule from the timeline stated in the

16 February Order as to the dates by which the Debtors shall have negotiated and executed a

17 definitive asset purchase agreement, and filed a motion seeking approval of the Sale,

18 ultimately the same objectives will be achieved under either of the timelines.  In either

19 scenario, the Sale must be closed by the end of May, 2011.  Therefore, the different mid-term

20 milestones proposed in the LOI should not be a negative factor in determining whether the

21 Motion should be granted.

22                              **IV.**

23                            **CONCLUSION**

24        Based on the foregoing, the Company respectfully requests an order of the Court:

25        (A)    Approving the provisions contained in section 8 of the LOI, described in this

26 Motion as the Stalking Horse Bidder Protections, in their entirety;

27        (B)    Authorizing the Debtors to pay the Break-Up Fee and Expense Reimbursement

28 to Balmoral in case it is not the final buyer, in accordance with terms and conditions set forth

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

MOTION FOR ORDER APPROVING LETTER OF INTENT

8313.001  873260.2

1    in the LOI, including providing Balmoral's right to payment with administrative superpriority

2    status;

3         (C)    Approving the conditional "No-Shop" exclusivity provision set forth in

4    paragraph 8A of the LOI;

5         (D)    Approving the overbid procedures set forth in paragraph 8C of the LOI;

6         (E)    Approving the provision of due diligence period as set forth in paragraph 8D of

7    the LOI;

8         (F)    Approving the timeline proposed by the LOI; and

9         (G)    Granting such other and further relief as the Court deems just and proper.

10

11                              Respectfully submitted,

12    DATED:  March 22, 2011              RUTTER HOBBS & DAVIDOFF
                             INCORPORATED

13

14                            By_____

15                               BRIAN L. DAVIDOFF

16                               C. JOHN M. MELISSINOS
                           CLAIRE E. SHIN

17                            General Reorganization Attorneys for
                        Debtors and Debtors-in-Possession

18

19

20

21

22

23

24

25

26

27

28

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

-19-

8313.001  873260.2

### DECLARATION OF MICHAEL BENNISH

I, Michael Bennish, declare:

1.    I am Chief Executive Officer ("CEO") and Chairman of the Board of Directors of both Debtors and Debtors-in-Possession P&C Poultry Distributors, Inc., a California corporation ("P&C"), and Custom Processors, Inc., a California corporation ("Custom" and, collectively with P&C, the "Company" or the "Debtors"). I have been responsible for and have overseen the general operations of the Company since the mid-1990s and, in my current capacity, I am familiar with the day-to-day operations, business, and financial affairs of the Company.

2.    I submit this declaration (the "Declaration") in support of the Debtors' *Motion for Order Approving the Stalking Horse Bidder Protections Set Forth In the Letter of Intent with Balmoral Advisors, LLC* (the "Motion").

3.    Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other employees and representatives of the Company, my review of relevant documents, or my opinion based upon my experience and knowledge of the Company's operations and financial condition. If I were called to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Company.

4.    The Company is a "further processor" of chicken meats (i.e., chicken meats that have been cut, de-boned, marinated, battered, breaded, partially fried or "par-fried," frozen, or otherwise prepared for cooking by restaurants and other food service establishments), and distributor of processed poultry products operating out of a U.S.D.A.-certified facility located in City of Industry, California. The Company produces value-added frozen and fresh poultry products for re-sale to major fast food restaurant chains and casual dining services, including CKE Restaurants, Inc. (Carl's Jr., Hardee's), Yum! Brands, Inc. (KFC, Taco Bell), the Carlson Companies (Pickup Stix, T.G.I. Friday's) and Daphne's Greek Cafe. The Company is a well-regarded, top-tier food supplier with annual sales topping $48 million in 2010.

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

8313.001  873260.2

-20-

MOTION FOR ORDER APPROVING LETTER OF INTENT

5.    I caused P&C and Custom to commence their chapter 11 cases on August 27, 2010 (the "Petition Date") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in order to protect the value of their assets and pursue a strategy that will permit them to reorganize for the benefit of all stakeholders.  An order granting joint administration of the P&C and Custom bankruptcy cases, under P&C's bankruptcy case number, was entered on September 1, 2010 [Docket No. 16 in the P&C case].

6.    Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors continue to operate their business and manage their properties as debtors-in-possession.  The first meeting of creditors pursuant to section 341(a) of the Bankruptcy Code was held on October 18, 2010, and has been completed.  On November 24, 2010 the United States Trustee ("UST") appointed a Committee of Creditors Holding Unsecured Claims (the "Committee").

