1  Brian L. Davidoff (State Bar No. 102654)
Email:  bdavidoff@rutterhobbs.com
2  C. John M. Melissinos (State Bar No. 149224)
Email:  jmelisinos@rutterhobbs.com
3  Claire E. Shin (State Bar No. 249492)
Email:  cshin@rutterhobbs.com
4  RUTTER HOBBS & DAVIDOFF
   INCORPORATED
5  1901 Avenue of the Stars, Suite 1700
Los Angeles, California 90067
6  Telephone: (310) 286-1700
Facsimile:  (310) 286-1728
7
8  General Reorganization Attorneys for
Debtors and Debtors-in-Possession

9

UNITED STATES BANKRUPTCY COURT

10

CENTRAL DISTRICT OF CALIFORNIA

11

LOS ANGELES DIVISION

12

| | |
|---|---|
| In re: | Case No. 2:10-bk-46350-PC |
| P&C POULTRY DISTRIBUTORS, INC., | Jointly Administered with Case No. 2:10-bk-45362-PC |
| Debtor and Debtor-in-Possession. | Chapter 11 |
| | **NOTICE OF MOTION AND FURTHER MOTION BY DEBTORS AND DEBTORS-IN-POSSESSION P&C POULTRY DISTRIBUTORS, INC. AND CUSTOM PROCESSORS, INC. FOR ORDER AUTHORIZING CONTINUED USE OF CASH COLLATERAL; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF BRUCE WEINSTEIN IN SUPPORT THEREOF** |
| In re: | |
| CUSTOM PROCESSORS, INC., | Hearing: |
| Debtor and Debtor-in-Possession. | Date:  June 29, 2011 Time:  9:30 a.m. Ctrm:  Courtroom 1539 Edward R. Roybal Fed. Bldg. 255 East Temple Street Los Angeles, CA 90012 |

26

27  //

28  //

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

---

FURTHER MOTION FOR ORDER AUTHORIZING CONTINUED USE OF CASH COLLATERAL

8313.001  923117.7

1   **TO THE HONORABLE PETER CARROLL, UNITED STATES BANKRUPTCY JUDGE,**

2   **THE UNITED STATES TRUSTEE, EAST WEST BANK, THE OFFICIAL COMMITTEE OF**

3   **UNSECURED CREDITORS, ALL PARTIES-IN-INTEREST HEREIN, AND THEIR**

4   **RESPECTIVE COUNSEL:**

5        **PLEASE TAKE NOTICE** that on June 29, 2011 at 9:30 a.m. or as soon thereafter as

6   can be heard, in Courtroom 1539, at the Edward R. Roybal Federal Building and U.S.

7   Courthouse, 255 E. Temple Street, Los Angeles, CA 90012, the Debtors and Debtors-in-

8   Possession P&C Poultry Distributors, Inc. ("P&C") and Custom Processors, Inc. ("Custom"

9   and, collectively with P&C, the "Company" or the "Debtors"), will and hereby do move (the

10  "Motion") the Court for the entry of an order (1) authorizing the continued use by the

11  Debtors of cash collateral ("Cash Collateral") of their secured lender, East West Bank (the

12  "Bank"), in accordance with a new budget (the "Fifth Budget"), and (2) granting

13  replacement liens and other adequate protections to the Bank as described in this Motion.

14       This Motion is made pursuant to 11 U.S.C. § 363(c), Rule 4001 of Federal Rules of

15  Bankruptcy Procedure and Local Bankruptcy Rules 4001-1 and 9075-1.  The Motion is based

16  on the attached Memorandum of Points and Authorities, the Declaration of Bruce Weinstein,

17  the exhibits thereto and all the pleadings filed to date in these bankruptcy cases.

18       The Fifth Budget is designed to serve as a bridge to the Debtors' exit strategy:

19  reorganization under a chapter 11 plan.  The Debtors have filed a proposed chapter 11 plan

20  and disclosure statement concurrently with the filing of this Motion.  The proposed plan

21  contemplates that the Debtors will, in accordance with their restructured operations, pay the

22  Bank in full over time and pay approximately 10% to unsecured creditors on a pro rata

23  basis.  During the period of the Fifth Budget the Debtors will proceed with all due speed

24  toward negotiating and ultimately confirming the proposed plan, which they hope can

25  proceed on a consensual basis.  To that end, the Debtors request that the Fifth Budget be

26  approved and that they be authorized to continue to use the Cash Collateral of the Bank in

27  accordance with the Fifth Budget, for the benefit of all creditors herein.

28  //

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

1

FURTHER MOTION FOR ORDER AUTHORIZING CONTINUED USE OF CASH COLLATERAL

1    **PLEASE TAKE FURTHER NOTICE** that in accordance with the briefing schedule set

2    at a hearing in these cases on June 1, 2011, any responses or opposition to the Motion must

3    be filed with the Court no later than June 27, 2011.  In accordance with Local Bankruptcy

4    Rule 9013-1(c)(2), any response to the Motion shall be in writing in the form required by

5    Local Bankruptcy Rule 9013-1(f) and shall be filed with the Bankruptcy Court at 255 E.

6    Temple Street, Los Angeles, CA 90012, and served upon counsel for the Debtors at the

7    address listed in the upper left-hand corner of the caption page, and upon the Office of the

8    United States Trustee, 725 S. Figueroa St., Suite 2600, Los Angeles, California 90017.

9

10                                                    Respectfully submitted,

11   DATED:     June 20, 2011                 RUTTER HOBBS & DAVIDOFF
                                                  INCORPORATED

12

13                                            By      _/s/ C. John M. Melissinos_____
                                                  BRIAN L. DAVIDOFF
14                                                C. JOHN M. MELISSINOS
                                                  CLAIRE E. SHIN
15                                                General Reorganization Attorneys for
                                                  Debtors and Debtors-in-Possession
16

17

18

19

20

21

22

23

24

25

26

27

28

RUTTER
HOBBS
DAVIDOFF
INCORPORATED
L A W Y E R S

2
FURTHER MOTION FOR ORDER AUTHORIZING CONTINUED USE OF CASH COLLATERAL
8313.001  923117.7

## TABLE OF CONTENTS

Page

**MEMORANDUM OF POINTS & AUTHORITIES**........................................................1

**INTRODUCTION** ........................................................................................................1

**BACKGROUND FACTS**..............................................................................................2

    **A.**    **Company Overview.** .......................................................................2

    **B.**    **Status of the Bankruptcy Cases.** .................................................3

    **C.**    **The Debtors' Operations to Date.**.................................................4

        1.    Proceedings on and the Authorization to Use Cash Collateral. .........4

        2.    The Debtors' Continued Performance.............................................6

    **D.**    **The Fifth Budget.**..........................................................................6

    **E.**    **Mosaic and Debtors' Efforts Re Potential Sale of Assets.**........................7

**THE USE OF CASH COLLATERAL FOR OPERATIONS SHOULD** .................................8

**BE AUTHORIZED IN ACCORDANCE WITH THE FIFTH BUDGET** .............................8

    **A.**    **The Legal Standard.** .....................................................................8

    **B.**    **The Bank Will Remain Adequately Protected During the New**
        **Budget Period.**..........................................................................11

        1.    The Fifth Budget Is Feasible. ..........................................................11

        2.    The Bank Will Remain Adequately Protected. ..................................11

    **C.**    **Information Required by Local Bankruptcy Rule 4001-2.** ....................14

**CONCLUSION**............................................................................................................14