7.    On September 3, 2010, the Debtors submitted substantially all the items they were required to submit to the Office of the United States Trustee with the "7-Day Package."   On October 1, 2010, each of P&C and Custom filed their Schedules of Assets and Liabilities and Statements of Financial Affairs.  The Debtors have timely filed all their Monthly Operating Reports, and thus the Debtors are current on their administrative duties as debtors and debtors-in-possession herein.

8.    On December 21, 2010, the Court entered its order extending the Debtors' exclusive periods such that the period during which only the Debtors may file a plan of reorganization will run through and including April 25, 2011, and the period during which only the Debtors may solicit acceptances of a plan will run through and including June 24, 2011.  On December 28, 2010, the Court entered an order setting February 28, 2011 as the deadline for filing pre-petition claims.  The Debtors served and filed notice of the deadline on or about December 30, 2010.

9    On December 21, 2010, the Court entered an order authorizing the employment of Mosaic Capital LLC ("Mosaic") as investment bankers for the Debtors.  As further described below, Mosaic has done a significant amount of work in attempting to

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

MOTION FOR ORDER APPROVING LETTER OF INTENT

8313.001  873260.2

1    locate new financing sources for the Debtors, and eventually identifying Balmoral as a

2    stalking horse bidder/potential buyer for the Debtors' assets.

3        10.    By orders entered on October 4, 2010, November 29, 2010, January 28, 2011

4    and February 11, 2011, the Court authorized the Debtors' use of cash collateral. After a

5    hearing on the Debtors' Further Motion for Order Authorizing Continued Use of Cash

6    Collateral on February 9, 2011, the Court entered its order (the "February Order") extending

7    the Debtors' authority to use cash collateral through May 13, 2011. A true and correct copy

8    of the February Order is attached hereto as Exhibit "1". The February Order contains a

9    timeline in accordance of which certain events in connection with a Sale and/or confirmation

10    of a chapter 11 plan (the "Plan") must take place, as follows:

11      (i)    If **Sale**:

12          (a)    **March 4, 2011** – The Debtors shall have identified a transaction

13    by this date and a buyer/partner with respect to such transaction.

14          (a)    **April 1, 2011** – The Debtors shall have negotiated and executed a

15    definitive asset purchase agreement.

16          (b)    **April 20, 2011** – The Debtors shall file a motion seeking approval

17    of a Sale.

18          (c)    **May 31, 2011** – The Sale shall close by this date after entry of an

19    order approving a Sale.

20      (ii)    If **Plan**:

21          (a)    **March 4, 2011** – The Debtors shall have identified a transaction

22    by this date and a buyer/partner to form the basis of the Plan.

23          (b)    **April 29, 2011** – A hearing on the approval of a disclosure

24    statement describing the Plan must occur by this date.

25          (c)    **June 30, 2011** – A confirmation hearing on the Plan must occur

26    by this date.

27        11.    On or about March 10, 2011, Balmoral and I, on behalf of the Company,

28    executed a Letter of Intent agreement (the "LOI"), which contains the parties' preliminary

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

8313.001  873260.2

-22-

agreement relating to a potential sale of substantially all of the Debtors' assets or a plan of reorganization for the Debtors with Balmoral as the sponsor. A true and correct executed copy of the LOI (partly redacted) is attached hereto as Exhibit "2". Also, on or about the same date, Daniel Bennish and I entered into a letter agreement with Balmoral regarding our future management of the new entity that would be established after a Sale to Balmoral (the "Management LOI"). A true and correct executed copy of the Management LOI (partly redacted) is attached hereto as Exhibit "3".

12.    Balmoral has required that for it to incur the time and expense related to diligence and potentially negotiating definitive agreements, it requires court approval of the Stalking Horse Bidder Protections (as the term is defined in the Motion) at the earliest possible time. At the same time, the Company and I, and also, on information and belief, the Company's primary secured creditor, East West Bank (the "Bank"), believe that it would be premature to reveal certain financial aspects of the LOI, in that it is not yet a definitive agreement. As such, certain portions of the LOI and the Management LOI attached hereto have been redacted. However, I am informed and believe that the Bank has reviewed the LOI and that it does not oppose the terms and conditions contained therein, including the provisions for the Stalking Horse Bidder Protections.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 22nd day of March, 2011, at City of Industry, California.