**DECLARATION OF BRUCE WEINSTEIN** ....................................................................16

RUTTER
HOBBS ☒
DAVIDOFF
INCORPORATED
L A W Y E R S

FURTHER MOTION FOR ORDER AUTHORIZING CONTINUED USE OF CASH COLLATERAL
8313.001   923117.7

## TABLE OF AUTHORITIES

1                                                                                                Page

2

3  **FEDERAL CASES**

4  *Gen. Elec. Mortgage Corp. v. S. Vill. Inc. (In re S. Vill., Inc.)*, 25 B.R. 987, 989-90 & n.4
     (Bankr. D. Utah 1982) ...................................................................................................10
5

6  *In re First S. Sav. Ass'n*, 820 F.2d 700, 710 (5th Cir. 1987)...................................................11

7  *In re Markos Gurnee Partnership*, 252 B.R. 712, 716 (Bankr. N.D. Ill. 1997).......................11

8  *In re McCombs Properties VI, Ltd.*, 88 B.R. 261 (Bankr. C.D. Cal. 1988) ...............................11

   *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984)...............................................................11
9
   *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assoc. Ltd.*, 484 U.S. 365, 108 S.Ct. 626
10    (1988) ..........................................................................................................................10

11 **STATE CASES**

12 11 U.S.C § 363(a)..............................................................................................................8, 9

13 11 U.S.C. § 361 ...................................................................................................................10

14 11 U.S.C. § 506(a)...............................................................................................................10

15 11 U.S.C. § 506(c)...............................................................................................................14

16 11 U.S.C. § 552(b) ..............................................................................................................14

17 11 U.S.C. §§ 544, 545, 547, 548, or 549 ..............................................................................14

18 **CASES**

19 O'Toole, *Adequate Protection and Post-Petition Interest in chapter 11 Proceedings*, 56 Am.
     Bankr. L.J. 251, 263 (1982) ............................................................................................10
20
   H.R. Rep. No. 950-595, pp. 181, 356 (1977)........................................................................10
21
   S. Rep. No. 95-989, p. 68 (1978) ........................................................................................10
22
   U.S. Code Cong. & Admin. News, 1978 pp. 5787, 5854, 6141, 6312 ...................................10

23

24

25

26

27

28

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

**FURTHER MOTION FOR ORDER AUTHORIZING CONTINUED USE OF CASH COLLATERAL**
8313.001   923117.7

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

By the within motion (the "Motion"), Debtors and Debtors-in-Possession P&C Poultry Distributors, Inc. ("P&C") and Custom Processors, Inc. ("Custom" and, collectively with P&C, the "Company" or the "Debtors"), in furtherance of the Debtors' ultimate restructuring under Bankruptcy Court protection, seek continued authority to use cash collateral ("Cash Collateral") of their secured lender, East West Bank (the "Bank"), in accordance with a new budget (the "Fifth Budget").

As previously presented to the Court, the Debtors had a potential buyer/stalking horse bidder for the Debtors' assets, and they were expecting to be able to enter into an asset purchase agreement by late April, 2011. The Debtors proceeded toward negotiating definitive agreements and ultimately consummating a sale with the potential buyer, Balmoral Advisors, LLC ("Balmoral"). However, after conducting its due diligence, Balmoral decided, abruptly and unexpectedly, that it would not further pursue its interest in the Debtors' assets. On or about April 25, 2011, Balmoral formally notified the Debtors that it would be withdrawing from a potential transaction with the Debtors.

After this turn of events, the Debtors promptly commenced discussions with the Bank and with the Committee to work out a consensual plan of reorganization (as defined below, the "Proposed Plan"). During the course of these discussions, the Debtors shared their projections in the form of a new budget (the "Fourth Budget") covering the period from the week ending May 21, 2011 through the week ending July 2, 2011, with the Bank and the Official Committee of Unsecured Creditors (the "Committee"). After a meeting with the Bank and its counsel, the Debtors also provided the Bank with evidence of encouraging support from the Debtor's customers, including additional orders which the Debtors anticipated receiving. While the Bank evaluated the information provided by the Debtors and a term sheet presented outlining a proposed reorganization plan, the Debtors entered into two stipulations with the Bank extending the Debtors' authority to use Cash Collateral,

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

1

1  first from May 14, 2011 through May 31, 2011, and then from that date through July 2,

2  2011.

3       These negotiations continue.  Moreover, concurrently with the filing of this Motion,

4  the Debtors filed their Joint Chapter 11 Plan Of Reorganization Of P&C Poultry Distributors,

5  Inc. And Custom Processors, Inc. (the "Proposed Plan") and their Joint Disclosure Statement

6  Describing (the "Disclosure Statement").  The Debtors are optimistic that the Proposed Plan

7  can be confirmed, to the benefit of all creditors herein.

8       Accordingly, in order to avoid unwanted, potentially fatal interruptions in the

9  Debtors' operations, the Debtors bring this Motion seeking an order authorizing them to

10  continue to use Cash Collateral.  The Debtors intend to operate under the Fifth Budget,

11  attached as <u>Exhibit "1"</u> to the accompanying Declaration of Bruce Weinstein (the "Weinstein

12  Declaration"), for the period from July 3, 2011 through October 1, 2011.  The Debtors

13  anticipate that they will be in a position to confirm the Proposed Plan by September 30,

14  2011, or shortly thereafter.

### II.

### <u>BACKGROUND FACTS</u>

**A.**    **<u>Company Overview.</u>**

18       The Debtors are a "further processor" of chicken meats (*i.e.*, chicken meats that have

19  been cut, de-boned, marinated, battered, breaded, partially fried or "par-fried," frozen, or

20  otherwise prepared for cooking by restaurants and other food service establishments), and

21  distributor of processed poultry products operating out of a U.S.D.A.-certified facility located

22  in City of Industry, California.  The Company produces value-added frozen and fresh poultry

23  products for re-sale to major fast food restaurant chains and casual dining services, including

24  CKE Restaurants, Inc. (Carl's Jr., Hardee's), Yum! Brands, Inc. (KFC), Pickup Stix, T.G.I.

25  Friday's and Popeye's Chicken & Biscuits.  The Company is a well-regarded, top-tier food

26  supplier with annual sales topping $48 million in 2010.  Weinstein Decl.,¶ 5.

27  //

28  //

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

2

B.    **Status of the Bankruptcy Cases.**

The Debtors commenced their chapter 11 cases on August 27, 2010 (the "Petition Date") by filing voluntary petitions (the "Petitions")[1] under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Weinstein Decl., ¶ 6.  Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors continue to operate their business and manage their properties as debtors-in-possession.  The meeting of creditors pursuant to section 341(a) of the Bankruptcy Code was held on October 18, 2010.  On November 24, 2010 the United States Trustee ("UST") appointed the Committee, which has retained counsel and which has been active in the case.  Weinstein Decl., ¶ 7.

On December 21, 2010, the Court entered an order extending the Debtors' exclusive periods such that the period during which only the Debtors may file a plan of reorganization will run through and including April 25, 2011, and the period during which only the Debtors may solicit acceptances of a plan will run through and including June 24, 2011.  After a hearing held on April 20, 2011, the Court approved further extensions of the exclusive periods through and including August 23, 2011 and October 24, 2011, respectively.  Weinstein Decl., ¶ 8.

As further described below, by orders entered on October 4, 2010, November 29, 2010, January 28, 2011 and February 11, 2011, the Court authorized the Debtors' use of cash collateral.  The Debtors' authority to use Cash Collateral was further extended through two stipulations they entered into with the Bank, which stipulations were approved by the Court by orders entered on May 13, 2011 and June 6, 2011, respectively.  The Debtors have timely filed their all Monthly Operating Reports, and thus are current on their administrative duties as debtors and debtors-in-possession herein.  Weinstein Decl., ¶ 9.