_____
MICHAEL BENNISH

RUTTER
HOBBS
DAVIDOFF
INCORPORATED
LAWYERS

1

## DECLARATION OF GORDON GREGORY

2    I, Gordon Gregory, declare:

3    1.    I am the chairman and a managing director of Mosaic Capital LLC, a California

4    limited liability company ("Mosaic"), the investment banker and financial advisor to Debtors

5    and Debtors-in-Possession P&C Poultry Distributors, Inc. ("P&C") and Custom Processors, Inc.

6    ("Custom" and, collectively with P&C, the "Debtors" or the "Company"). Mosaic is employed

7    as investment bankers to the Debtors with respect to the potential sale of some or all of their

8    assets, or with respect to a corporate reorganization centered around new investment into

9    the Debtors. I am one of the professionals at Mosaic principally responsible for our work on

10   behalf of the Debtors.

11   2.    I make this declaration in support of the *Debtors' Motion for Order Approving the*

12   *Stalking Horse Bidder Protections Set Forth in the Letter of Intent With Balmoral Advisors, LLC*

13   (the "Motion"). Except for those statements made upon information and belief, the following

14   facts are based upon my personal knowledge and if called to testify, I could and would

15   competently testify to such facts. As to those statements made upon information and belief, I

16   believe them to be true.

17   3.    Since its retention by the Debtors, Mosaic has been actively engaged in

18   identifying and contacting potential purchasers (or equity sources) for the Debtors' business,

19   organizing the process, assisting potential bidders/investors in the conduct of due diligence,

20   and conducting other activities designed to maximize the value of the estates. As part of this

21   process, Mosaic identified and contacted at least 40 parties which have indicated an interest

22   in purchasing the Debtors' assets, and of these, at least 25 serious, interested potential buyers

23   signed and returned non-disclosure agreements.

24   4.    Mosaic completed a "pitch book" to be used in the formal effort to solicit

25   interest in the Debtors. Although seemingly a simple task, the "pitch book" reflects the sum

26   total of Mosaic's understanding of the Debtors' business, including customers, industrial

27   processes, profit and margin drivers, actual and pro forma financials, and competitive

28   position in the marketplace.

RUTTER &
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

MOTION FOR ORDER APPROVING LETTER OF INTENT

8313.001  873260.2

5.      At the same time as formal, broad marketing efforts were underway, we worked through the end of the year holidays to generate interest from firms we knew might have a special interest in the Debtors' business. Given the specialized nature of the Debtors' business and operating environment, we targeted parties generally falling into the following categories: (a) food companies with either a focus in poultry or other types of meat processing or private label manufacturing; and (b) private equity firms with a focus on distressed transactions and a history of working with food and/or agriculture related companies, including parties having prior experience with asset sales under 11 U.S.C. § 363. Of these parties, three met with the Debtors at the Debtors' offices.

6.      In or around late February, we completed our marketing process and commenced negotiations with one or more lead bidders. Shortly afterward, we identified Balmoral as a stalking horse bidder/potential buyer for the Debtors' operations. After extensive negotiations with Balmoral and considerable internal deliberation among the Debtors, their general reorganization attorneys and us at Mosaic, on or about March 10, 2011, the Debtors and Balmoral (the "Parties") executed a Letter of Intent agreement (the "LOI"), which contains the Parties' preliminary agreement relating to a potential Sale. A true and correct copy of the LOI is attached as Exhibit "2" to the accompanying Declaration of Michael Bennish. The LOI, however, is not intended to be an asset purchase agreement, which would contain all matters upon which the Parties need to agree for a Sale. Neither is it intended to be an exhaustive list of the bidding procedures.

7.      Balmoral has begun its due diligence on the assets and liabilities of the Company following the execution of the LOI. If Balmoral determines the results of its preliminary diligence support further expenditure of its time and money, it will begin to negotiate formal agreements ("Definitive Document(s)") for a transaction ("Transaction") with the Debtors. The Parties anticipate that they will be in a position to execute the Definitive Documents by April 29, 2011 and close the Transaction if it is through a section 363 sale by May 27, 2011.

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

8313.001  873260.2

-25-

MOTION FOR ORDER APPROVING LETTER OF INTENT

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this ___th day of March, 2011 at Los Angeles, California.

GORDON GREGORY

MOTION FOR ORDER APPROVING LETTER OF INTENT