On December 21, 2010, the Court entered also its order authorizing the employment of Mosaic Capital LLC ("Mosaic") as investment bankers for the Debtors.  Mosaic's efforts are further described in subsection E, below.

---

[1]  An order granting joint administration of the P&C and Custom bankruptcy cases, under P&C's bankruptcy case number, was entered on September 1, 2010 [Docket No. 16 in the P&C case].

3

**FURTHER MOTION FOR ORDER AUTHORIZING CONTINUED USE OF CASH COLLATERAL**

8313.001  923117.7

C.    **The Debtors' Operations to Date.**

    1.    Proceedings on and the Authorization to Use Cash Collateral.

There have already been numerous proceedings on Cash Collateral in these cases, including two contested hearings.   A summary of the Cash Collateral proceedings is as follows:

On the Petition Date, the Debtors filed their Notice of Motion and Emergency Motion for Order Authorizing Debtors in Possession to Use Cash Collateral (the "Initial Motion") which the Bank opposed. On September 1, 2010, the Bankruptcy Court held an emergency hearing on the Initial Motion at which the Court granted the Debtors interim use of cash collateral pursuant to its Order Granting Debtors' Motion For Order Authorizing Use Of Cash Collateral (the "Interim Order").   On September 16, 2010, the Court held a final hearing on Debtors' use of cash collateral, and it granted the relief requested over the opposition of the Bank.  Subsequently, on October 4, 2010, the Court entered its Final Order Granting Debtors' Motion For Order Authorizing Use Of Cash Collateral (the "Final Order").  A copy of the Final Order is also attached as Exhibit "2" to the Weinstein Declaration.  Weinstein Decl., ¶ 10.

On October 27, 2010, the Debtors filed their Motion For Order Authorizing Continued Use of Cash Collateral (the "Second Cash Collateral Motion") for the period through the week ending February 11, 2011.  After a hearing on November 17, 2010, the Court approved the Debtors authority to operate under the terms of the new budget, but only through January 19, 2011, in accordance with the Court's Order Authorizing Continued Use Of Cash Collateral (the "November Order"), entered November 29, 2010.  A copy of the November Order is attached as Exhibit "3" to the Weinstein Declaration.  At a continued hearing on the Second Cash Collateral Motion on January 19, 2011, the Court extended the Debtors' authority to operate under the New Budget through February 11, 2011.  Weinstein Decl., ¶ 11.

On January 24, 2011, the Debtors filed their Further Motion For Order Authorizing Continued Use Of Cash Collateral (the "Third Cash Collateral Motion").  By the Third Cash

RUTTER
HOBBS
DAVIDOFF
INCORPORATED
L A W Y E R S

4

FURTHER MOTION FOR ORDER AUTHORIZING CONTINUED USE OF CASH COLLATERAL
8313.001   923117.7

1   Collateral Motion, the Debtors sought authority to continue to operate in accordance with a

2   new 13-week budget (the "Third Budget"), for the period through the week ending May 13,

3   2011.  After the hearing on the Third Cash Collateral Motion on February 9, 2011, the Court

4   entered its order (the "February Order") on February 11, 2011 extending the Debtors'

5   authority to use cash collateral through May 13, 2011 under the terms of the Third Budget.

6   Weinstein Decl., ¶ 12.

7         The February Order also set forth a timeline in accordance of which certain events in

8   connection with a sale and/or confirmation of a chapter 11 plan must take place.  As a

9   result of the abrupt withdrawal of Balmoral as a potential buyer, the Debtors were not able

10  to meet these deadlines.  Weinstein Decl., ¶ 20.  A copy of the February Order is attached as

11  Exhibit "4" to the Weinstein Declaration.

12        In light of the developments with Balmoral, representatives of the Debtors, the Bank

13  and the Committee conferred extensively regarding how to proceed.  In this regard, the

14  Debtors expressed confidence that in light of their restructuring efforts and their experience

15  with the sale process, the confirmation of a reorganizing plan by the Debtors would lead to

16  the highest and best outcome for all constituencies in these cases.  Weinstein Decl., ¶ 21.

17  Because both the Bank and the Committee wished additional time to study this proposed

18  alternative, and the Debtors' contentions with respect to it, and with respect to the latter

19  part of the period the Debtors having provided a new proposed budget (the "Fourth

20  Budget"), the parties entered into two stipulations continuing the Debtors' authority to use

21  cash collateral through July 2, 2011.  Each of the stipulations was subsequently approved by

22  the Court.  A copy of the Court's Order Approving Stipulation Authorizing Use Of Cash

23  Collateral Through And Including May 31, 2011, dated May 13, 2011, is attached as Exhibit

24  "5" to the Weinstein Declaration.  A copy of the Court's Order Granting Motion for Order

25  Approving Stipulation By And Between Debtors And Debtors-In-Possession P&C Poultry

26  Distributors, Inc. And Custom Processors, Inc. And East West Bank dated June 6, 2011, is

27  attached as Exhibit "6" to the Weinstein Declaration.

28  //

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

5
FURTHER MOTION FOR ORDER AUTHORIZING CONTINUED USE OF CASH COLLATERAL
8313.001  923117.7

2. The Debtors' Continued Performance.

The Debtors operated strongly in the latter part of the fall, 2010 and the November operating reports showed a significant profit, even after reorganization expenses. The Debtors' December operations resulted in a loss when all items are taken in into account, but the Debtors were still cash-flow positive. During the period covered by the Third Budget (from the week ending February 18, 2011 through May 13, 2011), the Debtors experienced some reduction in the total amount of their sales as the on-going result of weather-related sales reductions experienced by their customer's restaurants.

D. The Fifth Budget.

The Fifth Budget, attached as Exhibit "1" to the Weinstein Declaration, shows that the Debtors can maintain the value of their estates while they seek to confirm their Proposed Plan and exit their chapter 11 cases. Among other things, the Fifth Budget reflects the benefits in significant reductions in costs which the Debtors have been able to achieve during the spring. The Fifth Budget also reflects the impact of several new customer programs which are starting either presently or as the Fifth Budget period begins. It is notable that the overhead reductions and efficiencies now realized allow the Debtors to operate at a "breakeven" point well below the level on the Petition Date. This is significant for two reasons. First, it means that sales can be lower than the fall of 2010 but allow the Debtors to operate profitably. Second, it means that as new customer programs are added, the Debtors' operations should create the cash which will allow for confirmation and consummation of a chapter 11 plan. Weinstein Decl., ¶ 16.

Under the current circumstances, the need for approval of the Debtors' use of the Cash Collateral is clear and compelling. As a matter of business judgment, the Debtors believe that continued use of the Cash Collateral is in the best interests of their respective estates and creditors. First and foremost, the use of the Cash Collateral will fund necessary and ordinary operating expenses critical to preserving ongoing operations and, thus, the Debtors' ability to confirm the Proposed Plan. Furthermore, the right to continued use of the Cash Collateral will allow the Debtors to continue to operate their business in the

RUTTER
HOBBS
DAVIDOFF
INCORPORATED
L A W Y E R S

6

1   ordinary course of business during the projected remaining term of these chapter 11 cases.

2   Weinstein Decl., ¶ 17.

3       **E.    Mosaic and Debtors' Efforts Re Potential Sale of Assets.**

4           For approximately three months after its retention in December 2010, Mosaic

5   engaged in extensive and intensive marketing for the Debtor's assets.  Mosaic identified and

6   contacted 68 parties which indicated an interest in purchasing the Debtors' assets, and more

7   than 40 serious potential buyers signed non-disclosure agreements and were provided with

8   due diligence information on the Company.  At the same time, Mosaic also targeted specific

9   firms and investors that it knew might have a special interest in the Debtors' business.  As a

10  result of this intensive and exhaustive marketing effort, Mosaic identified Balmoral as a

11  potential buyer/stalking horse bidder for the Debtors' assets.  The Debtors are confident that

12  through their extensive marketing efforts, they reached all potential buyer/investor contacts.

13  Weinstein Decl., ¶ 19.

14          On or about March 10, 2011, the Debtors and Balmoral, subject to Court approval,

15  entered into a letter of intent agreement relating to a potential transaction.  Balmoral then

16  began its due diligence on the assets and liabilities of the Company.  However, after

17  conducting diligence, and prior to the hearing on the approval of the letter of intent,

18  Balmoral determined that it would not further pursue a transaction with the Debtors.  On or

19  about April 25, 2011, Balmoral formally notified the Debtors that it was not longer pursuing

20  a transaction.  As a result, there have been no further dealings with Balmoral.  Weinstein

21  Decl., ¶ 20.

22      **F.    The Debtors' Negotiations Toward a Consensual Plan of Reorganization.**

23          Shortly after Balmoral withdrew from pursuing a transaction with the Debtors, the

24  Debtors commenced discussions with the Bank and with the Committee in an effort to arrive

25  at a consensual plan of organization.  On April 28, 2011, the Debtors met with the Bank

26  representatives and proposed the outline terms of a plan of reorganization, based partly on

27  operational and business improvements the Debtors put in place during after the sale

28  process.  As outlined to the Bank and the Committee, the proposed plan contemplates that

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

7

1  the Debtors will continue the overhaul of their operations and garner new, additional

2  business coming in beginning in or about July, 2011.  These improvements and increase in

3  business create operations sufficient to pay the Bank in full over time and pay approximately

4  10% to unsecured creditors on a pro rata basis.

5       The Debtors have provided additional information to the Bank, as requested by the

6  Bank, regarding the operational improvements.  The Debtors also circulated both a draft

7  term sheet and a draft chapter 11 plan and disclosure statement to the Bank and the

8  Committee.  The Bank and the Committee continue to review the draft documents.

9  Weinstein Decl., ¶ 22.

10      Meanwhile, as noted above, on June 20, 2011, concurrently with the filing of this

11  motion, the Debtors filed their Joint Chapter 11 Plan Of Reorganization Of P&C Poultry

12  Distributors, Inc. And Custom Processors, Inc. (the "Proposed Plan") and their Joint

13  Disclosure Statement Describing (the "Disclosure Statement").  The Proposed Plan and the

14  Disclosure Statement are largely consistent with the drafts circulated to the Bank and the

15  Committee.  A hearing on approval of the Disclosure Statement is anticipated to occur on

16  August 24, 2011 at 9:30 a.m.

### III.

### THE USE OF CASH COLLATERAL FOR OPERATIONS SHOULD

### BE AUTHORIZED IN ACCORDANCE WITH THE FIFTH BUDGET

A.    **The Legal Standard.**

A debtor-in-possession's use of property of the estate is governed by section 363 of

the Bankruptcy Code.  Section 363(c)(1) provides, in pertinent part, that:

> If the business of the debtor is authorized to be operated under
> section . . . 1108 . . . of this title and unless the court orders
> otherwise, the trustee [or debtor-in-possession] may enter into
> transactions, including the sale or lease of property of the estate,
> in the ordinary course of business, without notice or hearing,
> and may use property of the estate in the ordinary course of
> business without notice or hearing.

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

FURTHER MOTION FOR ORDER AUTHORIZING CONTINUED USE OF CASH COLLATERAL

8313.001  923117.7

The Bankruptcy Code establishes a special requirement, however, regarding a debtor-in-possession's use of "cash collateral," defined as:

> . . . cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest  and includes the proceeds, products, offspring, rents, or profits of property. . .

11 U.S.C. § 363(a).

In this case, at least some of the proceeds of the Company's operations constitute "cash collateral," as that term is defined in the Bankruptcy Code, because the Bank holds security interests in all of the Company's assets, including cash receipts generated by selling its products.

Section 363(c)(2) permits a debtor-in-possession to use, sell or lease "cash collateral" under subsection (c)(1) only if either of two alternative circumstances exists:

> (A)    each entity that has an interest in such cash collateral consents; or
> (B)    the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

If the secured creditor does not consent to the use of its cash collateral, the court may authorize a debtor-in-possession to use the cash collateral even over the creditor's objection under section 363(c)(2)(B) if the court determines that the creditor is "adequately protected."  11 U.S.C. §§ 361, 363(c), (e).

Section 361 of the Bankruptcy Code provides that:

> [W]hen adequate protection is required . . . of an interest of an entity in property, such adequate protection may be provided by —
>     (1)    requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the . . . use . . . under section 363 of this title . . . results in a decrease in the value of such entity's interest in such properly;
>     (2)    providing to such entity an additional or replacement lien to the extent that such . . . use . . . results in a decrease in the value of such entity's interest in such property; or

RUTTER
HOBBS
DAVIDOFF
INCORPORATED
L A W Y E R S

9

> (3)    granting such other relief . . . as will result in the realization by such entity of the indubitable equivalent in such entity's interest in such property.

11 U.S.C. § 361.

Neither section 361 nor any other provision of the Bankruptcy Code defines the nature and extent of the "interest in property" of which a secured creditor is entitled to adequate protection under section 361.  However, the statute plainly provides that a qualifying interest demands protection only to the extent that the use of the creditor's collateral will result in a decrease in "the value of such entity's interest in such property." 11 U.S.C. § 361.  *See also Gen. Elec. Mortgage Corp. v. S. Vill. Inc. (In re S. Vill., Inc.)*, 25 B.R. 987, 989-90 & n.4 (Bankr. D. Utah 1982); O'Toole, *Adequate Protection and Post-Petition Interest in Chapter 11 Proceedings*, 56 Am. Bankr. L.J. 251, 263 (1982).

The phrase "value of such entity's interest," although not defined in the Bankruptcy Code, was addressed by the Supreme Court in the landmark decision, *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assoc. Ltd.*, 484 U.S. 365, 108 S.Ct. 626 (1988).  For the meaning of "value of such entity's interest," the Supreme Court was guided by section 506(a), which defines a creditor's allowed secured claim:

> The phrase "value of such creditor's interest" in §506(a) means "the value of the collateral."  H.R. Rep. No. 950-595, pp. 181, 356 (1977); *see also* S. Rep. No. 95-989, p. 68 (1978), U.S. Code Cong. & Admin. News, 1978 pp. 5787, 5854, 6141, 6312.  We think the phrase "value of such entity's interest" in §361(1) and (2), when applied to secured creditors, means the same.

*Id.* at 630.

*Timbers* demonstrates that a secured creditor is entitled to "adequate protection" only against diminution in the value of the collateral securing the creditor's allowed secured claim. Under *Timbers*, therefore, where the "value of the collateral" is not diminishing by its use, sale, or lease, the creditor's interest is adequately protected.  This conclusion flows directly from the equivalency of "value of such entity's interests" with "value of the collateral."

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

8313.001  923117.7

FURTHER MOTION FOR ORDER AUTHORIZING CONTINUED USE OF CASH COLLATERAL

1    The entitlement to and measure of the protection required is therefore determined by

2    the extent of the anticipated or actual decrease, if any, in the value of the secured creditor's

3    collateral during the course of the bankruptcy case.  *See In re First S. Sav. Ass'n*, 820 F.2d

4    700, 710 (5th Cir. 1987); *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984).  Said another

5    way, it is "intended by the Bankruptcy Code only to assure that a secured creditor, during

6    the pendency of a bankruptcy case, does not suffer a loss in the value of its interest in

7    property of the bankruptcy estate." *In re Markos Gurnee Partnership*, 252 B.R. 712, 716

8    (Bankr. N.D. Ill. 1997); *In re McCombs Properties VI, Ltd.*, 88 B.R. 261 (Bankr. C.D. Cal.

9    1988).

10    **B.    The Bank Will Remain Adequately Protected During the New Budget**

11    **Period.**

12        1.    The Fifth Budget Is Feasible.

13    As noted above, the Fifth Budget takes into account an expected additional volume of

14    business evidenced by written commitments for orders from the Debtor's customers and the

15    operational efficiencies and costs reductions realized through the Debtors' restructuring and

16    the efforts of the Debtors' management.  As set forth in the Fifth Budget, sales are estimated

17    to average between $625,000 and $675,000 per week.  However, over time this is enough to

18    allow the Debtors to operate on a positive basis in terms of the use of cash.  Moreover, the

19    amount of the Debtors' accounts receivable are forecast to grow over the period of the Fifth

20    Budget, protecting the Bank's position and benefiting all creditors herein.  Weinstein Decl.,

21    ¶ 23, Exh. "1".

22        2.    The Bank Will Remain Adequately Protected.

23    The main purpose of the Fifth Budget is to give the Debtors time to confirm the

24    Proposed Plan and emerge from Bankruptcy Court protection.  Indeed, as noted above, a

25    large part of this process should be completed by the end of the third quarter of 2011,

26    during the period covered by the Fifth Budget.  During this period, the Debtors' continued

27    use of the Cash Collateral will allow the Debtors to continue the normal operations of their

28    business, and maintain, preserve, and enhance their business and thus the value of the

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

11

8313.001   923117.7

collateral base in which the Bank claims an interest.  Moreover, the Debtors' continued use of the Cash Collateral will provide the funds needed by the Debtors for the confirmation of the Proposed Plan, and, ultimately, an exit from chapter 11 once the Proposed Plan is confirmed.

This point is critical because the Debtor's continued use of the Cash Collateral is essential to the Debtors' successful reorganization.  If the Debtors were prohibited from using the Cash Collateral in aid of their Proposed Plan, they would be forced to totally cease their operations, and there would be no prospect for reorganization and no recovery for unsecured creditors.  Under such circumstances, the proceeds yielded would only be a small fraction of what the Debtors could accomplish by continuing operations and reorganizing their financial affairs.  In contrast, maintenance of the Debtors' ongoing operations will preserve the value of the Bank's interests, thus providing adequate protection to the Bank.

Under the Fifth Budget, the Bank's collateral base, in the form of accounts receivable and inventory, is expected to increase.  In addition, however, and as set forth in the Initial Motion and as supported by the evidence in the Declarations of Michael Bennish and Bruce Weinstein in Support of First Day Motions, the Bank will also remain adequately protected by its liens in the Debtors' equipment (book value of $5.6 million), the equity in the Los Angeles Facility (as that term has been used) above the existing mortgage obligation (at least $1.1 million), and the overall enterprise value of the Debtors.  *See generally* Declaration of Bruce Weinstein in Support of First Day Motions [Docket No. 6] and Declaration of Michael Bennish in Support of First Day Motions [Docket No. 7].[2]

Also significant to the Bank's collateral position, as discussed in the Debtors' previous motions for authority to use cash collateral, is that the Bank has not only guarantees, but also pledges of the substantial equity in the personal residences of both Howard Bennish and Stafford Bennish, two of the four shareholders of P&C.  Collectively, this equity is

---

[2]  To the extent required, the Debtors request that the Court take judicial notice pursuant to Rule 201 of the Federal Rules of Evidence of the Declarations of Michael Bennish and Bruce Weinstein in Support of First Day Motions.

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

FURTHER MOTION FOR ORDER AUTHORIZING CONTINUED USE OF CASH COLLATERAL
8313.001  923117.7

1   believed to be close to $1 million or more.  Weinstein Decl., ¶ 27.  Accordingly, it is clear

2   that the Bank remains adequately protected, even if there has been a reduction in the

3   amount of Debtors' accounts receivable and inventory.[3]

4       It is true that during the last few months, as the Debtors have scaled their operations

5   to what they believe is a sustainable level of future orders, the outstanding amount of

6   accounts receivable have fallen, decreasing the collateral base.  Weinstein Decl.,

7   ¶ 28.  However, the Debtors still contend that the Bank is adequately protected by an overall

8   equity cushion and will remain so during the period of the Fifth Budget.

9       Also, and as further adequate protection for post-petition decrease in the value of the

10  Bank's pre-petition collateral, if any (and as set forth in the Final Order), the Debtors agree

11  to grant the Bank a lien and security interest (the "Replacement Lien") against the Debtors'

12  post-petition assets as well as the proceeds and products thereof; provided, however, that

13  the Replacement Lien shall only be valid and enforceable to the same extent, against the

14  same type of property and in same priority as the security interests and liens that the

15  Bank enjoyed immediately prior to the Petition Date.  The Replacement Lien shall be

16  recognized only to the extent of the post-petition diminution in value of the Bank's pre-

17  petition collateral resulting from the Company's use of Cash Collateral during these chapter

18  11 cases.  The foregoing notwithstanding, the Replacement Lien shall not attach to claims,

19  rights and causes of action arising under chapter 5 of the Bankruptcy Code.

20      In addition, consistent with the February Order, the Debtors will continue providing

21  periodic cash collateral usage reports and monthly reports to the Bank, under such terms as

22  mutually agreed upon by the Debtors and the Bank.  To date, the Debtors have provided all

23  of the requested information to the Bank in a timely manner.  Weinstein Decl., ¶ 29.

24

25  [3]  Supplemental information establishing the value provided by the liens against the residences can be
    provided if necessary.  To the extent required, the Debtors can further discuss at least one other element of the
26  Bank's adequate protection.  The Bank receives over $26,000 every month via the Debtors, although the
    payment is on account of the Bank's separate mortgage on the Los Angeles Facility (owned by non-debtor
27  affiliate Sotello Properties, LLC and leased to P&C).  Because the mortgage on the Los Angeles Facility is
    admittedly over-secured, these lease payments are, in a very real sense, "adequate protection" payments to the
28  Bank on the affiliates overall debt.

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

**FURTHER MOTION FOR ORDER AUTHORIZING CONTINUED USE OF CASH COLLATERAL**
8313.001   923117.7

**C.**    **Information Required by Local Bankruptcy Rule 4001-2.**

The proposed form of order or relief sought in this Motion does not contain any

provision that:

(1)    Grants cross-collateralization protection, other than a replacement lien or

other adequate protection, to the prepetition secured creditors;

(2)    Binds the estate or all parties in interest with respect to the validity,

perfection, or amount of the secured creditor's prepetition lien or debt or the waiver of

claims against the secured creditor;

(3)    Waives or limits the estate's rights under 11 U.S.C. § 506(c);

(4)    Grants to the prepetition secured creditor liens on the debtor's claims and

causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548, or 549;

(5)    Deems prepetition secured debt to be post-petition debt or that use post-

petition loans from a prepetition secured creditor to pay part or all of that secured creditor's

prepetition debt, other than as provided in 11 U.S.C. § 552(b);

(6)    Provides disparate treatment for the professionals retained by a creditors'

committee from that provided for the professionals retained by the debtor with respect to a

professional fee carve out; or

(7)    Primes any secured lien.

**IV.**

**CONCLUSION**

Based on the foregoing, the Company respectfully requests an order of the Court:

(A)    Authorizing the Debtors to use Cash Collateral in accordance with the Fifth

Budget attached as Exhibit "1" to the Weinstein Declaration;

(B)    Authorizing the Debtors to exceed any line item in the Fifth Budget by twenty

percent (20%);

(C)    Finding that the interest of the Bank in the Cash Collateral is adequately

protected by (i) the value of the Debtors' assets; (ii) the equity in the Debtors' business and

other collateral, which exists in excess of the amount owing to the Bank; (iii) the provision

14

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

1    of the Replacement Lien to the Bank; and (iv) the provision of periodic reports to the Bank;

2    and

3            (D)      Such other and further relief as the Court deems just and proper.

4

5                                      Respectfully submitted,

6    DATED:    June 20, 2011            RUTTER HOBBS & DAVIDOFF

7                                         INCORPORATED

8                            By      */s/ C. John M. Melissinos*

9                                  BRIAN L. DAVIDOFF
                                 C. JOHN M. MELISSINOS

10                                 CLAIRE E. SHIN
                                General Reorganization Attorneys for

11                                 Debtors and Debtors-in-Possession

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RUTTER
HOBBS ■
DAVIDOFF
INCORPORATED
L A W Y E R S

FURTHER MOTION FOR ORDER AUTHORIZING CONTINUED USE OF CASH COLLATERAL

8313.001   923117.7

1

### DECLARATION OF BRUCE WEINSTEIN

2      I, Bruce Weinstein, declare:

3      1.      I am Chief Restructuring Officer ("CRO") of both P&C Poultry Distributors, Inc.

4  ("P&C") and Custom Processors, Inc. ("Custom"), debtors and debtors-in-possession in the

5  above referenced chapter 11 cases (collectively the "Debtors" or the "Company").  In the

6  second quarter of 2010, my consulting firm BDW and Company, Inc. ("BDW") and I were

7  engaged by P&C to assist with management of the Company's financial affairs.  In August

8  2010, I was employed by the Company as CRO.  As CRO, I am overseeing the financial

9  affairs and cash flow management of the Company, and responsible for analyzing and

10  directing the Company's finances, negotiating with the Company's lenders and investors

11  concerning financing issues, and managing and controlling the Company's cash assets.  I

12  also review and approve material expenditures based upon the existing cash flow and

13  budgeted cash flow.  In this capacity, I am familiar with the books and records and financial

14  affairs of the Company.

15      2.      I have been a corporate turnaround consultant for over 17 years.  Additionally,

16  I have worked as a chief financial officer for companies, and as a senior credit officer at

17  asset-based lenders and national banks.  I am President of BDW, a consulting firm that

18  provides financial advisory services to business entities to help them enhance their long-term

19  growth.  I, through BDW, have worked with many companies in transition, including

20  companies experiencing financial distress, undercapitalized growth companies, or

21  companies pursuing strategic industry partnerships, with their goal-setting, creation of

22  action plans and effective implementation of plans.  I have worked with companies in a

23  variety of industries, including but not limited to, aerospace, agriculture, apparel,

24  construction, defense/military, distribution, engineering, food processing, entertainment,

25  and trucking industries.

26      3.      I submit this declaration (the "Declaration") in support of the Debtors' Motion

27  By Debtors And Debtors-In-Possession P&C Poultry Distributors, Inc. And Custom Processors,

28  Inc. For Order Authorizing Continued Use Of Cash Collateral (the "Motion").  Attached as

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

16

FURTHER MOTION FOR ORDER AUTHORIZING CONTINUED USE OF CASH COLLATERAL
8313.001   923117.7

1  Exhibit "1" hereto and incorporated herein by this reference is a true and correct copy of the

2  new budget (the "Fifth Budget") under which the Debtors intend to operate for the period

3  from July 3, 2011 through October 1, 2011.

4        4.    Except as otherwise indicated, all facts set forth in this Declaration are based

5  upon my personal knowledge, or I have gained such knowledge from the business records of

6  the Company which were made at or near the time of the acts, conditions or events to which

7  they relate.  Any such document or record was prepared in the ordinary course of business

8  by a person who had personal knowledge of the event being recorded and had a duty to

9  accurately record such event.  If I were called to testify, I would testify competently to the

10 facts set forth in this Declaration.  I am authorized to submit this declaration on behalf of

11 the Company.

12       5.    The Debtors are a "further processor" of chicken meats (*i.e.*, chicken meats

13 that have been cut, de-boned, marinated, battered, breaded, partially fried or "par-fried,"

14 frozen, or otherwise prepared for cooking by restaurants and other food service

15 establishments), and distributor of processed poultry products operating out of a U.S.D.A.-

16 certified facility located in City of Industry, California.  The Company produces value-added

17 frozen and fresh poultry products for re-sale to major fast food restaurant chains and casual

18 dining services, including CKE Restaurants, Inc. (Carl's Jr., Hardee's), Yum! Brands, Inc.

19 (KFC), Pickup Stix, T.G.I. Friday's and Popeye's Chicken & Biscuits.  The Company is a well-

20 regarded, top-tier food supplier with annual sales topping $48 million in 2010.

21       6.    The Debtors commenced their chapter 11 cases on August 27, 2010 (the

22 "Petition Date") by filing voluntary petitions (the "Petitions") under chapter 11 of title 11 of

23 the United States Code (the "Bankruptcy Code").  An order granting joint administration of

24 the P&C and Custom bankruptcy cases, under P&C's bankruptcy case number, was entered

25 on September 1, 2010 [Docket No. 16 in the P&C case].

26       7.    Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors

27 continue to operate their business and manage their properties as debtors-in-possession.

28 The meeting of creditors pursuant to section 341(a) of the Bankruptcy Code was held on

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

17

1    October 18, 2010.  On November 24, 2010 the United States Trustee ("UST") appointed the

2    Official Committee of Unsecured Creditors (the "Committee"), which has retained counsel

3    and which has been active in the case.

4         8.    On December 21, 2010, the Court entered an order extending the Debtors'

5    exclusive periods such that the period during which only the Debtors may file a plan of

6    reorganization will run through and including April 25, 2011, and the period during which

7    only the Debtors may solicit acceptances of a plan will run through and including June 24,

8    2011.  After a hearing held on April 20, 2011, the Court approved further extensions of the

9    exclusive periods through and including August 23, 2011 and October 24, 2011,

10   respectively.

11        9.    As further described below, by orders entered on October 4, 2010, November

12   29, 2010, January 28, 2011 and February 11, 2011, the Court authorized the Debtors' use of

13   cash collateral.  The Debtors' authority to use cash collateral (the "Cash Collateral") of East

14   West Bank (the "Bank") was further extended through two stipulations the Debtors entered

15   into with the Bank, which stipulations were approved by the Court by orders entered on

16   May 13, 2011 and June 6, 2011, respectively.  The Debtors have timely filed their all

17   Monthly Operating Reports, and thus are current on their administrative duties as debtors

18   and debtors-in-possession herein.

19        10.   On the Petition Date, the Debtors filed their Notice of Motion and Emergency

20   Motion for Order Authorizing Debtors in Possession to Use Cash Collateral (the "Initial

21   Motion") which the Bank opposed. On September 1, 2010, the Bankruptcy Court held an

22   emergency hearing on the Initial Motion at which the Court granted the Debtors interim use

23   of cash collateral pursuant to its Order Granting Debtors' Motion For Order Authorizing Use

24   Of Cash Collateral (the "Interim Order").  On September 16, 2010, the Court held a final

25   hearing on Debtors' use of cash collateral, and it granted the relief requested over the

26   opposition of the Bank.  Subsequently, on October 4, 2010, the Court entered its Final Order

27   Granting Debtors' Motion For Order Authorizing Use Of Cash Collateral (the "Final Order").

RUTTER
HOBBS
DAVIDOFF
INCORPORATED
L A W Y E R S

28

**FURTHER MOTION FOR ORDER AUTHORIZING CONTINUED USE OF CASH COLLATERAL**
8313.001  923117.7

1    Attached as <u>Exhibit "2"</u> hereto and incorporated herein by this reference is a true and correct

2    copy of the Final Order.

3        11.    On October 27, 2010, the Debtors filed their Motion For Order Authorizing

4    Continued Use of Cash Collateral (the "Second Cash Collateral Motion") for the period

5    through the week ending February 11, 2011.  After a hearing on November 17, 2010, the

6    Court approved the Debtors authority to operate under the terms of the new budget, but

7    only through January 19, 2011, in accordance with the Court's Order Authorizing Continued

8    Use Of Cash Collateral (the "November Order"), entered November 29, 2010.  Attached as

9    <u>Exhibit "3"</u> hereto and incorporated herein by this reference is a true and correct copy of the

10   November Order.  At a continued hearing on the Second Cash Collateral Motion on January

11   19, 2011, the Court extended the Debtors' authority to operate under the New Budget

12   through February 11, 2011.

13       12.    On January 24, 2011, the Debtors filed their Further Motion For Order

14   Authorizing Continued Use Of Cash Collateral (the "Third Cash Collateral Motion").  By the

15   Third Cash Collateral Motion, the Debtors sought authority to continue to operate in

16   accordance with a new 13-week budget (the "Third Budget"), for the period through the

17   week ending May 13, 2011.  After the hearing on the Third Cash Collateral Motion on

18   February 9, 2011, the Court entered its order (the "February Order") on February 11, 2011

19   extending the Debtors' authority to use cash collateral through May 13, 2011 under the

20   terms of the Third Budget.

21       13.    The February Order also set forth a timeline in accordance of which certain

22   events in connection with a sale and/or confirmation of a chapter 11 plan must take place.

23   Attached as <u>Exhibit "4"</u> hereto and incorporated herein by this reference is a true and correct

24   copy of the February Order.

25       14.    Attached as <u>Exhibit "5"</u> hereto and incorporated herein by this reference is a

26   true and correct copy of the Court's Order Approving Stipulation Authorizing Use Of Cash

27   Collateral Through And Including May 31, 2011, dated May 13, 2011.  Attached as <u>Exhibit</u>

28   <u>"6"</u> hereto and incorporated herein by this reference is a true and correct copy of the Court's

RUTTER
HOBBS
DAVIDOFF
INCORPORATED
L A W Y E R S

19

1    Order Granting Motion for Order Approving Stipulation By And Between Debtors And

2    Debtors-In-Possession P&C Poultry Distributors, Inc. And Custom Processors, Inc. And East

3    West Bank dated June 6, 2011.

4         15.    The Debtors operated strongly in the latter part of the fall, 2010 and the

5    November operating reports showed a significant profit, even after reorganization expenses.

6    The Debtors' December operations resulted in a loss when all items are taken in into account,

7    but the Debtors were still cash-flow positive.  During the period covered by the Third Budget

8    (from the week ending February 18, 2011 through May 13, 2011), the Debtors experienced

9    some reduction in the total amount of their sales as the on-going result of weather-related

10   sales reductions experienced by their customer's restaurants.

11        16.    The Fifth Budget, attached as Exhibit "1" hereto, shows that the Debtors can

12   maintain the value of their estates while they seek to confirm their Proposed Plan and exit

13   their chapter 11 cases.  Among other things, the Fifth Budget reflects the benefits in

14   significant reductions in costs which the Debtors have been able to achieve during the

15   spring.  The Fifth Budget also reflects the impact of several new customer programs which

16   are starting either presently or as the Fifth Budget period begins.  It is notable that the

17   overhead reductions and efficiencies now realized allow the Debtors to operate at a

18   "breakeven" point well below the level on the Petition Date.  This is significant for two

19   reasons.  First, it means that sales can be lower than the fall of 2010 but allow the Debtors

20   to operate profitably.  Second, it means that as new customer programs are added, the

21   Debtors' operations should create the cash which will allow for confirmation and

22   consummation of the Proposed Plan.

23        17.    Concurrently with the filing of this motion, the Debtors filed their Joint

24   Chapter 11 Plan Of Reorganization Of P&C Poultry Distributors, Inc. And Custom

25   Processors, Inc. (the "Proposed Plan") and their Joint Disclosure Statement Describing (the

26   "Disclosure Statement").  Under the current circumstances, the need for approval of the

27   Debtors' use of the Cash Collateral is clear and compelling.   As a matter of business

28   judgment, the Debtors believe that continued use of the Cash Collateral is in the best

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

20

FURTHER MOTION FOR ORDER AUTHORIZING CONTINUED USE OF CASH COLLATERAL
8313.001   923117.7

interests of their respective estates and creditors.  First and foremost, the use of the Cash Collateral will fund necessary and ordinary operating expenses critical to preserving ongoing operations and, thus, the Debtors' ability to confirm the Proposed Plan.  Furthermore, the right to continued use of the Cash Collateral will allow the Debtors to continue to operate their business in the ordinary course of business during the projected remaining term of these chapter 11 cases.

18.    On December 21, 2010, the Court entered also its order authorizing the employment of Mosaic Capital LLC ("Mosaic") as investment bankers for the Debtors.

19.    For approximately three months after its retention in December 2010, Mosaic engaged in extensive and intensive marketing for the Debtor's assets.  Mosaic identified and contacted 68 parties which indicated an interest in purchasing the Debtors' assets, and more than 40 serious potential buyers signed non-disclosure agreements and were provided with due diligence information on the Company.  At the same time, Mosaic also targeted specific firms and investors that it knew might have a special interest in the Debtors' business.  As a result of this intensive and exhaustive marketing effort, Mosaic identified Balmoral Advisors, LLC ("Balmoral") as a potential buyer/stalking horse bidder for the Debtors' assets.  The Debtors are confident that through their extensive marketing efforts, they reached all potential buyer/investor contacts.

20.    On or about March 10, 2011, the Debtors and Balmoral, subject to Court approval, entered into a letter of intent agreement relating to a potential transaction. Balmoral then began its due diligence on the assets and liabilities of the Company. However, after conducting diligence, and prior to the hearing on the approval of the letter of intent, Balmoral determined that it would not further pursue a transaction with the Debtors.  On or about April 25, 2011, Balmoral formally notified the Debtors that it was not longer pursuing a transaction.  As a result, there have been no further dealings with Balmoral.

21.    Shortly after Balmoral withdrew from pursuing a transaction with the Debtors, the Debtors commenced discussions with the Bank and with the Committee in an effort to

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

21

arrive at a consensual plan of organization.  On April 28, 2011, the Debtors met with the Bank representatives and proposed the outline terms of a plan of reorganization, based partly on operational and business improvements the Debtors put in place during after the sale process.  As outlined to the Bank and the Committee, the proposed plan contemplates that the Debtors will continue the overhaul of their operations and garner new, additional business coming in beginning in or about July, 2011.  These improvements and increase in business create operations sufficient to pay the Bank in full over time and pay approximately 10% to unsecured creditors on a pro rata basis.

22.    The Debtors have provided additional information to the Bank, as requested by the Bank, regarding the operational improvements.  The Debtors also circulated both a draft term sheet and a draft chapter 11 plan and disclosure statement to the Bank and the Committee.  The Bank and the Committee continue to review the draft documents.  The Proposed Plan and the Disclosure Statement are largely consistent with the drafts circulated to the Bank and the Committee.  I understand that a hearing on approval of the Disclosure Statement is anticipated to occur on August 24, 2011 at 9:30 a.m.

23.    The Fifth Budget takes into account an expected additional volume of business evidenced by written commitments for orders from the Debtor's customers and the operational efficiencies and costs reductions realized through the Debtors' restructuring and the efforts of the Debtors' management.  As set forth in the Fifth Budget, sales are estimated to average between $625,000 and $675,000 per week.  However, over time this is enough to allow the Debtors to operate on a positive basis in terms of the use of cash.  Moreover, the amount of the Debtors' accounts receivable are forecast to grow over the period of the Fifth Budget, protecting the Bank's position and benefiting all creditors herein.

24.    The main purpose of the Fifth Budget is to give the Debtors time to confirm the Proposed Plan and emerge from Bankruptcy Court protection.  Indeed, as noted above, a large part of this process should be completed by the end of the third quarter of 2011, during the period covered by the Fifth Budget.  During this period, the Debtors' continued use of the Cash Collateral will allow the Debtors to continue the normal operations of their

RUTTER
HOBBS ☒
DAVIDOFF
INCORPORATED
L A W Y E R S

**FURTHER MOTION FOR ORDER AUTHORIZING CONTINUED USE OF CASH COLLATERAL**
8313.001  923117.7

business, and maintain, preserve, and enhance their business and thus the value of the collateral base in which the Bank claims an interest. Moreover, the Debtors' continued use of the Cash Collateral will provide the funds needed by the Debtors for the confirmation of the Proposed Plan, and, ultimately, an exit from chapter 11 once the Proposed Plan is confirmed.

25.    This point is critical because the Debtor's continued use of the Cash Collateral is essential to the Debtors' successful reorganization. If the Debtors were prohibited from using the Cash Collateral in aid of their Proposed Plan and its subsequent consummation, they would be forced to totally cease their operations, and there would be no prospect for reorganization and no recovery for unsecured creditors. Under such circumstances, the proceeds yielded would only be a small fraction of what the Debtors could accomplish by continuing operations and reorganizing their financial affairs. In contrast, maintenance of the Debtors' ongoing operations will preserve the value of the Bank's interests, thus providing adequate protection to the Bank.

26.    Under the Fifth Budget, the Bank's collateral base, in the form of accounts receivable and inventory, is expected to increase. In addition, however, and as set forth in the Initial Motion and as supported by the evidence in the Declarations of Michael Bennish and Bruce Weinstein in Support of First Day Motions, the Bank will also remain adequately protected by its liens in the Debtors' equipment (book value of $5.6 million), the equity in the Los Angeles Facility (as that term has been used) above the existing mortgage obligation (at least $1.1 million), and the overall enterprise value of the Debtors.

27.    Also significant to the Bank's collateral position, as discussed in the Debtors' previous motions for authority to use cash collateral, is that the Bank has not only guarantees, but also pledges of the substantial equity in the personal residences of both Howard Bennish and Stafford Bennish, two of the four shareholders of P&C. Collectively, I understand from broker reports that this equity is believed to be close to $1 million or more. Accordingly, it is clear that the Bank remains adequately protected, even if there has been a reduction in the amount of Debtors' accounts receivable and inventory.

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

23
FURTHER MOTION FOR ORDER AUTHORIZING CONTINUED USE OF CASH COLLATERAL
8313.001    923117.7

28.    It is true that during the last few months, as the Debtors have scaled their operations to what they believe is a sustainable level of future orders, the outstanding amount of accounts receivable have fallen, decreasing the collateral base.  However, the Debtors still contend that the Bank is adequately protected by an overall equity cushion and will remain so during the period of the Fifth Budget.

29.    To date, the Debtors have provided in a timely manner all of the financial reporting under the orders providing for use of cash collateral.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 20th day of June, 2011, at City of Industry, California.

BRUCE WEINSTEIN

FURTHER MOTION FOR ORDER AUTHORIZING CONTINUED USE OF CASH COLLATERAL

RUTTER HOBBS DAVIDOFF
INCORPORATED
LAWYERS

8313.001  923117.7

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:  1901 Avenue of the Stars, Suite 1700, Los Angeles, California 90067

A true and correct copy of the foregoing document described will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below: **NOTICE OF MOTION AND FURTHER MOTION BY DEBTORS AND DEBTORS-IN-POSSESSION P&C POULTRY DISTRIBUTORS, INC. AND CUSTOM PROCESSORS, INC. FOR ORDER AUTHORIZING CONTINUED USE OF CASH COLLATERAL; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF BRUCE WEINSTEIN IN SUPPORT THEREOF** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On June 20, 2011, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

J. Alexandra Rhim:  arhim@buchalter.com
Scott O. Smith:  ssmith@buchalter.com
David Neale:  dln@lnbyb.com
Russell Clementson:  Russell.clementson@usdoj.gov; ustpregion16.la.ecf@usdoj.gov
James Selth:  jim@wsrlaw.net, charles@wsrlaw.net
Sara Chenetz:  chenetz@blankrome.com; chang@blankrome.com
Bernard Kornberg:  bjk@severson.com
Craig A. Loren: aloren@debtacquisitiongroup.com;bschwab@debtacquisitiongroup.com; jsarachek@debtacquisition.com

☐   Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On June 20, 2011, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

VIA OVERNITE EXPRESS
Honorable Peter Carroll
United States Bankruptcy Court
255 East Temple Street
Suite 1534
Los Angeles, California 90012

☒   Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| June 20, 2011 | Nikki Shlosser | /s/ Nikki Shlosser |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

8313.001  923117.7

1   **II.  SERVED BY VIA U.S. MAIL**

2   ATTORNEYS FOR U.S. GROWERS COLD STORAGE
    John Horvath, Esq.
3   Horvath & Weaver, P.C.
    10 S. La Salle, Suite 1400
4   Chicago, Illinois  60603

5   De Lage Landen Financial Services, Inc.
    1111 Old Eagle School Road
6   Wayne, Pennsylvania 19087

7   Crown Credit Company
    403 Washington Street
8   New Bremen, Ohio 45869

9   Raymond Leasing Corp
    Corporate Headquarters
10  P.O. Box 130
    Greene, New York 13778

11

12  Chi-Ming Fan, Trustee of
        the Fan Family Trust
    1102 John Reed Court
13  City of Industry, California 91745

14  VIA U.S. MAIL
    COUNSEL FOR EAST WEST BANK
15  Alexandra Rhim, Esq.
    Buchalter Nemer
16  1000 Wilshire Boulevard, Suite 1500
    Los Angeles, California 90017-2457

17

18  COUNSEL FOR  CREDITORS' COMMITTEE
    Ronald A. Clifford, Esq,
    Blakely & Blakely LLP
19  2 Park Plaza , Suite 400
    Irvine, California 92614

20

21  OUST
    Russell Clementson, Esq.
    Office of the United States Trustee
22  725 South Figueroa Street, 26th Floor
    Los Angeles, California 90071

23

24

25

26

27

28

8313.001   923117.7